# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Paul Hansmeier,

*Debtor.*

BKY No. 15-42460

---

Randall L. Seaver, Trustee,

*Plaintiff,*

v.

Paul Hansmeier and Padraigin Browne,

*Defendants.*

ADV No. 16-04018

TO:   PLAINTIFF RANDALL L. SEAVER, TRUSTEE, BY HIS ATTORNEY, MATTHEW D. SWANSON OF FULLER, SEAVER, SWANSON & KELSCH, P.A., 12400 PORTLAND AVENUE SOUTH, SUITE 132, BURNSVILLE, MINNESOTA 55337.

## DEFENDANT PADRAIGIN BROWN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1.   The undersigned counsel for Defendant Padraigin Browne ("Defendant") moves the Court for summary judgment and gives notice of hearing.

2.   The Court will hold a hearing on this motion at 10:30 a.m. on May 18, 2016 before the Honorable Kathleen H. Sanberg, in Courtroom 8W, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

3.      Any response to this motion must be filed by May 13, 2016 which is five days

before the time set for hearing.  UNLESS A RESPONSE TO THE MOTION IS

TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A

HEARING.

4.      This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This

proceeding is a core proceeding. The petition commencing this Chapter 7 case was

filed on July 13, 2015.  The case is now pending in this court.

5.      This motion arises under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56. This

motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9006-1 and 9013.

The Defendant asks for an order granting her motion for summary judgment and

dismissing the Plaintiff's Complaint.

6.      This motion is based upon the Memorandum of Law in Support of Summary

Judgment and is supported by the Unsworn Declaration of David M. Burns and

attached exhibit (including the Affidavit of Padraigin Browne).

WHEREFORE, the Defendant respectfully requests that the Court grant the

motion, dismiss the Complaint and issue an order for the Plaintiff to pay proceeds from

the sale of the condominium to the Defendant.

<div style="margin-left:40%">

DAVE BURNS LAW OFFICE, LLC

</div>

Dated: April 27, 2016              /e/ David M. Burns
                                   David M. Burns, #337869
                                   475 Grain Exchange North
                                   301 Fourth Avenue South
                                   Minneapolis, MN  55415
                                   (612) 677-8351
                                   *Attorney for Defendant Padraigin Browne*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>Paul Hansmeier,<br><br>*Debtor.* | BKY No. 15-42460 |
| Randall L. Seaver, Trustee,<br><br>*Plaintiff,*<br><br>v.<br><br>Paul Hansmeier and Padraigin Browne,<br><br>*Defendants.* | ADV No. 16-04018 |

### <u>MEMORANDUM OF LAW IN SUPPORT OF BROWNE'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Padraigin Browne ("Browne") respectfully submits this Memorandum of Law in Support of her Motion for Summary Judgment.

### PRELIMINARY STATEMENT

For over a quarter of a year, the Chapter 7 Trustee has possessed Browne's proceeds arising from the sale of her homestead she owned with the debtor. As set forth

below, the Trustee has zero interest in these proceeds. The Trustee has no right to possess

the proceeds and they should be turned over to Browne immediately, with interest.[1]

Further, notwithstanding the Court's sense of urgency regarding Browne's interest

in the property at the hearing on the debtor's motion to sell the homestead, over a quarter

of a year has elapsed and Browne has yet to receive what is due her. At great personal

expense, Browne has been forced to hire an attorney to address the Trustee's significant

delay.

And, although the Trustee has recently turned over *some* of the funds that the

Trustee concedes are owed to Browne, the Trustee is nonetheless continuing to refuse to

turn over approximately $71,000 in funds that the Trustee's complaint for declaratory

relief concedes are owed to Browne—all without the Court's permission.

Fundamental notions of due process and equity support an order from this Court

compelling the Trustee to turn over Browne's proceeds without any further delay. The

Trustee has engaged in excessive delay, mishandled the funds[2] and inappropriately

withheld funds he concedes are owed to Browne.

---

[1] *See* U.S. Department of Justice, Handbook for Chapter 7 Trustees, Page 4-32 (Oct. 1, 2012) ("Generally, estate funds should be maintained in an interest-bearing account."); Page 5-7 ("The trustee may be held personally liable for lost interest.").

[2] On information and belief, the Trustee failed to deposit the funds in an interest-bearing account.

# FACTS

Browne is the non-filing spouse of the debtor Paul Hansmeier.  The debtor filed a

Chapter 13 petition on July 13, 2015.  *See* Chapter 13 Voluntary Petition (Docket No. 1).[3]

The debtor's homestead was a condominium located at 100 3rd Avenue South, Unit

3201, Minneapolis, MN 55401.  See debtor's Schedule A (Docket No. 1). The debtor and

Browne owned the condominium as joint tenants.  Declaration of Padraigin Browne

("Browne Decl."), at ¶ 3.

On the date of the debtor's filing:

- the value of Browne and the debtor's condominium was no greater than $1.1 million;  Browne Decl., Ex. 1, see debtor's Schedule A (Docket 1), and

- the condominium was encumbered by a mortgage held by TCF National Bank in the amount of $597,852.60; see debtor's Schedule A (Docket No. 1); and

- the debtor's interest in the condominium was encumbered by a $71,620.90 judgment lien in favor of creditor Sandipan Chowdhury; *see* Claims Register, Claim #3; and

- Sandipan Chowdhury was a creditor of the debtor and not of Padraigin Browne.  *Id*.

Browne and the debtor sold their homestead in December 2015.  (Complaint at ¶

21.)  The sale price was $1.2 million. (Complaint Ex. B.)  In connection with its order

approving the sale, the Court ordered that the sale proceeds be retained by the Chapter 7

Trustee pending further order of the Court.  See December 3, 2015 Order (Docket No.

57).  Instead, the Trustee filed a complaint for declaratory relief seeking a determination

---

[3] Unless otherwise specified, all docket citations are citations to the docket of Bankruptcy Case 15-42460.

of the proper distribution of the proceeds.  The Court has scheduled the matter for a trial

on August 1, 2016 (eight months after the property sold).  But there is no need for a trial

at great expense to Browne and the bankruptcy estate; the remaining funds should be

turned over to Browne immediately.

## SUMMARY JUDGMENT STANDARD

Summary judgment dismissing a plaintiff's claim is appropriate if the plaintiff

"fails to make a showing sufficient to establish the existence of any element essential to

that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  The court explained

[477 U.S. at 322-323]:

> In such a situation, there can be "no genuine issue as to any
> material fact," since a complete failure of proof concerning an
> essential element of the nonmoving party's case necessarily
> renders all other facts immaterial. The moving party is "entitled
> to a judgment as a matter of law" because the nonmoving party
> has failed to make a sufficient showing on an essential element
> of her case with respect to which she has the burden of proof.
> "[T]h[e] standard [for granting summary judgment] mirrors the
> standard for a directed verdict under Federal Rule of Civil
> Procedure 50(a) . . . ." *Anderson v. Liberty Lobby, Inc.*, ante, at
> 250.
>
> Of course, a party seeking summary judgment always bears the
> initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact. But
> unlike the Court of Appeals, we find no express or implied
> requirement in Rule 56 that the moving party support its
> motion with affidavits or other similar materials negating the
> opponent's claim.

The Eighth Circuit, in *Johnson v. Wheeling Machine Products*, 779 F. 3d 514, 517 (8th

Cir. 2015) reiterated this standard:

> A movant is entitled to summary judgment "if the movant
> shows that there is no genuine dispute as to any material fact
> and the movant is entitled to judgment as a matter of law."
> Fed.R.Civ.P. 56(a). The moving party bears the initial
> responsibility of informing the district court of the basis for its
> motion and identifying those materials, if any, that demonstrate
> an absence of a genuine issue of material fact. *Celotex Corp. v.
> Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265
> (1986). Assuming there has been adequate time for discovery,
> the court must enter summary judgment if the nonmovant then
> "fails to make a showing sufficient to establish the existence of
> an element essential to that party's case, and on which that
> party will bear the burden of proof at trial." *Id*. at 322, 106 S.Ct.
> 2548.

## ARGUMENT

This case concerns what interest a Chapter 7 Trustee has in a non-filing spouse's

homestead equity.  The answer is none.  As the bankruptcy estate is limited to the

property of the debtor, the proper measure of the Trustee's interest in the sale proceeds is

the debtor's non-exempt equity that existed as of July 13, 2015, *i.e.* the date the Chapter

13 petition was filed.

The basic math is straightforward. The value of the debtor's homestead as of July

13, 2015 was no greater than $1.1 million. At that time, the debtor's homestead was

encumbered by a mortgage in favor of TCF National Bank in the amount of $597,853,

leaving $502,147 in equity. Minnesota's statutory exemption is $390,000. Applying the

statutory exemption to the equity leaves a non-exempt equity amount of $112,147. As a

joint tenant, the debtor's share of the non-exempt equity is $56,074. The final step in the

analysis is to reduce the debtor's share of the non-exempt equity by the $71,621

judgment lien in favor of Chowdhury. This application leaves a *negative* balance for the

debtor's non-exempt equity.  As the debtor had no non-exempt equity in the

condominium as of July 13, 2015, nothing falls to the bankruptcy estate and the Trustee

has no interest in the sale proceeds he currently holds.

   I.   **None of the Sale Proceeds are within the Bankruptcy Estate.  The Trustee's Interest in the Sale Proceeds is Equal to the Debtor's Non-Exempt Equity Interest in his Condominium as of July 13, 2016.**

        Section 541(a)(1) of the Bankruptcy Code states the filing of a bankruptcy petition

creates an estate comprised of "all legal or equitable interest of the debtor in property as

of the commencement of the case."  The debtor filed his Chapter 13 petition on July 13,

2015. The case was subsequently converted to Chapter 7 by the Court. Conversion from

Chapter 13 to Chapter 7 does not commence a new bankruptcy case. The existing case

continues along another track, Chapter 7 instead of Chapter 13, without "effecting a

change in the date of the filing of the petition." 11 U.S.C. § 348(a). The estate of a

Chapter 7 case created by conversion is defined by 11 U.S.C § 348(f)(1)(A):

> "[P]roperty of the [Chapter 7] estate in the converted case shall
> consist of property of the estate, as of the date of filing of the
> [initial Chapter 13] petition, that remains in the possession of
> or is under the control of the debtor on the date of conversion."

Any post-petition increases in equity of a debtor's homestead belong to the debtor, not a

Chapter 7 estate created by conversion. *See, e.g., In re Lynch*, 363 B.R. 101, 107 (9th Cir.

2007) ("Excluding equity resulting from debtors' payments on loans secured by their

residence and property appreciation subsequent to their chapter 13 filing in a case

converted to chapter 7 serves the congressional purpose of encouraging chapter 13

reorganizations over chapter 7 liquidations, as reflected in the legislative history.").[4]

Thus, to determine the Trustee's interest in Browne and the debtor's homestead,

the Court must calculate the debtor's non-exempt equity interest in the homestead on July

13, 2015, *i.e.* the date on which the debtor filed his Chapter 13 petition.

## II.   Debtor had No Non-Exempt Equity in his Condominium as of July 13, 2015.

As set forth below, the debtor had no non-exempt equity in the condominium on

July 13, 2015.

### A.   The Value of the Condominium as of July 13, 2015 was No Greater than $1.1 Million.

The debtor scheduled the value of the condominium at $885,000.  See debtor's

Schedule A (Docket No. 1).  The 2015 estimated market value was $885,000. Declaration

of David M. Burns Ex. 1.  Additionally, Browne retained an appraiser to conduct a

retroactive appraisal of the condominium as of July 1, 2015. The appraisal report is

---

[4] *See also In re Woodland,* 325 B.R. 583, 586 (Bankr. W.D. Tenn. 2005) (holding that
"[s]ince property of the Chapter 7 estate relates back to what was property of the
bankruptcy estate when the Chapter 13 was commenced and since the Debtor still has the
vehicle in his possession, the present 'equity' in the vehicle does not belong to the
Chapter 7 trustee or to unsecured creditors of this estate"); *In re Pruneskip,* 343 B.R. 714,
716 (Bankr. M.D. Fla. 2006) (holding that "the property of the estate and the Debtor's
equity in the two (2) 1998 Ford Windstars is determined as of the filing date of the
Chapter 13 Petition, and not the date on which the Debtor's case was converted"); *In re
Boyum,* No. 05-1044-AA, 2005 WL 2175879, at *2 (D. Or. Sept. 6, 2005) ("[Section]
348(f)(1)(A) specifically limits the property of the estate upon conversion to the property
of the estate, i.e., the debtor's interest in the property, as of the date the Chapter 13
petition was filed. Therefore, to the extent that appellant acquired equity in the Subaru
Forester after the filing her Chapter 13 petition, such equity is not property of the estate
upon conversion to Chapter 7.").

attached as Exhibit 1 to the Declaration of Padraigin L. Browne. Browne Decl., Ex. 1.

The report concluded that the condominium was worth no more than $1.1 million as of

July 1, 2015. A summary of the report is as follows:

The appraiser reviewed sales data of previously owned condominiums in various

downtown Minneapolis neighborhoods. Based on an analysis of sales data, the appraiser

concluded that similar units experienced a 9% annual increase in value during the

relevant time period. According to the report, the appraiser's conclusion was "well

supported" by interviews with real estate agents who specialize in the downtown

Minneapolis condo market. The appraiser's conclusion is also supported by the increase

in the tax assessed value for the condominium, which increased from $885,000 at the

time of the petition to $965,500 afterward.

The appraiser further considered the impact of Browne and the debtor's post-

petition improvements to their condominium. The appraiser's interviews with Browne's

listing agent, as well as other agents who competed for the listing (and were thus very

familiar with the condominium), suggested that the post-petition improvements added

anywhere between $200,000 and $300,000 in increased sales value. The appraiser

conceded these estimates may be accurate. However, for the reasons described in the

report, there was not enough market data for the appraiser to verify these estimates to the

requisite degree of certainty. The appraiser instead turned to professional market surveys,

which list the expected contributory value for various pre-sale improvements.

Based on the foregoing factors, the appraiser concluded that Browne's

condominium was worth $1.1 million as of July 1, 2015. The difference between the

December 2015 sale price of $1.2 million and the July 2015 value of $1.1 million is attributable to improving market conditions and post-petition improvements.

The appraiser's estimate is reliable. The appraisal was conducted in conformity with the Uniform Standards of Professional Appraisal Practices. The appraiser consulted such data sources as NorthstarMLS, Realist, Hennepin County, the City of Minneapolis, and local real estate agents who specialize in the downtown Minneapolis high-end condominium market. The appraiser is very familiar with the condominium, having personally visited, measured and photographed it. The appraiser conducted a prior appraisal of the unit. The prior appraisal was conducted in anticipation of sale and appraised the unit under the assumption that Browne and the debtor made post-petition improvements to the condominium. The prior appraisal was within $25,000 of the condominium's ultimate sale price.

It is quite possible that the appraiser's estimate significantly overestimates the value of the condominium as of July 13, 2015. Several real estate agents who are very familiar with Browne's condominium estimated that the post-petition improvements added between $200,000 and $300,000 of value to the condominium. While the appraiser conceded that this was possible, for the reasons described in the appraisal report, the appraiser adopted a more conservative approach.

### B.   The Condominium was Encumbered by a $597,853 Mortgage Held by TCF National Bank.

Brown and the debtor's joint equity in the condominium is equal to its value less the mortgage held by TCF National Bank. As of July 13, 2015, the value was no greater

than $1.1 million and the mortgage was $597,853. See debtor's Schedule A (Docket No.

1.)  The joint equity figure is $502,147.

### C.     Browne and the Debtor's Non-Exempt Equity is Equal to the Difference between their Total Equity and Minnesota's $390,000 Statutory Exemption.

Browne and the debtor are entitled to a joint exemption of $390,000.  In order to

calculate Browne and the debtor's *non-exempt* equity, $502,147 is reduced by

Minnesota's statutory exemption of $390,000. (Complaint at ¶ 30.)  This leaves Browne

and the debtor with non-exempt equity of $112,147.

### D.     The Debtor's Share of the Non-Exempt Equity is One-Half of the Non-Exempt Equity.

Browne and the debtor owned the condominium as joint tenants. The applicable

law is Minnesota law. *O'Hagan v. U.S.*, 86 F.3d 776, 779 (8th Cir. 1996) ("Accordingly,

we look to the applicable state law—in this case Minnesota, where the real property is

located—to define the property rights upon which the government has levied.").  As joint

tenants, Browne and the debtor had an undivided one-half interest in the property. *See id.*

(discussing joint tenancy under Minnesota law). *See also Kipp v. Sweno*, 683 N.W.2d

259, 263 (Minn. 2004) ("[Joint tenants] each have an undivided one-half interest in this

homestead property…."). Accordingly, the debtor's share of the non-exempt equity is

one-half of $112,147, *i.e.,* $56,074.

### E.     Debtor's $56,074 Share was Completely Encumbered by Chowdhury's Lien.

The final step of the analysis is to reduce the debtor's non-exempt equity by the

amount of the Chowdhury judgment lien. Under Minnesota law, a judgment lien against

one joint tenant in real estate does not impair another joint tenant's interest. *Gibson v.*

*Trs. Of Minn. State Basic Bldg. Trades Fringe Benefits Funds*, 703 N.W.2d 864, 868−69

(Minn. App. 2005) ("[A] judgment lien can only attach to the interest of the debtor….").

Browne is not a debtor.  Thus, while the Chowdhury lien encumbered the debtor's share,

it did not encumber Browne's share.  The debtor's share of non-exempt equity, *i.e.*

$56,073, is completely covered by Chowdhury's $71,621 lien which was paid at closing.

Simply put, the debtor had no non-exempt equity as of July 13, 2015.  Because the debtor

had no non-exempt equity as of the date of filing, the Trustee has no interest in the sale

proceeds of Browne's homestead.

## CONCLUSION

A straightforward calculation of the debtor's non-exempt equity in his

condominium, as of July 2015, reveals that the debtor had none. The estate thus has none

and, accordingly, the Chapter 7 Trustee has no interest in the sale proceeds. There is no

genuine issue of material fact that all of the sale proceeds should be returned to Browne

immediately.

**DAVE BURNS LAW OFFICE, LLC**

Dated: April 27, 2016                    By:  /e/ David M. Burns
                                              David M. Burns #337869
                                              475 Grain Exchange North
                                              301 Fourth Avenue South
                                              Minneapolis, MN 55415
                                              (612) 677-8351

dave@daveburnslaw.com

Attorney for Padraigin Browne

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>Paul Hansmeier,<br><br>   *Debtor.* | BKY No. 15-42460 |
| Randall L. Seaver, Trustee,<br><br>   *Plaintiff,*<br><br>v.<br><br>Paul Hansmeier and Padraigin Browne,<br><br>   *Defendants.* | ADV No. 16-04018 |

## ORDER GRANTING SUMMARY JUDGMENT

This case came before the Court for hearing on Defendant Padraigin Browne's motion for summary judgment on May 18, 2016. Based upon the files and arguments by counsel,

IT IS ORDERED:

1.  Defendant Padraidin Browne's motion is granted;

2.  The plaintiff's complaint is dismissed;

3.      All remaining sale proceeds from the sale of Browne's condominium

should be returned paid to her immediately.

Dated:_____

_____
Kathleen H. Sanberg
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:

Paul Hansmeier,

       *Debtor.*

BKY No. 15-42460

---

Randall L. Seaver, Trustee,

       *Plaintiff,*

v.

Paul Hansmeier and Padraigin Browne,

       *Defendants.*

ADV No. 16-04018

## <u>DECLARATION OF DAVID M. BURNS</u>

I, David M. Burns, declare under penalty of perjury, that:

    1.    I am an attorney licensed to practice law in the State of Minnesota and represent Defendant Padraigin Browne in this bankruptcy proceeding.

    2.    Attached to this declaration are true and correct copies of the following documents:

    **Exhibit 1:**    2015 Hennepin County Property Market Value Assessment

Executed on: April 27, 2016        Signed:/e/ David M. Burns_____
                           David M. Burns, #337869

Dave Burns Law Office, LLC
475 Grain Exchange North
301 Fourth Avenue South
Minneapolis, MN 55415
(612) 677-8351

*Attorney for Defendant Padraigin
Browne*

## Parcel Data for Taxes Payable 2015

_Click Here for the 2015 State Copy to be used when filing for the 2014 M-1PR State Refund_

🖨 Print              [View map]    [Current year taxes]

The data listed below reflects information from December 31st of the payable year referenced above. Any adjustments made after that date will NOT be reflected.

| | |
|---|---|
| Property ID: | 23-029-24-32-0809 |
| Address: | 100    3RD AVE S  #3201 |
| Municipality: | MINNEAPOLIS |
| School Dist: | 001            Construction year: 2006 |
| Watershed: | 6            Approx. Parcel Size: IRREGULAR |
| Sewer Dist: | |
| Owner Name: | ███████████ |
| Taxpayer Name & Address: | ███████████ |
| | 100 3RD AVE S #3201 |
| | MINNEAPOLIS MN 55401 |

### Sale Information

Sales prices are reported as listed on the Certificate of Real Estate Value and are not warranted to represent arms-length transactions.

| | |
|---|---|
| Sale Date: | December, 2015 |
| Sale Price: | $1,200,000 |
| Transaction Type: | Warranty Deed |

### Tax Parcel Description

The following is the County Auditor's description of this tax parcel. It may not be the legal description on the most recent conveyance document recording ownership. Please refer to the legal description of this property on the public record when preparing legal documents for recording.

| | |
|---|---|
| Addition Name: | CIC NO. 1380 THE CARLYLE |
| Lot: | |
| Block: | |
| First Line Metes & Bounds: | UNIT NO 3201 |
| Full Metes & Bounds: | Note: To read full tax parcel description, click here. For term abbreviations, click here. |
| Abstract or Torrens: | TORRENS |

### Value and Tax Summary for Taxes Payable 2015
### Values Established by Assessor as of January 2, 2014

| | |
|---|---|
| Estimated Market Value: | $885,000 |
| Taxable Market Value: | $885,000 |
| Total Improvement Amount: | |
| Total Net Tax: | $16,161.28 |

EXHIBIT _____ |

Total Special Assessments:

Solid Waste Fee:

Total Tax:                                                                      $16,161.28

### Property Information Detail for Taxes Payable 2015
### Values Established by Assessor as of January 2, 2014

| Values: | |
| --- | --- |
| Land Market | $11,600 |
| Building Market | $873,400 |
| Machinery Market | |
| **Total Market:** | $885,000 |
| Qualifying Improvements | |
| Veterans Exclusion | |
| Homestead Market Value Exclusion | |

| Classifications: | |
| --- | --- |
| Property Type | CONDOMINIUM |
| Homestead Status | HOMESTEAD |
| Relative Homestead | |
| Agricultural | |
| Exempt Status | |

Hennepin County is providing this information as a public service.
Tax related questions:     **taxinfo@hennepin.us**

## Hennepin County, Minnesota

Open government  |  Privacy  |  Copyright 2016

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In re:<br><br>Paul Hansmeier,<br><br>*Debtor.* | BKY No. 15-42460 |
| ────────────────<br><br>Randall L. Seaver, Trustee,<br><br>*Plaintiff,*<br><br>v.<br><br>Paul Hansmeier and Padraigin Browne,<br><br>*Defendants.* | ADV No. 16-04018 |

### DECLARATION OF PADRAIGIN BROWNE

1.   I submit this Declaration in support of Padraigin Browne's Motion for Summary Judgment.

2.   Attached as Exhibit 1 hereto is a true and correct copy of an Appraisal Report for the condominium located at 100 3rd Ave. S. #3201 Minneapolis, MN 55401.

3.   I owned the condominium with my husband, Paul Hansmeier, in joint tenancy. The two joint tenants were my husband and me.

This Declaration is submitted pursuant to 28 U.S.C. § 1746. I declare under the penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2016

Padraigin Browne



## APPRAISAL REPORT

100 3rd Avenue South, Unit 3201
Minneapolis, MN 55401

Date of Report:
March 8, 2016

Appraiser's Opinion of Market Value:
$1,100,000

Prepared for:
Padraigin Browne
3749 Sunbury Alcove
Woodbury, MN 55125

File Number: 161092

*Copyright © 2016 Crawford Appraisal*

EXHIBIT 1



**CRAWFORD APPRAISAL**
Residential & Commercial Appraisal Services

March 8, 2016

Padraigin Browne
3749 Sunbury Alcove
Woodbury, MN 55125

**RE:    Single-Family Condominium Appraisal**

Dear Ms. Browne:

At your request, I have prepared an appraisal report of condominium unit #3201 located at 100 3rd Avenue South in Minneapolis, Minnesota.

This appraisal report sets forth my opinion of fair market value along with supporting data and reasoning which forms the basis of my opinion. The value opinion reported is qualified by certain definitions, limiting conditions, and certifications, which are stated within this report.

This report is written in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) as issued by the Appraisal Foundation. It is considered sufficient such that you and the other intended users of the report should understand it, and deem the data, analysis, and conclusions contained herein to be credible. Any additional information that is contained within the file is available at your request.

Thank you for selecting Paul Crawford Appraisal for your valuation needs. If you have any questions concerning the report, please contact me at (612) 584-0143.

Respectfully,

Paul Crawford
Paul Crawford Appraisal
Certified General Appraiser
Minnesota License No. 40280382

# TABLE OF CONTENTS

**Introduction**
    Title Page ................................................................................................................ 1
    Letter of Transmittal .............................................................................................. 2
    Table of Contents ................................................................................................... 3
**Identification of the Appraisal Problem and Scope of Work** ................................ 4
    Type of Report ....................................................................................................... 4
    Intended User(s) ..................................................................................................... 4
    Intended Use ........................................................................................................... 4
    Identification of the Real Estate Appraised ........................................................... 4
    Identification of the Real Property Interest Appraised ........................................... 4
    Definition of Value ................................................................................................ 4
    Effective Date ........................................................................................................ 4
    Date of Report ........................................................................................................ 4
    Extraordinary Assumption(s) ................................................................................ 4
    Hypothetical Condition(s) ..................................................................................... 4
    Scope of Work ....................................................................................................... 5
**Presentation of Data** ............................................................................................... 7
    Owner of Record As of the Effective Date ........................................................... 7
    Use of the Real Estate As of the Effective Value ................................................. 7
    Use of the Real Estate Reflected in the Appraisal ................................................ 7
    Property Taxes ........................................................................................................ 7
    Assessor's Value .................................................................................................... 7
    Sale & Listing History ........................................................................................... 7
    Association Dues .................................................................................................... 7
    Neighborhood ........................................................................................................ 8
    Market Conditions ................................................................................................. 9
    Land Description .................................................................................................... 10
    Improvement Description ....................................................................................... 11
    Sketch of Improvements ........................................................................................ 12
    Subject Photos ....................................................................................................... 13
**Analysis of Data and Conclusions** ......................................................................... 15
    Sales Comparison Approach .................................................................................. 15
        Sales Comparison Adjustment Chart ............................................................... 16
        Summary of the Adjustments Made to the Comparables ................................. 17
        Reconciliation of the Sales Comparison Approach "Subject to" ..................... 17
        "As Is" Valuation ............................................................................................ 18
        Home Gain 2012 National Home Improvement Survey .................................. 19
        Summary of Interviews with Real Estate Agents ............................................ 20
        Reconciliation of the Subject's "As Is" Market Value ................................... 21
    Exposure Time ....................................................................................................... 21
**Addenda**

## IDENTIFICATION OF THE APPRAISAL PROBLEM AND SCOPE OF WORK

TYPE OF REPORT

This type of report is an *Appraisal Report*, as described and outlined in Standards Rules 2-3 and 2-3 of the Uniform Standards of Professional Appraisal Practice (USPAP) 2016-2017.

INTENDED USER

The intended user of this report is the client and the bankruptcy court.

INTENDED USE

The intended use of this appraisal is bankruptcy.

IDENTIFICATION OF THE REAL ESTATE APPRAISED

The real property appraised is located at 100 3rd Avenue South #3201, Minneapolis, MN. It is legally described as CIC NO 1380 THE CARLYLE UNIT NO 3201, Hennepin County, Minnesota. Its Hennepin County parcel identification number is 23-029-24-32-0809.

IDENTIFICATION OF THE REAL PROPERTY INTEREST APPRAISED

The property interest appraised is the fee simple estate.

DEFINITION OF VALUE

The definition of value used in this appraisal is *fair market value*, as defined by the Internal Revenue Service §20.2031-1(b).

*The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.*

EFFECTIVE DATE

July 1, 2015, this is a retrospective appraisal.

DATE OF REPORT

March 8, 2016.

EXTRAORDINARY ASSUMPTIONS

This appraisal is not made based on any extraordinary assumptions.

HYPTOTHETICAL CONDITIONS

This appraisal is not made based on any hypothetical conditions.

**IDENTIFICATION OF THE APPRAISAL PROBLEM AND SCOPE OF WORK**

SCOPE OF WORK

1. The appraiser has previously appraised the subject property on September 18, 2015 with an effective date of September 16, 2015. The intended use of that appraisal was to assist the client in determining the market value of the property for pre-sale purposes. That appraisal was based on the hypothetical condition that the subject property was in "show ready" condition, which involved cleaning and painting the interior of the home and replacing the carpet. The appraiser determined the market value of the property subject to the completion of those improvements was $1,175,000. On February 25, 2016 the client engaged Paul Crawford Appraisal to appraise the subject considering the "as is" condition of the property prior with an effective date of July 1, 2015, which was prior to the improvements made by the property owner.

2. Data regarding the subject were gathered from various sources including NorthstarMLS, Realist, Hennepin County, the City of Minneapolis, the current property owner, the client's real estate agent (Ben Ganje of Lakes Sotheby's International Realty) the Association Management Company (FirstService Residential, 952-277-2700), and from a personal inspection of the subject.

3. An interior and exterior inspection of the subject occurred on September 16, 2015, which included photographing the home, and taking notes on the type, quality, and condition of the improvements. This appraisal makes the assumption that the home was in overall similar condition on the effective date (July 1, 2015) than it was when the appraiser inspected it (September 16, 2015). Gross living area (GLA) was obtained from the appraiser's direct measurements. Some of the common areas and the subject's neighborhood and surrounding area were also viewed.

4. Data regarding the comparable properties were gathered from various sources including NorthstarMLS, Realist, the real estate agents involved in the transactions, the management companies of the comparable sales, Hennepin County, and the City of Minneapolis. The appraiser made an exterior inspection of the comparables used in this appraisal.

5. Only the sales comparison approach is used to determine the subject's market value. By itself, the sales comparison approach produces credible appraisal results. This approach uses comparative analysis that considers the sales of similar (or substitute) properties and establishes a value estimate by making quantitative adjustments to the sale prices of the comparable properties. Adjustments are made based on relevant, market-derived data including paired sales analyses and depreciated replacement cost estimates, and are confirmed by discussions with real estate experts in the subject's market area. After making adjustments to the comparables for significant differences when compared to the subject, each sale indicates a market value for the subject to the completion of repairs and

**IDENTIFICATION OF THE APPRAISAL PROBLEM AND SCOPE OF WORK**

SCOPE OF WORK

modifications. These indications of market value are then reconciled into a final opinion of value for the subject property, after which the subject's "as is" market value is determined. Additional details about the valuation process are included in the valuation section of this appraisal. The cost approach is not reliable due to the overall level of depreciation (including obsolescence) affecting the subject improvements, and due to the subject being an attached condominium unit. The income approach is not developed due to a lack of reliable rental data for properties similar to the subject within the subject market. Additionally, hypothetical buyers would not rely on these methods when determining a purchase price.

6.  The appraiser's analysis and opinions are communicated to the client in this Appraisal Report. Supporting documentation is retained within the appraiser's workfile and is available to the client at their request.

## PRESENTATION OF DATA

OWNER OF RECORD AS OF THE EFFECTIVE DATE

Padraigin Browne & Paul Hansmeier

USE OF THE REAL ESTATE AS OF THE EFFECTIVE DATE

Single-family condominium unit

USE OF THE REAL ESTATE REFLECTED IN THIS APPRAISAL

Single-family condominium unit

PROPERTY TAXES (PAY 2015)

$16,161.28

ASSESSOR'S VALUE (JANUARY 2, 2015)

$965,500

SALE & LISTING HISTORY

The appraiser previously prepared an appraisal of the subject property with an effective date of September 16, 2015, subject to the completion of repairs and modifications. The appraiser's opinion of market value at that time was $1,175,000. On November 2, 2015 the subject was listed for sale on the MLS for $1,300,000. It sold on December 15, 2015 for $1,200,000 after 29 days on the market. As concluded in the forthcoming Market Conditions section of this appraisal, market conditions between the effective date of the appraiser's original appraisal and the date of closing were improving at 0.75% per month, or 2.25% for the 3-month period. Although the appraiser has not analyzed the purchase agreement for the December 15, 2015 transaction, based on the preceding analysis and the prior appraisal of the subject property, it appears the subject sold at market value.

ASSOCIATION DUES

According to the property owner, association dues for the subject are $890 per month. Dues include heat, air conditioning, sanitation, snow and lawn care, outside maintenance, hazard insurance, electric, cable TV, water/sewer, building exterior, security staff, professional management, and costs associated with the shared amenities.

## PRESENTATION OF DATA

<u>NEIGHBORHOOD</u>

The subject is located in the Downtown West neighborhood in the City of Minneapolis, MN. The neighborhood is bound by the Mississippi River to the north, Portland Avenue and 5th Avenue South to the east, 12th Street to the south, and 3rd Avenue North to the west. Downtown West is located within the downtown Minneapolis Central Business District. The housing stock in the neighborhood consists to newer built condominiums and condo conversions. There are also many apartments, office, and retail properties. Uptown and Downtown Minneapolis provide a plethora of retail, employment, and recreational opportunities. The neighborhood also has good access to recreational opportunities, as it is located within close proximity to the Mississippi River.

**Downtown West Neighborhood Map**



---

## PRESENTATION OF DATA

<u>MARKET CONDITIONS</u>

To analyze market conditions, the appraiser reviewed sales data of previously owned, 2-4 bedroom condominiums in downtown Minneapolis, as well as the greater Central Community, which consists of the following downtown neighborhoods: Downtown East, Downtown West, Elliot Park, Loring Park, North Loop (Warehouse District), and Stevens Square/Loring Heights.

Based on an analysis of this data and additional data retained within the appraisers workfile, the appraiser has determined that market conditions have increased by approximately 9% over 2015, which equates to a 9% annual increase, or an increase of 0.75% per month on a straight-line basis. This is the market conditions adjustment used in this appraisal, which is well supported by interviews with real estate agents that specialize in the downtown Minneapolis condo market. A summary of these interviews is including in the valuation section of this appraisal.

## PRESENTATION OF DATA



LAND DESCRIPTION

*Site Dimensions:* Approximately 331' x 132', less office area

*Site Area:* Approximately 0.94 acre

*View:* Views of Downtown Minneapolis and the Mississippi River

*Zoning:* B4S-1/ Downtown Service District (`99), DP/ Downtown Parking Overlay District (`99), MR/ Miss River Critical Area Overlay (`99), and SH/ Shoreland Overlay District (`99) (Current use is legal.)

*Utilities/Public Improvements:* Electricity, Natural Gas, Municipal Water, Municipal Sanitary Sewer, Storm Sewer, Asphalt Street, Concrete Curb and Gutter, Concrete Sidewalk

*Site Topography*: Level

## PRESENTATION OF DATA



### IMPROVEMENT DESCRIPTION

*Design:* 3-Bedroom Condominium, 32nd Floor, Corner unit facing east and south

| | |
|---|---|
| *Year built:* 2006 | *Effective age:* 5-10 years |
| *Garage:* 2 indoor parking space | *Driveway surface:* Concrete/Avg.-Good |
| *Exterior:* Concrete/Avg.-Good | *Roof surface:* Flat/Avg.-Good |
| *Windows:* Stationary/Avg.-Good | *Foundation:* Concrete/Avg.-Good |
| *Walls:* Drywall (paint)/Avg.-Good | *Floors:* Carpet, wood, tile/Good |
| *Trim:* Wood/Avg.-Good | *Ceiling:* Drywall/Avg.-Good |
| *Gross Living Area:* 1,979 SF | *Rooms:* 6 (3 BRs, 1.75 bath) |
| *Heating:* Forced Air | *Cooling:* Central Air |

*Appliances and Amenities:* Refrigerator, range/oven, dishwasher, washer, dryer. (Included in the valuation.) Secure entrance, heated garage, elevator, storage.

*Common Elements:* 5th amenities deck with outside pool (seasonal), hot tub (year round), gym, and main floor party room, conference room, and wine room.

*Other comments:* According to the management company there are a total of 253 residential condominium units in the 42-floor (high-rise) condominium project with just fewer than 500 parking stalls. The homeowner's association allows for rentals with certain restrictions. No single entity owns more than 10% of the condominium units, and

## PRESENTATION OF DATA

<u>IMPROVEMENT DESCRIPTION</u>

there is no commercial space available within the project. The project is in overall
average to good condition for its age, with a good quality of construction. There are just
fewer than 2 parking stalls per unit, with 20 guest parking spaces also available, and
parking appears to be adequate.

<u>SKETCH OF IMPROVEMENTS</u>

**First Floor**



**PRESENTATION OF DATA**

<u>SUBJECT PHOTOS</u>



Living Room



Dining Room



Bedroom



¾ Bathroom



Kitchen



Bedroom

# PRESENTATION OF DATA

<u>SUBJECT PHOTOS</u>



Master Bathroom



Master Bedroom



Terrace



View



View



View

## ANALYSIS OF DATA AND CONCULSIONS

SALES COMPARISON APPROACH

The sales comparison approach is used to one degree or another in almost every type of appraisal. The value estimate under this analysis method may best be described as the price at which a buyer will buy, and a seller sell; neither being under abnormal pressure.

The underlying assumption of this valuation method is that a purchaser will pay no more for the right to enjoy a set of benefits than necessary; in short, the benefits of real estate ownership are similar and may be substituted one for another. The assumption is also made that both parties to the transaction are fully informed regarding the property and the pertinent market, and that the property has been on the market for a reasonable marketing period.

The appraiser has analyzed sales data for the year prior to the effective date of this appraisal. Sales data were obtained from a variety of resources including the NorthstarMLS, Realist, City of Minneapolis and Hennepin County records. Transaction details were confirmed with the real estate agents involved in the sale of the properties.

All comparable sales selected by the appraiser are located within The Carlyle. These sales are the best indicators of the subject's market value. This appraisal determines the "as is" market value of the subject, prior to any improvements being made. Most condominium units in the subject's condominium project are in "show ready" condition, which includes making minor repairs, replacing floor and wall coverings, and obtaining professional staging services.  Therefore the most reliable way of determine the "as is" market value of the subject property is to first determine the market value "subject to" completion of repairs and modifications. Then the appraiser deducts the contributory value of the completed improvements to determine the "as is" market value of the subject property as of the effective date.

On the upcoming sales comparison grid, adjustments are made to the comparables for differences when compared to the subject property.

# ANALYSIS OF DATA AND CONCULSIONS

## SALES COMPARISON APPROACH

### Sales Comparison Adjustment Chart

| Item | Subject | Comparable Sale #1 | | Comparable Sale #2 | | Comparable Sale #3 | |
|------|---------|--------------------|--|--------------------|--|--------------------|--|
| Property Address | 100 3rd Ave S #3201 Minneapolis | 100 3rd Ave S #3102 Minneapolis | | 100 3rd Ave S #2607 Minneapolis | | 100 3rd Ave S #1807 Minneapolis | |
| Proximity to Subject | N/A | Same Project | | Same Project | | Same Project | |
| Data Sources | Personal Inspection, City and County Records | MLS, City & County Records | | MLS, City & County Records | | MLS, City & County Records | |
| Original Listing Price | N/A | $1,595,000 | | $725,000 | | $679,900 | |
| Sale Price | N/A | $1,595,000 | | $690,000 | | $680,000 | |
| Days on Market | N/A | 5 | | 6 | | 5 | |
| Financing | N/A | Cash | | Conventional | | Conventional | |
| Concessions | N/A | None | | None | | None | |
| Conditions of Sale | N/A | Traditional | | Traditional | | Traditional | |
| Closing Date | Effective Date: 7/1/2015 | 7/29/15 | | 1/16/2015 (+4.5%) | $31,050 | 4/6/2015 (+2.25%) | $15,300 |
| Location | Good | Similar | | Similar | | Similar | |
| HOA Monthly Assessment | $890 | $1,123 | | $680 | | $699 | |
| Common Elements | Good | Similar | | Similar | | Similar | |
| Floor Location | 32nd Floor | 31st Floor/Similar | | 26th Floor/Inferior @ 6% | $41,400 | 18th Floor/Inferior @ 14% | $95,200 |
| View | Partial River, Partial Skyline/Good | Full River/Superior @ 7.5% | ($119,625) | Partial River, Partial Skyline/Similar | | Partial River, Partial Skyline/Similar | |
| Design | High-Rise | Similar | | Similar | | Similar | |
| Age (Actual/Effective) | 9 actual/5-10 effective | 9 actual/5-10 effective | | 9 actual/5-10 effective | | 9 actual/5-10 effective | |
| Construction Quality | Average-Good | Superior @ 5% | ($79,625) | Similar | | Similar | |
| Condition | Average-Good | Similar | | Similar | | Similar | |
| Bedrooms | 3 | 3 | | 2 + Den | $20,000 | 2 + Den | $20,000 |
| Baths | 1.75 | 1.75 | | 1.75 | | 1.75 | |
| Gross Living Area | 1,979 SF | 2,195 SF | ($97,200) | 1,472 SF | $228,150 | 1,472 SF | $228,150 |
| Heating/Cooling | FA/CA | FA/CA | | FA/CA | | FA/CA | |
| Unit Amenities | 2 small terraces, fireplace | 2 small terraces, large terrace, fireplace | ($52,000) | 1 small terrace, fireplace | $15,000 | 1 small terrace | $20,000 |
| Car Storage | 2 Underground Parking Stalls | 3 Underground Parking Stalls | ($30,000) | 2 Underground Parking Stalls | | 2 Underground Parking Stalls | |
| Net Adjustment | | ($378,450) | | $335,600 | | $378,650 | |
| Adjusted Sale Price | | **$1,216,550** | | **$1,025,600** | | **$1,058,650** | |

# ANALYSIS OF DATA AND CONCULSIONS

SALES COMPARISON APPROACH

## Summary of the Adjustments Made to the Comparables

Comparable Sale #1 is the best overall indicator of the subject's market value. It sold recently and is located only one floor below the subject. This unit sold for $1,595,000, but is superior to the subject in several regards. First and foremost, it has a more desirable full river view compared to the subject, which has partial river and skyline views. A 7.5% downward adjustment is made to account for this difference. In determining this adjustment, the appraiser reviewed sales data and spoke with real estate agents who have a history of selling condos in The Carlyle. This unit also has a superior quality of construction compared to the subject, which include a superior kitchen and a more open floorplan. A 5% downward adjustment is made to account for these differences. This unit also has more living space than the subject and gross living area is adjusted for at $450 per square foot, which is supported by paired sales studies that are retained within the appraiser's workfile. Regarding differences in amenities, this unit has a large 260 SF outdoor patio/terrace, which is very desirable. It is adjusted for at $200 per square foot. Lastly, this comparable sale came with three parking spaces compared to the subject's two spaces. Per discussions with real estate agents, parking spaces in the Carlyle trade at $25,000 to $30,000. After making downward adjustments, this comparable sale indicated a market value to be applied to the subject of $1.22 million.

Comparable Sales #2 and #3 are overall fairly similar to one another, and predictably, both indicate a similar market value for the subject. Both have similar orientations and views as the subject, but they are less desirable in that they are located on lower floors, with smaller square footage and fewer bedrooms. After making upward adjustments, they indicate a market value to be applied to the subject of $1.03 million and $1.06 million respectively.

Lastly, the December 2015 sale for $1,200,000 of the subject condo is also considered. After, adjusting this sale for differences in market conditions between July 2015 and December 2015 (+0.75%/month), it indicates July 2015 market value of $1,155,000.

## Reconciliation of the Sales Comparison Approach "Subject to" Completion of Repairs and Modifications

For this appraisal, only comparable sales from The Carlyle have been utilized. The appraiser considered analyzing comparable sales from competing condominium projects, such as The Ivy and The Phoenix, but too many differences exist to make them reliable indicators of the subject's market value. Of the three comparable sales analyzed, the best indicator of the subject's market value is Comparable Sale #1, and it is given the most weight in the appraiser's reconciliation. After adjusting for market conditions, the subject's subsequent sale is also a very good indicator of its market value. Based on this analysis, the appraiser's opinion of the subject's market value as of July 1, 2015 is:

## $1,150,000

## ANALYSIS OF DATA AND CONCULSIONS

SALES COMPARISON APPROACH

### "As Is" Valuation

The preceding opinion of market value is based on the subject being in "show ready" condition at the time of sale, which includes having new paint and floor coverings, staging services, and minor repairs being made. To arrive at the "as is" market value of the subject property, the appraiser estimates the contributory value of the improvements that were made to the property using actual cost figures provided by the client, and subtracts the value from the previous estimate.

Following is a breakdown of the actual costs associated with preparing the unit for sale (provided by the property owner), rounded to the nearest dollar.

| Type of work | Cost |
| --- | --- |
| Refinishing floors | $4,065 |
| Replacing carpet | $3,700 |
| Painting | $6,105 |
| New light fixtures/cleaning | $4,862 |
| Staging services | $4,520 |
| Electrical work | $450 |
| Plumbing work | $150 |
| Fireplace work | $450 |
| **Total Costs** | **$24,302** |

It is common for property owners to make similar repairs and alterations to a property prior to sale, especially for higher priced homes, as these improvements often result in a higher sale price and shorter marketing period. A shorter marketing period results in fewer holding costs, such as mortgage payments, utility payments, and association dues.

A 2013 study prepared by the Real Estate Staging Association (RESA) concluded that homes not staged experienced an average marketing time of 143 days compared 40 days for homes that were staged, which is a difference of approximately 3.5 months.

In determining the return on investment made by the improvements, the appraiser has interviewed real estate agents to get their opinions on the impacts of making improvements to properties prior to sale. The results of these interviews support a survey prepared by Home Gain, which is the basis for determining the contributory value of the subject improvements.

## ANALYSIS OF DATA AND CONCULSIONS

<u>SALES COMPARISON APPROACH</u>

**Home Gain 2012 National Home Improvement Survey**

In 2012, Home Gain surveyed nearly 500 real estate agents nationwide to determine the best low cost home improvements for people getting their home ready to sell. The relevant results of this survey are summarized below:

| Improvement | Cost | Benefit | ROI | % Recommend |
|---|---|---|---|---|
| Clean | $402 | $2,024 | 403% | 99% |
| Electrical & Plumbing | $807 | $3,175 | 293% | 93% |
| Staging | $724 | $2,144 | 196% | 76% |
| Carpet | $671 | $1,746 | 160% | 99% |
| Floors | $902 | $1,897 | 110% | 93% |
| Paint Interior | $967 | $2,001 | 107% | 94% |

In determining the return on investment for the improvements made to the subject property, the appraiser has applied the average surveyed return on investment (ROI) to the actual cost figures incurred by the property owner.

| Type of work | Cost | ROI | Contributory Value of Improvement |
|---|---|---|---|
| Refinishing floors | $4,065 | 110% | $4,472 |
| Replacing carpet | $3,700 | 160% | $5,920 |
| Painting | $6,105 | 107% | $6,532 |
| New light fixtures/cleaning | $4,862 | 348%* | $16,919 |
| Staging services | $4,520 | 196% | $8,859 |
| Electrical work | $450 | 293% | $1,319 |
| Plumbing work | $150 | 293% | $440 |
| Fireplace work | $450 | 293% | $1,319 |
| **Total Costs** | **$24,302** | **188% (implied)** | **$45,780** |

*Note: This cost item combines two expense categories, thus ROI is calculated as the average between Clean (403%) and Electrical (293%).

## ANALYSIS OF DATA AND CONCULSIONS

<u>SALES COMPARISON APPROACH</u>

The above method indicates that the improvements made to the subject property prior to sale increased the value of the property by approximately $46,000. In determining whether or not this is appropriate, the appraiser also conducted interviews with real estate agents specializing in the downtown Minneapolis condo market. Following is a summary of these interviews, which includes discussions on market conditions.

### Summary of Interviews with Real Estate Agents

Ben Ganje of Lakes Sotheby's International Realty was the listing agent for the subject condominium when it sold in December 2015. MLS records indicate that throughout 2015 Mr. Ganje listed and sold 48 properties, 27 of which were condominiums, and 25 of which were condominiums located in Minneapolis. He stated that in his opinion the property owners' improvements added $200,000 to its overall market value, and had they not been done the subject condominium would have only sold for $1,000,000. Mr. Gange also stated that market conditions increased by 9-10% over 2015.

Cynthia K. Froid of Keller Williams Integrity Realty sold 20 condos in 2015, with 13 selling for over $700,000. She was very familiar with the subject condominium unit, as she viewed the home and competed with Mr. Ganje for the listing. Cynthia stated that prior to making any updates to the property, she felt the condo was worth only $900,000. She also stated that market conditions for downtown condos improved from 5-10% over 2015 depending on the condo project, with The Carlyle being at the upper end of that range.

Christian H. Klempp of Edina Realty listed and sold 19 condominiums over 2016, with the majority being located downtown Minneapolis. Mr. Klempp felt that staging for upper bracket condominiums is a very important factor for buyers. For upper bracket condos, more than any other market segment, buyers have certain expectations for condition, and when those conditions aren't met it can be detrimental to a property's marketability. He stated that buyers in this market often require move-in ready condos. Without knowing the specifics of the sellers upgrades and its condition prior to making the upgrades, he was not able to give an exact estimate; however he stated that the increase in value could be as much as $200,000. Regarding market conditions, Mr. Klempp opined that condo values increased by 0.5%-1.0% per month between July and the late fall, but likely stabilized over the winter due to lower seasonal demand.

Marissa Skaja of Downtown Resource Group sold 11 condos in Minneapolis over 2015. She stated that updates to floor coverings, walls, and kitchen usually bring at least a dollar-for-dollar return on investment. However, not many homes in the subject's price bracket sell without being in "show ready" condition, making this difficult to analyze. Regarding market conditions, she stated that condos in the $800,000-$1,400,000 do not stay on the market for very long, as they have been in high demand over the past year. She felt that over 2015, condo values increased by 10%, while condo values in The Carlyle may have increased by as much as 15%.

## ANALYSIS OF DATA AND CONCULSIONS

SALES COMPARISON APPROACH

Colleen J Ratzlaff LaBeau of RE/Max Advantage Plus sold 11 condos in downtown Minneapolis over 2015, the majority of which were located in Stonebridge Lofts. She stated that market values in that project increase by 5-10% over 2015 depending on the unit type.

### Reconciliation of the Subject's "As Is" Market Value

Based on these interviews, the appraiser's opinion of market conditions (increasing at 9% over 2015) is well supported. Additionally, the two agents that have seen the condo in its "as is" condition (Mr. Ganje and Ms. Froid) felt that the upgrades made to the unit prior to selling increased the value by $200,000 and $300,000. While this is possible, no market data could be found that supports these opinions. The appraiser searched the market for high-end condo properties that were not in "show ready" condition, and did not find any relevant sales. Therefore, no reliable paired sales analyses could be prepared. Based on the Home Gain survey and interviews with real estate agents that have experience selling condos in downtown Minneapolis, it is the appraiser's opinion that the $24,302 in improvements contributed $50,000 in value to the subject home.

Therefore, the "as is" market value of the subject property as of July 1, 2015 is calculated as follows:

| | |
|---|---|
| Market Value Subject To Completion of Repairs and Modifications: | $1,150,000 |
| Less: Contributory Value of the Improvements: | ($50,000) |
| **"As Is" Market of the Subject:** | **$1,100,000** |

EXPOSURE TIME

This is the estimated length of time the property would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. The marketing time of the comparable properties indicates and exposure time for the subject of 0-3 months if staged and in "show ready" condition. The "as is" exposure time is slightly higher, and is determined to be 3-6 months.

**ADDENDA**

CERTIFICATION

ASSUMPTIONS & LIMITING CONDITIONS

APPRAISER QUALIFICATIONS

# CERTIFICATION

I certify that, to the best of my knowledge and belief:

- the statements of fact contained in this report are true and correct.

- the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- my engagement in this assignment was not contingent upon developing or reporting predetermined results.

- my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the property that is the subject of this report.

- no one provided significant real property appraisal assistance to the person signing this certification.

Paul Crawford
Certified General Real Property Appraiser
MN License # 40280382, Expires 8/31/17
Date of Signature: March 8, 2016

## ASSUMPTIONS & LIMITING CONDITIONS

1. The information given to the appraiser by the owner and/or his agent has been relied upon as fact, although checked as to reasonableness and accuracy wherever possible. This data has been made a part of this appraisal report where deemed pertinent by the appraiser. Information furnished by other data sources is believed to be reliable. However, no warranty is given for its accuracy.

2. The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements, and any such sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. No survey was performed.

3. The appraiser certifies that, to the best of his knowledge and belief, the statements, information and materials contained in the appraisal are correct. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he considers reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

4. The appraiser assumes no responsibility for matters legal in nature affecting the property appraised and to the title thereto. The appraiser does not guarantee the title to the property in any manner, nor has any investigation been made to reveal the existence of any liens or encumbrances on the property title.

5. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined and considered in the appraisal report.  It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted within the report.

6. The appraiser has not made any special investigation into environmental matters affecting the subject. It is assumed that there is full compliance with applicable federal, state and local environmental regulations and laws unless non-compliance is stated, defined and considered in the appraisal report.

7. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more of less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

## ASSUMPTIONS & LIMITING CONDITIONS

8. The appraiser is not qualified to detect hazardous waste and/or toxic materials.  The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property.  The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.  The client is urged to retain an expert in this field, if desired.

9. The appraiser has no interest, present or contemplated, in the subject property and neither the contract to make the appraisal, nor the compensation, is contingent upon the amount of valuation reported.

10. Possession of this report or copies thereof does not carry with it the right to copy or publish all or any part of this report.

11. The appraiser is not required to give testimony or appear in court because of having made this appraisal unless previous arrangements have been made.

12. This report was performed in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal.

# APPRAISER QUALIFICATIONS

## PAUL CRAWFORD
400 South Fourth Street, Suite 401
Minneapolis, MN 55415
(612) 584-0143
paul@crawfordappraisalmn.com

**Qualifications**
Certified General Real Property Appraiser
(MN License # 40280382, Expires 8/31/2017)

**Experience**
Crawford Appraisal — 2005-2006, 2013-Present
Prepare residential and commercial appraisal reports.

Meeks Appraisal & Consulting — 2011-2014
Prepare residential and commercial appraisal reports for use in eminent domain
proceedings.

**Education**
Saint Cloud State University; Saint Cloud, MN — Bachelor of Arts, May 2009
*University Chronicle*, Editor; Dean's List; *summa cum laude*

**Appraisal Education**
Basic Appraisal Principles (1/05)
Basic Appraisal Procedures (2/05)
15-Hour National UPAP Course (2/05)
Appraisal Trends (5/06)
National USPAP Update Equivalent (5/06)
New FHA Appraisal Forms & Guidelines (7/06)
Advanced URAR & Fannie Mae Guidelines (7/06)
Basic Appraisal Procedures (10/11)
15-Hour National USPAP Course (11/11)
Basic Appraisal Principles (1/12)
2012-2013 7 Hour USPAP Update (4/13)
General Appraiser Sales Comparison Approach (7/13)
General Appraiser Site Valuation and Cost Approach (9/13)
General Appraiser Market Analysis, Highest and Best Use (9/13)
Expert Witness for Commercial Appraisers (10/13)
Commercial Appraisal Review (12/13)
General Report Writing & Case Studies (1/14)
General Appraiser Income Approach (3/14)
Statistics, Modeling, & Financing (4/14)
2014-2015 7-Hour USPAP Update (4/14)

## APPRAISER QUALIFICATIONS

**STATE OF MINNESOTA**



**Department of Commerce**

PAUL R CRAWFORD
1621 19TH AVENUE NE #3
MINNEAPOLIS, MN  55418

**The Undersigned COMMISSIONER OF COMMERCE for the State of Minnesota hereby certifies that**

**Paul R Crawford**

1621 19TH AVENUE NE #3
MINNEAPOLIS, MN  55418

has complied with the laws of the State of Minnesota and is hereby licensed to transact the business of

**Resident Appraiser : Certified General**

**License Number: 40280382**

unless this authority is suspended, revoked, or otherwise legally terminated. This license shall be in effect
until August 31, 2017.

**IN TESTIMONY WHEREOF, I have hereunto set my hand this July 01, 2015.**

**COMMISSIONER OF COMMERCE**

Minnesota Department of Commerce

Licensing Division

85 7th Place East, Suite 500
St. Paul, MN 55101-3165
Telephone: (651) 539-1599
Email: licensing.commerce@state.mn.us
Website: commerce.state.mn.us

**Notes:**

- **Individual Licensees Only - Continuing Education:** 15 hours is required in the first renewal period, which includes a 7 hour USPAP course. 30 hours is required for each subsequent renewal period, which includes a 7 hour USPAP course.

- **Appraisers:** You must hold a licensed Residential, Certified Residential, or Certified General qualification in order to perform appraisals for federally-related transactions. **Trainees do not qualify.** For further details, please visit our website at commerce.state.mn.us.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>Paul Hansmeier,<br><br>*Debtor.*<br>─────────────────── | BKY No. 15-42460 |
| Randall L. Seaver, Trustee,<br><br>*Plaintiff,*<br><br>v.<br><br>Paul Hansmeier and Padraigin Browne,<br><br>*Defendants.* | ADV No. 16-04018 |

### UNSWORN CERTIFICATE OF SERVICE

I, David M. Burns, declare under penalty of perjury, that on April 27, 2016, I filed:

1. Defendant Padraigin Browne's Notice of Motion and Motion for Summary Judgment;
2. Memorandum of Law in Support of Browne's Motion for Summary Judgment;
3. Unsworn Declaration of David M. Burns;
4. Unsworn Declaration of Padraigin Browne; and
4. Proposed Order Granting Summary Judgment.

with the Clerk of Bankruptcy Court through ECF and that ECF will send an e-notice of electronic filing to all filing users of this case via the court's CM/ECF server.

Executed on: April 27, 2016                    Signed:/e/ David M. Burns_____

                                               David M. Burns, #337869
                                               Dave Burns Law Office, LLC
                                               475 Grain Exchange North
                                               301 Fourth Avenue South
                                               Minneapolis, MN 55415
                                               (612) 677-8351

                                               *Attorney for Defendant Padraigin
                                               Browne*