## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                            BKY No. 15-42460
                                                                  ADV No. 16-4018
Paul Hansmeier,

        Debtor.

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Paul Hansmeier and Padraigan Browne,

        Defendants.

### MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Randall L. Seaver, Trustee ("Plaintiff" or "Trustee") submits this memorandum in response to Defendant Padraigin Browne's ("Browne" or "Defendant") motion for summary judgment.

The Plaintiff also submits the Affidavit of Matthew D. Swanson, previously served and filed at Docket Number 9 in opposition to the motion.

The Defendant has filed a motion for summary judgment which, itself raises several purported issues which if relevant, requires factual findings which preclude entry of judgment.

### RESPONSE TO DEFENDANT'S PRELIMINARY STATEMENT

The Defendant's memorandum in support of summary judgment begins with ridiculous accusations of wrongdoing by the Plaintiff which serve nothing more than as a distraction to the

issues at hand.  The Defendant accuses the Trustee of not handling this matter in a timely

fashion, and neglecting his duties as a Chapter 7 Panel Trustee by not maintaining the funds at

issue in an interest bearing account.  Both of these arguments are meritless.

The Plaintiff was directed by this Court to hold the sale proceeds pending further order of

the court.  Before the Trustee could made any decisions about payment of closing proceeds, he

had to investigate the facts surrounding the purchase of the condominium, mortgage payments,

and unexpected and/or lien assertions that were made against the property at the time of closing.

After being appointed, the trustee immediately began to seek necessary information.  A letter

was sent to Barbara May, Hansmeier's attorney, on December 8, 2015.[1]  Supp. Aff. MDS at Ex.

1[2].  Various items were requested in that letter.  Hansmeier did not produce documents

responsive to that letter, for the most part, until he began putting documents in a Dropbox on or

about January 12, 2016.  As the court is aware, the Plaintiff has expended substantial efforts to

obtain documents from the debtor, Paul Hansmeier ("Debtor"), with very little cooperation;

documents which were essential to evaluate the proper allocation of the sales proceeds.

The trustee also sought Rule 2004 authorization for Browne.  The trustee obtained that

authorization on December 22, 2015.  The trustee issued a subpoena to Browne.  The subpoena

was served on Browne, by substitute service on Defendant Hansmeier on December 24, 2015.

Along with the subpoena counsel for the Plaintiff sent a letter to Defendant stating the following:

> I want to make sure you get a copy of this subpoena as soon as possible because
> some of the information sought by the subpoena relates to the recent sale of the
> property at 100 Third Avenue South, #3201, Minneapolis.  We need all of the
> information relating to that sale as soon as possible in order to analyze rights and
> claims.

---

[1] Barbara May had also served as Padraigin Browne's attorney at Browne's October 28, 2015 Rule 2004
examination conducted by attorney Edward Sheu.
[2] "Supp. Aff. of MDS" refers to the Supplemental Affidavit of MDS filed herewith.

See Supp. Aff. of MDS at Ex. 2.  The subpoena required document production by January 8, 2016, and set her examination for January 14, 2016.  In early January the Plaintiff's counsel was contacted by Browne's new attorney requesting a new examination date.  The Plaintiff agreed to reschedule the examination date, but refused to extend the document production deadline, which had already passed.  Despite Defendant's promises to produce documents the Plaintiff didn't receive any documents from the Defendant until they were made available through a dropbox link on or about February 5, 2016.  So, pursuant to the subpoena, which is a Court Order, Browne was required to produce documents responsive to the subpoena on January 8, 2016.  Browne, who is an attorney, apparently made a decision to simply ignore the subpoena.  She did not produce any documents responsive to the subpoena until February 5, 2016, approximately 28 days after the subpoena required the production of those documents.[3]

As a result of Browne's decision to ignore the subpoena, the trustee did not receive documents until February 5, 2016.  Additionally, the trustee had to continue the Rule 2004 examination of Browne from its original date of January 14, 2016 to February 18, 2016, because Browne had refused to comply with the subpoena and produce documents.

Finally, after Browne's intentional disregard of her obligations under the subpoena, the trustee received documents and conducted the examination of Browne on February 18, 2016.  That examination together with documents produced by Defendants Hansmeier and Browne revealed the following to the trustee, and all of which were relevant to allocation of home proceeds:

1.  All of the vendor contracts which were paid as closing costs were the sole obligation of Browne.  Those obligations totaled in excess of $14,000.  MDS Aff. Ex. 2 at 80-84.

---

[3] Probably not coincidentally, she finally decided to comply with the subpoena after the 8th Circuit BAP denied Hansmeier's request for a stay of this Court's order of conversion.

2. The Defendants had over $20,000 in cash hidden in a box in their condominium on the day of Hansmeier's bankruptcy filing.  A joint decision was made by them to intentionally understate, in Hansmeier's bankruptcy schedules, the amount of cash held on the day of filing.  MDS Aff. Ex. 2 at 66.

3. Liquidation of pre-petition accounts receivable by Hansmeier resulted in monies being deposited into Browne's account, from which mortgage payments were made.  Supp. Aff. of MDS Ex. 3.

4. Liquidation of an estate asset, consisting of Vikings tickets, resulted in proceeds which were deposited into Browne's account from which the mortgage payments were made. Id.

5. An unscheduled 2014 state income tax refund was deposited into Browne's account from which the mortgage payments were made.  Supp. Aff. of MDS Ex. 5.

6. $20,000 of the cash hidden in the Defendants' condominium was deposited into an account held in Browne's name shortly before filing.  On the day of filing, monies in that account which, using a FIFO basis, were attributable solely to the $20,000 cash deposit equaling $7,709.64.  That, of course, is the same account from which mortgage payments were made.  Supp. Aff. of MDS Ex. 4.

7. Brown apparently paid nothing towards the purchase of the condominium.  It appears that all of the funds used to purchase the condominium came from Hansmeier.  The discovery of this fact by the trustee necessitated a legal analysis by the trustee as to whether the transfer itself, by which Browne became a titled owner of the condominium, was an avoidable transfer.  The trustee has not yet reached a conclusion on this issue.  However, the trustee has not yet asserted an avoidance claim.

Once the Plaintiff had sufficient documentation to analyze the matter, he filed his

Complaint for declaratory relief to obtain an Order authorizing the disbursement of the funds in

his possession.  Once that action was commenced the Plaintiff worked with the Debtor and

Defendant to distribute approximately two thirds of the funds in his possession to Browne and

Hansmeier.  Furthermore, nothing prevented the Defendant from filing a Complaint or motion,

on her own behalf, to expedite this process.

The Defendant's accusation that the Trustee is somehow mishandling funds by not

maintaining them in an interest bearing account is simply an attempt to distract the Court.  This

is not the first time this issue has been raised.  The Defendant's husband leveled threats of

4

litigation at the Trustee in March due to the fact that the sales proceeds were not being held in an interest bearing account[4]. The Trustee explained to the Debtor that his handling of funds is in full compliance with current applicable guidelines. The Trustee also "strongly suggested" that the Debtor, or his counsel, contact Assistant U.S. Trustee, Robert Raschke, to confirm that the Trustee's handling of estate funds was appropriate. Attached to the Supplemental Affidavit of MDS as Ex. 6 is a true and correct copy of the April 7, 2016 letter to the Debtor's counsel addressing the interest issue. It is implausible to think that the Defendant and Debtor have not discussed this exact matter, even after being provided with the April 7, 2016 correspondence. Even the slightest bit of diligence by the Defendant, by way of a phone call to the United States Trustee's Office would have confirmed the complete lack of a factual or legal basis for the Defendant's allegation.

The Defendant's attempt to raise this issue, once again, is simply a bad faith effort to distract the Court and sling mud at the Plaintiff, without any factual or legal basis.[5]

## BACKGROUND FACTS

The debtor filed a Chapter 13 bankruptcy petition on July 13, 2015. In his Schedule A, he listed a ½ ownership interest in real property located at 100 Third Avenue South, #3201, Minneapolis, Minnesota ("Condominium"). He stated in his Schedules A and C, signed under penalty of perjury, that the value of the Condominium was $885,000. He claimed an exemption of $287,147.42 in the Condominium using state exemptions. The debtor has never amended his original Schedule A, B or C. To date the exemption claimed by Debtor remains $287,147.42.

[4] The Defendant's concern about interest is somewhat ironic in that she and her husband conspired to and did conceal monies by hiding that money in a box in a closet.
[5] Mr. Robert Raschke has indicated that he, or another attorney from the Office of the United States Trustee, will be present at the summary judgment hearing to be available to answer any questions this Court may have about the Trustee's adherence to current policies.

On September 16, 2015, the Debtor and Browne, without seeking court approval, entered into a listing agreement with Lakes/Sotheby's International Realty, in which they agreed to offer their condominium for sale for the price of $1,300,000. In the listing agreement the Debtor and Browne agreed to pay a commission on the sale of the real property located at 100 Third Avenue South, #3201, Minneapolis, Minnesota ("Condominium"). Aff. MDS at Ex. 2.[6]

During the fall of 2015, Browne entered into contracts with various vendors for material and/or labor to improve the Condominium. The debtor was not a party to any of those contracts, nor was the Chapter 13 trustee. See Browne testimony pages 80 to 87, February 18, 2016 Rule 2004 Examination, Aff. MDS Ex. 2.

On November 9, 2015, the Debtor and Browne accepted an offer to sell the Condominium for $1,200,000. Aff. MDS Ex. 2 at 77. On November 25, 2015, Debtor filed a motion seeking approval of the sale of the Condominium for $1,200,000. The motion stated that "Debtor seeks to sell his home to pay his creditors and to reduce his living expenses". The motion was opposed, in part, by the United States Trustee and various creditors, seeking to deny the relief requested pertaining to the distribution of sales proceeds. On December 3, 2015, after hearing on the motion, this Court approved the sale of the Condominium. The order authorizing the sale of the Condominium provided authorization for a Chapter 7 trustee to proceed with the sale and, in essence, pay necessary closing costs including the sale commission from the sale proceeds. Aff. MDS at Ex. 3. The order did not allocate sale proceeds as between the estate, the Debtor and Browne.

On December 15, 2015, the sale of the Condominium closed. At closing the following expenses, in addition to the mortgage, were paid out of the sale proceeds:

---

[6] "Aff. of MDS" refers to the Affidavit of Matthew D. Swanson filed with the trustee's motion for Partial Summary Judgment on May 4, 2016.

| | |
|---|---:|
| Judgment payoff to Best & Flanagan, LLP Trust Account ref. Chowdhury | $71,620.90 |
| Broker Commission (Listing) to Lakes Sotheby's International Realty | $495.00 |
| Listing Commission to Lakes Sotheby's International Realty | $39,600.00 |
| Selling Commission to Coldwell Banker Burnet | $32,400.00 |
| State Deed Tax to Burnet Title | $4,080.00 |
| Balance of HOA dues to the Carlyle | $1,112.91 |
| Contractors Invoice to J. Nordstrom | $150.00 |
| Electrical Useage to The Carlyle | 150.00 |
| Escrow for Nicollet Mall pending assessment and escrow fee to Burnet Title Master Escrow | $1,962.00 |
| HOA dues current letter to First Service Residential | $185.00 |
| Invoice for carpet to Midwest interiors | $1,800.00 |
| Invoice for flooring to Duane's Floor Service | $4,065.00 |
| Invoice for painting to Roell | $3,105.00 |
| Invoice to Pride Electric | $450.00 |
| Lights and cleaning to Fix Design Haus | $4,861.83 |
| Reimbursed realtor for resale disclosure to Ben Ganje | $160.00 |
| | <u>Total:  $166,197.64</u> |

A copy of the HUD settlement statement is attached to Aff. MDS Ex. 4.

The trustee believes those costs and expenses incurred by the Debtor and Browne, post-petition, should be paid by the Debtor and Browne with payment of those costs and expenses being deducted from their $390,000 joint homestead exemption availability.  Apparently, the Debtor and Browne believe that the debtor's creditors should bear the burden of those expenses. Except for the Chowdhury judgment, they are simply costs and expenses that the sellers have either agreed to, or are legally obligated to pay in order to complete the transaction.

7

On December 3, 2015, this Court also entered an order converting the case to a Chapter 7

based in part, on the Debtor's bad faith filing.  On the same day, the Court entered an order

authorizing the sale of the property.  Aff. MDS Ex. 3.

## ARGUMENT

The Defendant's motion for summary judgment has raised, for the first time, the issue of

valuation of the Condominium.  This was not a defense raised in the Defendant's Complaint, nor

had the Plaintiff heard of this defense prior to the filing of the Defendant's motion.  Summary

judgment is only appropriate:

> "if the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to a judgment as a matter of
> law." In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the burden
> of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  It

is clear from the Complaint that the Plaintiff has alleged that the chapter 7 estate has an interest

based on the sale price of $1,200,000.  As noted at paragraph 14 of the Complaint, and discussed

herein, the Defendant, Debtor and their real estate agent believed the value to be approximately

$1,300,000 as of September 16, 2015.  The Defendant and Debtor's March 16, 2016 Answer

does not refute this fact or raise any defense that this valuation is improper.

A party moving for summary judgment has the burden of showing that there are no

material facts at issue precluding entry of judgment.  *In re de Jesus*, 268 B.R. 185, 190 (Bankr.

D. Minn. 2001).  The Defendant in raising the valuation issue, if a legitimate issue, has created

an issue of material fact which requires further examination.  Given the short notice provided by

the Defendant on this defense, the Plaintiff has had little to no time to investigate this issue

through discovery including through taking the deposition of the appraiser.  The Plaintiff has the

right to cross-examine said expert and if necessary obtain an expert opinion of his own.


**1.  Valuation Issue Raised by Defendant Prevent Entry of Summary Judgment**

a.  Misleading Representations to the Court

The Plaintiff believes it is important to draw the Court's attention to the continuation of

misleading representations to this Court regarding the valuation of the Condominium.  The

Defendant's raising of a valuation issue is simply a continuation of her co-defendant's activities

during the course of the Chapter 13.

In particular, Defendant Hansmeier mislead this Court on many occasions with respect to

the condominium.  Additionally, Browne participated in Hansmeier's scheme to mislead

creditors about the pending sale of the condominium as will be seen in this brief analysis.

Relevant events relating to representations to this Court and testimony in the Chapter 13 are as

follows:

1. On July 13, 2015, Hansmeier files his Chapter 13, representing, under penalty of perjury
   that the value of the condominium is $885,000.  See Debtor's Original Schedule B.

2. Approximately two months later, on September 16, 2015, the Defendants' signed a listing
   agreement listing the condominium for $1,300,000.  Aff. of MDS Ex. 1.  Hansmeier has
   never filed an amended Schedule A.  Hansmeier has never filed an amended Schedule C.

3. According to the Defendant's Motion for Summary Judgement, the Defendants obtained
   an appraisal for the Condominium on September 18, 2015, which estimated the value at
   $1,175,000 as of September 16, 2015.  See Defendant's Affidavit, Ex. 1 at 5, filed with
   her motion for summary judgment.  That valuation was $290,000 more than the
   scheduled value of the Condominium.

4. Four days after having the Condominium appraised at $1,175,000, Hansmeier had his
   attorney, Barbara May, file a motion to avoid a judgment lien on the Condominium
   asserting that lien impaired his homestead exemption based on the false valuation in his
   schedules.  See docket entry 23 in the underlying bankruptcy case.

5. After that motion was filed, both Defendants gave testimony under oath to a creditor's attorney, as authorized by the Court.  In that testimony, Browne, being represented by attorney Barbara May, concealed the fact that a listing agreement had been signed, and offered, at best, misleading testimony as to the value of the property, which she had already listed for sale for $1.3 million dollars.  See Browne examination pages 51-52, attached to Aff. of MDS Ex. 2.  Similarly, although Hansmeier had also signed a listing agreement, he also pretended that he didn't know what the listing price would be.

6. Then, after one week on the market, the Defendants agreed to sell the property for $1.2 million dollars.  Aff. of MDS Ex. 2 at 77.

7. Several weeks later, Hansmeier verified a motion, which was filed with this Court, seeking authorization to sell the Condominium.  In that motion, Hansmeier represented to this Court that the sale would result in the estate receiving $20,439.55 in non-exempt bankruptcy estate property, which would be immediately paid to the estate upon closing to pay creditors.  See Debtor's November 25, 2015 Motion to Sell Property, docket No. 49 at 3, filed in bky no. 15-42460.  Hansmeier's Modified Chapter 13 Plan, filed on November 11, 2015, provided that the Debtor would pay $65,000 into the Chapter 13 plan within 90 days from the sale of his homestead. See Docket No. 40 at 5.

8. The Debtor's November 25, 2015 motion made no mention to this Court of several unpaid vendor liens against the property in excess of $14,000.00.

Hansmeier's expedited motion to approve the sale of the Condominium was filed by Barbara May, who represented Browne at her October 28, 2015 Rule 2004 examination.  Browne did not object to the sale motion, despite the fact that it purported to transfer at least $20,000 to the bankruptcy estate.  Now it is the position, apparently, of Browne that, although she paid nothing for her ownership interest in this property and used misappropriated estate funds to make mortgage payments, that the estate and its creditors are entitled to none of the sale proceeds. Apparently representations made to this Court by her co-defendant were simply necessary to make sure the sale was approved.

b. Defendant's Valuation of $1,100,000 is Improper and Raises an Issue of Material Fact

The Defendant's motion for summary judgment seeks to raise an issue of material fact which would preclude entry of summary judgment.  The Defendant argues that the relevant value

10

for the Condominium, for purposes of this matter, is the value as of the filing of the Debtor's

Chapter 13 petition.  The Defendant bases this assertion on a retroactive appraisal which

provides an opinion as to the value of the Condominium as of July 1, 2015.  See Exhibit 1 to

Affidavit of Padraigin Browne.

      Despite Defendant's conclusions, the appraisal at best creates an issue of material fact in

this matter.  One appraiser's opinion of value does not establish that value as fact for this case.

The Plaintiff has the right to cross-examine the appraiser and perform his own investigation on

this factual issue.  A review of the appraisal, attached to the Defendant's affidavit, raises several

issues which require further findings.  For instance, the appraiser establishes the Condominium's

value as $1,200,000 as of December 15, 2015, the closing date, instead of the date the date the

purchase agreement was executed, November 9, 2015.  Furthermore, one of the sales

comparisons used by the Defendant's appraiser would give the Condominium an appraised value

of $1,216,550 as of July 1, 2015.  See Browne Aff. Ex. 1 at 16.

      Conveniently missing from the Defendant's Affidavit is a copy of the alleged September

18, 2015 appraisal.  According to the Debtor's appraiser, as of September 16, 2015, the

Condominium was valued at $1,175,000.  The appraiser now asserts that this valuation assumed

that the property was "show ready" which included cleaning, painting and new carpeting.

Browne Aff. Ex. 1 at 5.   That appraisal should be subject to this Court's scrutiny, and

examination by the Plaintiff.  If we assume the appraiser's September valuation of $1,175,000 is

accurate, and apply his appreciation rate of .0075% per month to that value, the value as of the

Chapter 13 filing date would be approximately $1,157,441.09.[7]  Defendant may attempt to

remedy this glaring error by asserting that this value assumes certain repairs were made to the

Condominium post-petition, which would further reduce the value as of the filing date.

_____

[7] Reversing the appreciation for 2 months, July 13, 2015 to September 16, 2015, reduces the value by $17,558.91.

However, fatal to that argument, as further discussed below, is the fact that many of those "repairs" were funded through use of either bankruptcy estate property or were paid at closing from sales proceeds.  In either event the bankruptcy estate should not be penalized for those adjustments.

Another factual issue raised by the appraiser is his reduction of the appraised price for a purported increase in value attributed to improvements performed post petition.  There are several issues with making this adjustment; first, there is an assumption that the improvements actually increased the value of the property; and second, the adjustment assumes the funds used to "improve" the property were not property of the bankruptcy estate.  If the funds, or some of the funds, used to improve the property were property of the bankruptcy estate, the improvements and increase in value would be "proceeds" under 11 U.S.C. § 541(a)(6) and would be property of the bankruptcy estate.

        c.   Defendant's Testimony and Actions Support a Valuation in Excess of
             $1,100,000.

On September 16, 2015, the Debtor and Defendant executed a listing agreement with their real estate agent agreeing to list the Condominium for $1,300,000.  Assuming the real estate agent is competent, there must have been a basis for pricing the property $200,000 over the value the Defendant is urging the Court to accept in her motion for summary judgment.  The Defendant argues that the agent thought the approximately $24,000 of improvements would add $200,000 to the value of the property; however; this position is simply unsupported by any sales history.  See Browne Aff. Ex. 1 at 18-21.  The appraiser's skepticism regarding the $200,000-$300,000 increase opinions is well founded, and it seems highly unlikely that a competent real estate agent would execute a listing agreement with the expectation that the seller was going to improve the property by 18-27% through paint and carpeting.  Furthermore, according to the

appraiser's comments at page 5 of Exhibit 1 attached to Browne's affidavit, his opinion of the

value of the Condominium as of September 16, 2015 was $1,175,000, assuming the property was

cleaned, painted and carpeting was replaced.

### 2. __The Debtor's Bad Faith Filing Justifies the Application of 11 U.S.C. § 348(f)(2) and Establishing the Value as $1,200,000 for this Matter.__

The Defendant bases her argument of valuation on the application of § 348(f)(1)(A),

which provides that:

> Property of the estate in the converted case shall consist of property of the estate,
> as of the date of filing of the petition, that remains in the possession of or is under
> the control of the debtor on the date of conversion;

This provision was included in the Bankruptcy Code to remove the potential penalty to a good

faith Chapter 13 filer caused by the application of § 1306, which brought after-acquired property

into the bankruptcy estate.  Section 348(f)(1) protected the good faith filer from having after

acquired property become part of the converted estate on conversion.  See *In re Jackson*, 317

B.R. 511, 516 (Bankr.ND Ill 2004); citing *In re Warren*, 298 B.R. 322, 326 (N.D. Ill.

2003)(Congress sought to encourage debtors to reorganize their affairs through chapter 13 rather

than to immediately liquidate their property under chapter 7.)

> The Bankruptcy Reform Act of 1994 added subsection (f) to § 348 to clarify that
> Congress did not want courts to include in post-conversion chapter 7 estates the
> property acquired by the debtor during the pre-conversion chapter 13 case.  3
> Lawrence P. King, *Collier on Bankruptcy* ¶ 348.07[1] (Alan N. Resnick & Henry
> J. Sommer eds., 15th rev. ed.2008).  Congress was concerned that a contrary rule
> would greatly dissuade debtors and create a serious disincentive to chapter 13
> filing because debtors would fear that property acquired after filing could be lost
> if the case were converted. *Id.* (citing H.R.Rep. No. 835, 103d Cong., 2d Sess. 57
> (1994), U.S.Code Cong. & Admin.News 1994, p. 3340).

In re Laflamme, 397 B.R. 194, 201 (Bankr. D.N.H. 2008)

In this case we are not dealing with a good faith filer.   On December 3, 2015, this Court

found that the Debtor's Chapter 13 filing was in bad faith, and a scheme to avoid creditors and

court orders requiring him to produce financial records.  As a consequence, and to stop the bad

faith efforts of the Debtor, the Court converted this case.  This case was converted as a result of

the Debtor's bad faith, as a result, the Court should apply 11 U.S.C. § 348(f)(2) to this case.

Traditionally (f)(2) is applied to bad faith conversions by the debtor.  See 11 U.S.C. § 348(f)(2).

The Plaintiff believes the application of § 348(f)(2) is consistent with Congressional intent, and

application in this case is warranted as if the Debtor himself had converted the case in bad faith.

When analyzing bad faith conversions under § 348(f)(2), courts consider the debtor's

conduct throughout the entire case to establish a finding of bad faith.  *In re Wiggins*, 2012 WL

3889099, at **4–7 (Bankr.E.D.Tenn.2012). This case is unique, and arguably the code does not

specifically address this situation.  This Court noted multiple findings regarding the Debtor's bad

faith in the filing of his Chapter 13 case, as well as actions during the case.  Giving the Debtor

the benefit of § 348(f)(1)(A) in light of his bad faith would allow for the abuse of the Bankruptcy

Code.  The Court has the authority to apply § 348(f)(2) to this unique fact scenario as it is not

specifically accounted for in the Bankruptcy Code.  If not through § 348(f)(2), the Court could

exercise its authority through §105(a) to find the Debtor's bad faith is sufficient to establish that

this case should never have been filed as a Chapter 13 case, and in order to prevent an abuse of

process the court does not need to apply § 348(f)(1)(A) as it would be inconsistent with

Congressional intent and necessary to prevent the Debtor's abuse of process.

### 3. Plaintiff's Motion for Prejudgment Attachment in Adv. No. 16-4031 Requires an Order on the Allocation of Proceeds.

On April 13, 2016, the Plaintiff in this case filed a motion for prejudgment attachment

against the Defendant in Adversary No. 16-4031, that motion was amended on May 11, 2016,

seeking an attachment order for any non-exempt funds payable to the Defendant in this case.

The hearing on the Plaintiff's motion is scheduled for May 25, 2016.  The Plaintiff believes he

will prevail in obtaining an order for pre-judgment attachment, and when the Court grants the

Plaintiff's motion, it will be necessary for the court to determine the extent of the Debtor and

Defendant's homestead exemption, which is unaddressed by the Defendant's motion for

summary judgment.

### 4.   **Allocation of Sale Proceeds**

Defendant's motion for summary judgment fails to address the Plaintiff's claim for

allocation of sale proceeds.  In addition to the allocations set forth in the Complaint, the Court is

also faced with crediting post-petition mortgage payments as discussed above.   Pursuant to the

Plaintiff's calculations, as an initial matter, and without addressing any credits to the estate for

use of estate property for mortgage payments during the course of the Chapter 13 case, the

Plaintiff provides a proposed allocation of expenses below.  The Plaintiff's calculation utilizes

the $1,200,000 sale price.  After the $598,402.79 mortgage payoff there remains $601,597.21 in

funds to allocate.  The Plaintiff believes that the additional expenses/fees paid at closing should

be allocated as follows:

| **Debtor's Share** | Exempt Portion | Non-Exempt Portion | **Defendant's Share** | Exempt Portion | Non-Exempt Portion |
|---|---|---|---|---|---|
| 300,798.61 | 195,000.00 | 105,798.61 | 300,798.60 | 195,000.00 | 105,798.60 |
| | | | | | |
| Chowdhury Judgment | | (71,620.90) | | | |
| Commissions and Realtor Fees | (36,327.50) | | | (36,327.50) | |
| Contractor Fees | | | | (14,591.83) | |
| Deed Tax | (2,040.00) | | | (2,040.00) | |
| HOA Dues and Letter fee | (648.96) | | | (648.95) | |
| Electric Bill | (75.00) | | | (75.00) | |
| Escrow for Nicollet Mall Assessment | (981.00) | | | (981.00) | |

| Recording Fees | (74.00) | | | (74.00) | |
|---|---|---|---|---|---|
| **BALANCE** | **$154,853.54** | **$34,177.71** | | **$140,261.72** | **105,798.60** |

In accordance with the above allocations there remains non-exempt bankruptcy estate property to be turned over to the Trustee in an amount of at least $34,177.71. In light of the facts in this case, the above allocation is just and equitable.

While the Plaintiff has allocated the Chowdhury judgment payoff ($71,620.90) to the Debtor's side of the balance sheet, because the judgment was against the debtor alone, that allocation is inequitable and unfair to the Debtor's creditors. It appears that all funds to purchase the property came from Hansmeier. Most, if not all of the mortgage payments were also derived from Hansmeier funds, including the bankruptcy estate's account receivables. So most, if not all of the funds to finance the Condominium purchase came as a result of Hansmeier's business activities. The Chowdhury judgment was also a result of Hansmeier's business activities. Allocation of the Chowdhury judgment to Hansmeier alone gives Browne all of the benefits of the Debtor's business activities and none of the burdens.

## Conclusion

Due to the material issues of fact raised by the Defendant, and as set forth above, Defendant's motion for summary judgment should be denied.

FULLER, SEAVER, SWANSON & KELSCH, P.A.

Dated: May 13, 2016        By: /e/ Matthew D. Swanson
         Matthew D. Swanson      390271
         Randall L. Seaver         152882
         12400 Portland Avenue South, Suite 132
         Burnsville, MN 55337
         mswanson@fssklaw.com
         Telephone: 952-890-0888

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

BKY No. 15-42460

In re:

ADV No. 16-4018

Paul Robert Hansmeier,

     Debtor.

---

Randall L. Seaver, Trustee

     Plaintiff,

vs.                                    **AFFIDAVIT OF MATTHEW D. SWANSON**

Paul Hansmeier and Padraigin Browne,

     Defendants.

---

STATE OF MINNESOTA  )
                     ) ss.
COUNTY OF DAKOTA   )      Matthew D. Swanson, being first duly sworn on oath, states and alleges as follows:

1.     I am one of the attorneys representing the Plaintiff in the above matter, Randall L. Seaver, Trustee, who was appointed to administer the bankruptcy estate of Paul Robert Hansmeier, Bankruptcy Case No. 15-42460.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the listing agreement entered into between the Defendants and Lakes/Sotherby's in September of 2015.

3.     Attached hereto as Exhibit 2 is a true and accurate copy of the transcript of the Rule 2004 examination of Padraigin Browne taken on February 18, 2016.

4.     Attached hereto as Exhibit 3 is a true and accurate copy of the December 3, 2015 order entered in Bky No. 15-42460 approving the sale of real property.

5.     Attached hereto as Exhibit 4 is a true and accurate copy of the HUD statement for the sale of real property located at 100 South 3rd Avenue, 3201, Minneapolis, MN 55401.

6.     Attached hereto as Exhibit 5 is a true and accurate copy of the July 20, 2015 Associated Bank statement for the Defendant Padraigin Browne's account ending in #1853.

7.      Attached hereto as Exhibit 6 is a true and accurate copy of the October 20, 2015

Associated Bank statement for the Defendant Padraigin Browne's account ending in #1853.

FURTHER YOUR AFFIANT SAYETH NOT.

Matthew D. Swanson

Subscribed and sworn to before me
this 4 day of May, 2016.

Notary Public

Jennifer Marie Baker
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 1-31-2017

DocuSign Envelope ID: 9547E2F7-ED51-480E-9D84-FAD908C3FEB8

Lakes | Sotheby's
INTERNATIONAL REALTY

LISTING CONTRACT:
EXCLUSIVE RIGHT TO SELL

1. Date _____ **09/16/2015**

2. Page 1 of _____ pages

3. DEFINITIONS: This Contract involves the property located at ___ **100    3rd Ave S #3201** ___ ,

4. legally described as **CIC NO 1380 THE CARLYLE UNIT NO 3201** _____

5. _____ ("Property").

6. Seller is ___ **Padraigin Browne** _____ **Paul Hansmeier** ___ ("Seller").

7. Broker is _____ **Lakes Sotheby's International** _____ ("Broker").
   (Real Estate Company Name)

8. This Contract starts on ___ **September    16th** , 20 **15** ___ , and ends at 11:59 p.m. on ___ **March    16th** ,

9. 20 **16** ___ .

10. This Contract may only be canceled by written mutual agreement of the parties.

11. PRICE: Seller offers the Property for sale for the price of $ ___ **1,300,000.00** ___ , upon the following

12. terms: _____ **6 month listing contract** _____ .

13. LISTING: Seller gives Broker the exclusive right to sell the Property. In exchange, Broker agrees to list and market
14. the Property for sale. Broker may place a "For Sale" sign and a lock box with keys on the Property, unless prohibited by
15. governing authority. Seller understands this Contract DOES NOT give Broker authority to rent or manage the Property.
16. Seller understands Broker may be a member of a Multiple Listing Service ("MLS"), and if Broker is a member of MLS,
17. and where available, Broker may give information to the MLS concerning the Property. Broker may place information
18. on the Internet concerning the Property, including sold information (except as limited in the Internet Display Options
19. Form). If Broker sells the Property, Broker may notify the MLS and member REALTORS® of the price and terms of
20. the sale. Seller acknowledges that neither Broker, the MLS, the Minnesota Association of REALTORS®, nor any other
21. broker is insuring Seller or occupant against theft, loss or vandalism.

22. (Initial)

23. Seller acknowledges that Seller has received and has had the opportunity to review the Internet

24. Display Options Form.

25. LISTED FOR LEASE: The Property ☐ IS ☒ IS NOT currently listed for lease. If IS, the listing broker is
    (Check one.)

26. _____ . If IS NOT, Seller ☐ MAY ☒ MAY NOT list the Property for lease during the
    (Check one.)

27. terms of this Contract with another broker.

28. Nothing in this Contract shall prohibit Broker and Seller from entering into a listing agreement for the lease of this
29. Property upon terms acceptable to both parties.

30. SELLER'S OBLIGATION: Seller shall notify Broker of relevant information important to the sale of the Property.
31. Seller shall cooperate with Broker in selling the Property. Seller shall promptly inform Broker about all inquiries Seller
32. receives about the Property. Seller agrees to provide and pay for any inspections and reports required by any
33. governmental authority. Seller agrees to provide unit owners' association documents, if required. Seller shall remain
34. responsible for security, maintenance, utilities and insurance during the term of this Contract, and for safekeeping,
35. securing and/or concealing any valuable personal property during Property showings or open houses. Seller shall
36. surrender any abstract of title and a copy of any owner's title insurance policy for this Property, if in Seller's possession
37. or control, to buyer or buyer's designated title service provider. Seller shall take all actions necessary to convey
38. marketable title by the date of closing as agreed to in a purchase agreement. Seller shall sign all documents necessary
39. to transfer to buyer marketable title to the Property. Seller has the full legal right to sell the Property.

40. Seller authorizes Broker, and any other broker authorized by Broker, to preview and show the Property at reasonable
41. times and upon reasonable notice and agrees to commit no act which might tend to obstruct Broker's performance
42. hereunder. If the Property is occupied by someone other than Seller, Seller shall comply with Minnesota law and any
43. applicable lease provisions of an existing lease and provide tenant with proper notice in advance of any Property
44. showing.

MN:LC:ERS-1 (8/15)

EXHIBIT 1

instanet
forms

Lakes | Sotheby's
INTERNATIONAL REALTY

45.     Page 2

LISTING CONTRACT:
EXCLUSIVE RIGHT TO SELL

46.     Property located at    100    3rd Ave S #3201                    Minneapolis     MN     55401   .

47.     SELLER CONTENT LICENSE: In the event Seller provides content, including, but not limited to, any photos or videos
48.     of the Property ("Seller Content") to Broker, Seller grants to Broker a nonexclusive, perpetual, world-wide, transferable,
49.     royalty free license to sub-license (including through multiple tiers), reproduce, distribute, display, perform and create
50.     derivate works of the Seller Content. Seller represents and warrants that Seller has authority to provide Seller Content
51.     and Seller Content does not violate any restrictions regarding use including any third-party intellectual property rights
52.     or laws. Seller agrees to execute any further documents that are necessary to effect this license.

53.     NOTICE:     THE COMPENSATION FOR THE SALE, LEASE, RENTAL OR MANAGEMENT OF REAL PROPERTY
54.                 SHALL BE DETERMINED BETWEEN EACH INDIVIDUAL BROKER AND THE BROKER'S CLIENT.

55.     BROKER'S COMPENSATION:
56.     Seller agrees to pay Broker a retainer fee of $ _____0.00_____ at the commencement of this Contract, which
57.     fee should be kept by Broker whether or not Seller sells the Property. The retainer fee will apply toward satisfaction of
58.     any obligation to compensate Broker.

59.     Seller shall pay Broker, as Broker's compensation, ___6___

                                    0.00

        Other: __Commission shall be reduced to 5% if seller purchases next home with Ben Ganje/Josh Neumann__

63.     In addition, if before this Contract expires Broker presents a buyer who is willing and able to buy the Property at the
64.     price and terms required in this Contract, but Seller refuses to sell, Seller shall still pay Broker the same compensation.
65.     Seller agrees to pay Broker's compensation whether Broker, Seller or anyone sells the Property. Seller hereby permits
66.     Broker to share part of Broker's compensation with other real estate brokers, including brokers representing only the
67.     buyer. Seller agrees to pay Broker's compensation in full upon the happening of any of the following events:

68.          1.   the closing of the sale;
69.          2.   Seller's refusal to close the sale; or
70.          3.   Seller's refusal to sell at the price and terms specified above.

71.     If, within ___0___ days (not to exceed six (6) months) after the expiration of this Contract, Seller sells or agrees to sell
72.     the Property to anyone who:

73.          1.   during this Contract made inquiry of Seller about the Property and Seller did not tell Broker about the inquiry;
74.               or
75.          2.   during this Contract made an affirmative showing of interest in the Property by responding to an advertisement,
76.               or by contacting Broker or the licensee involved, or was physically shown the Property by Broker and whose
77.               name and address is on a written list Broker gives to Seller within 72 hours after the expiration of this Contract;

78.     then Seller shall still pay Broker the compensation noted herein, even if Seller sells the Property without Broker's
79.     assistance. Seller understands that Seller does not have to pay Broker's compensation if Seller signs another valid
80.     listing contract or facilitator services agreement for this Property after the expiration or cancellation of this Contract,
81.     under which Seller is obligated to compensate another licensed real estate broker.

82.     To secure the payment of Broker's compensation, Seller hereby assigns to Broker the gross proceeds from the sale
83.     of the Property in an amount equal to the compensation due to Broker under this Contract.

84.     COMPENSATION DISCLOSURE: Broker's compensation to cooperating brokers shall be as specified in the MLS
85.     unless Broker notifies Seller otherwise in writing.

86.     CLOSING SERVICES:

87.     NOTICE:     THE REAL ESTATE BROKER, LICENSEE REPRESENTING OR ASSISTING SELLER OR REAL ESTATE
88.                 CLOSING AGENT HAS NOT EXPRESSED AND, UNDER APPLICABLE STATE LAW, MAY NOT EXPRESS
89.                 OPINIONS REGARDING THE LEGAL EFFECT OF THE CLOSING DOCUMENTS OR OF THE CLOSING
90.                 ITSELF.

91.     After a purchase agreement for the Property is signed, arrangements must be made to close the transaction. Seller
92.     understands that no one can require Seller to use a particular person in connection with a real estate closing and that
93.     Seller may arrange for a qualified closing agent or Seller's attorney to conduct the closing.



Lakes | Sotheby's
INTERNATIONAL REALTY

LISTING CONTRACT:
EXCLUSIVE RIGHT TO SELL
94.    Page 3

95.    Property located at __100   3rd Ave S #3201__                    __Minneapolis      MN    55401__ .

96.    Seller's choice for closing services. (Initial one.)

97.    _P.H._  _PB_  _____ Seller wishes to have Broker arrange for the closing.
      (Seller)   (Seller)

98.    _____  _____ Seller shall arrange for a qualified closing agent or Seller's attorney to conduct the closing.
      (Seller)   (Seller)

99.    ADDITIONAL COSTS: Seller acknowledges that Seller may be required to pay certain closing costs, which may
100.   effectively reduce the proceeds from the sale.

101.   Seller understands that mortgage financing services are usually paid for by buyer; however, certain insured government
102.   loans may require Seller to pay a portion of the fees for the mortgage loan. Seller understands that Seller shall not be
103.   required to pay the financing fees on any mortgage without giving Seller's written consent.

104.   FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"): Section 1445 of the Internal Revenue Code
105.   provides that a transferee ("Buyer") of a United States real property interest must be notified in writing and must withhold
106.   tax from the transferor ("Seller") if the transferor ("Seller") is a foreign person, provided there are no applicable exceptions
107.   from FIRPTA withholding.

108.   Seller represents and warrants that Seller ☐ IS ☐ IS NOT a foreign person (i.e., a non-resident alien individual,
                                                -----(Check one.)----
109.   foreign corporation, foreign partnership, foreign trust, or foreign estate) for purposes of income taxation.

110.   Due to the complexity and potential risks of failing to comply with FIRPTA, Seller should seek appropriate legal and
111.   tax advice regarding FIRPTA compliance, as Broker will be unable to confirm whether Seller is a foreign person
112.   or whether the withholding requirements of FIRPTA apply.

113.   WARRANTY: There are warranty programs available for some properties which warrant the performance of certain
114.   components of a property, which warranty programs Seller may wish to investigate prior to the sale of the Property.

115.   AGENCY REPRESENTATION: If a buyer represented by Broker wishes to buy the Seller's Property, a dual
116.   agency will be created. This means that Broker will represent both the Seller and the buyer, and owe the same
117.   duties to the buyer that Broker owes to the Seller. This conflict of interest will prohibit Broker from advocating exclusively
118.   on the Seller's behalf. Dual agency will limit the level of representation Broker can provide. If a dual agency should arise,
119.   the Seller will need to agree that confidential information about price, terms, and motivation will still be kept
120.   confidential unless the Seller instructs Broker in writing to disclose specific information about the Seller. All other
121.   information will be shared. Broker cannot act as a dual agent unless both the Seller and the buyer agree to it. By
122.   agreeing to a possible dual agency, the Seller will be giving up the right to exclusive representation in an in-house transaction.
123.   However, if the Seller should decide not to agree to a possible dual agency, and the Seller wants Broker to represent
124.   the Seller, the Seller may give up the opportunity to sell the Property to buyers represented by Broker.

125.   Seller's Instructions to Broker:
126.   Having read and understood this information about dual agency, Seller now instructs Broker as follows:
127.   ☒  Seller will agree to a dual agency representation and will consider offers made by buyers represented by
128.      Broker.
129.   ☐  Seller will not agree to a dual agency representation and will not consider offers made by buyers represented
130.      by Broker.

131.   Real Estate Company Name: _____ **Lakes Sotheby's International** _____

132.                                                      Seller: _Paul Hansmeier_ _____

133.   By: _Ben Ganje_ _____                         Seller: _Padraigin Browne_ _____
      (Licensee) **Ben Ganje**                                     A95CB071C08F4FC...

134.                                                      Date: _____

MN:LC:ERS-3 (8/15)



DocuSign Envelope ID: 9547E2F7-ED51-480E-9D84-EAD906C2FEDB

Lakes | **Sotheby's**
INTERNATIONAL REALTY

LISTING CONTRACT:
EXCLUSIVE RIGHT TO SELL

135.    Page 4

136.  Property located at ___100  3rd Ave S #3201_____Minneapolis____MN___55401____.

137.  OTHER POTENTIAL SELLERS: Seller understands that Broker may list other properties during the term of this
138.  Contract. Seller consents to Broker representing or assisting such other potential sellers before, during and after the
139.  expiration of this Contract.

140.  PREVIOUS AGENCY RELATIONSHIPS: Broker or licensee representing or assisting Seller may have had a previous
141.  agency relationship with a potential buyer of Seller's Property. Seller acknowledges that Seller's Broker or licensee
142.  representing or assisting Seller is legally required to keep information regarding the ultimate price and terms the buyer
143.  would accept and the motivation for buying confidential, if known.

144.  INDEMNIFICATION: Broker will rely on the accuracy of the information Seller provides to Broker. Seller agrees
145.  to indemnify and hold harmless Broker from and against any and all claims, liability, damage or loss arising from any
146.  misrepresentation, misstatement, omission of fact or breach of a promise by Seller. Seller agrees to indemnify and hold
147.  harmless Broker from any and all claims or liability related to damage or loss to the Property or its contents, or any
148.  injury to persons in connection with the marketing of the Property. Indemnification by Seller shall not apply if the damage,
149.  loss or injury is the result of the gross negligence or willful misconduct of the Broker.

150.  FAIR HOUSING NOTICE: Seller understands that Seller shall not refuse to sell, or discriminate in the terms, conditions
151.  or privileges of sale, to any person due to his/her race, color, creed, religion, national origin, sex, marital status, status
152.  with regard to public assistance, handicap (whether physical or mental), sexual orientation or family status. Seller
153.  understands further that local ordinances may include other protected classes.

154.  ADDITIONAL NOTICES AND TERMS: As of this date Seller has not received notices from any municipality, government
155.  agency or unit owners' association about the Property that Seller has not informed Broker about in writing. Seller agrees
156.  to promptly inform Broker, in writing, of any notices of such type that Seller receives during the term of this Contract.

157.  This shall serve as Seller's written notice granting Broker permission to obtain mortgage information (e.g., mortgage
158.  balance, interest rate, payoff and/or assumption figures) regarding any existing financing on the Property. A copy of
159.  this document shall be as valid as the original.

160.  ELECTRONIC SIGNATURES: The parties agree the electronic signature of any party on any document related to this
161.  transaction constitute valid, binding signatures.

162.  CONSENT FOR COMMUNICATION: Seller authorizes Broker and its representatives to contact Seller by mail, phone,
163.  fax, e-mail or other means of communication during the term of this Agreement and anytime thereafter.

164.  OTHER: _____

165.  _____

166.  _____

167.  _____

168.  _____

169.  _____

170.  _____

171.  _____

172.  _____

MN:LC:ERS-4 (8/15)



Lakes | Sotheby's
        INTERNATIONAL REALTY
        INTERNATIONAL REALTY

173.   Page 5

LISTING CONTRACT:
EXCLUSIVE RIGHT TO SELL

174.   Property located at   **100   3rd Ave S #3201**                         **Minneapolis      MN     55401**   .

175.   **BROKER**                                              **SELLER**

176.   ACCEPTED BY:   **Lakes Sotheby's International**        ACCEPTED BY   *Padraigin Browne*
                      (Real Estate Company Name)                             (Seller)

177.   By: _Ben Ganje_                                         _____
            (Licensee)  **Ben Ganje**                          (Date)

178.   _____                        _____
       (Date)                                                  (Address)

179.   **3217 Galleria # L**                                   _____
       (Address)     **Edina        MN    55435-2509**         (Phone)

180.           **651-442-6161**                                _____
       (Phone)                                                 (E-Mail Address)

181.   _____
              **ben.ganje@lakesmn.com**
       (E-Mail Address)


182.                                                           **SELLER**

183.                                                           ACCEPTED BY:   *Paul Hansmeier*
                                                                              (Seller)

184.   _____                        _____
                                                               (Date)

185.                                                           _____
                                                               (Address)

186.                                                           _____
                                                               (Phone)

187.   _____                        _____
                                                               (E-Mail Address)


188.               THIS IS A LEGALLY BINDING CONTRACT BETWEEN SELLER AND BROKER.
189.          IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

MN:LC:ERS-5 (8/15)



# Certification to Withhold Property Listing
# from NorthstarMLS

2550 University Ave West, Suite 259 South, Saint Paul, MN 55114

For questions or help, contact the Help Desk at (651) 251-5456, 1-877-251-5455 or help@northstarmls.com

<u>NOTICE TO AGENT</u>: This completed, signed form must be uploaded to Add/Edit as a supplement to the withheld listing within two business days of the listing contract effective date.

<u>Informed Consent:</u>  The undersigned as owners of the property at:

| 100  3rd Ave S #3201 | Minneapolis | 55401 |
|---|---|---|
| Address | City | Zip |

have listed it for sale with_____ Ben Ganje _____

Name of MLS Participant (Agent/Broker)      (Please Print)

Contract Date_____     Contract Expiration Date_____

County_____Hennepin_____     PID#_____2302924320809_____

Property Type: ☒ Single Family   ☐ Multi-Family   ☐ Farm   ☐ Lots & Land   ☐ Commercial/Mixed Use (Optional)

In 2013, real estate transaction volume for over 69,800 properties valued at $15.1 billion was conducted through the NorthstarMLS system. Withholding from the Multiple Listing Service (MLS):

- Keeps your property from being exposed to the broadest market of over 14,000 agents and their buyers;
- Eliminates the ongoing advertising benefit of having your property available 24/7 to all potential buyers regardless of when they may start looking;
- Limits showings to agents affiliated with your listing broker and/or only to agents or brokers with whom they choose to cooperate;
- Keeps your property off of www.realtor.com and local Broker Reciprocity Web sites where buyers search for properties.

The listing broker/agent has fully explained the benefits of placing property for sale on the Multiple Listing Service (Service). The undersigned are fully aware that they are entitled to have their property placed on the Service, and that their property can be withheld from the Service only at their written request. The undersigned further have not been induced in any manner by the above named MLS Participant to withhold their property from the MLS. By signing this form, the undersigned hereby acknowledge having read and understood the foregoing.

The undersigned request that the property identified above be withheld from the Multiple Listing Service. Upon sale of this property, the undersigned authorizes the listing broker to disseminate sales information to members of the MLS.

Dated_____   Owner signature: _Paul Hansmeier_____

Dated_____   Owner signature: _Padraigin Browne_____

The undersigned Participant of the Service hereby acknowledges that the above owners of property have listed with the undersigned; that they have been advised by the undersigned of the benefits of the Service; and that the undersigned has not acted in any manner so as to induce them to withhold their property from the Service.

Dated: _____   By _Ben Ganje_____

Agent or Broker Signature  Ben Ganje

Office ID #  _____40130_____   Office Name: _____Lakes Sotheby's International_____

Agent ID #  ___502023353___   Address: _3217 Galleria # L    Edina    MN  55435-2509_

Phone: ___952-230-3101___

Lakes | **Sotheby's**
INTERNATIONAL REALTY

AGENCY RELATIONSHIPS IN
REAL ESTATE TRANSACTIONS

1.  Page 1

2.  <u>MINNESOTA LAW REQUIRES</u> that early in any relationship, real estate brokers or salespersons discuss with
3.  consumers what type of agency representation or relationship they desire.[1] The available options are listed below. This
4.  is not a contract. This is an agency disclosure form only. If you desire representation you must enter into a
5.  written contract, according to state law (a listing contract or a buyer/tenant representation contract). Until such time
6.  as you choose to enter into a written contract for representation, you will be treated as a customer and will not receive
7.  any representation from the broker or salesperson. The broker or salesperson will be acting as a Facilitator (see
8.  paragraph IV on page two (2)), unless the broker or salesperson is representing another party, as described below.

9.  ACKNOWLEDGMENT: I/We acknowledge that I/we have been presented with the below-described options.
10. I/We understand that until I/we have signed a representation contract, I/we am/are not represented by the
11. broker/salesperson. I/We understand that written consent is required for a dual agency relationship.

12.          THIS IS A DISCLOSURE ONLY, NOT A CONTRACT FOR REPRESENTATION.

13.  *Padraigin Browne*                                        *Paul Hansmeier*
     (Signature)                          (Date)              (Signature)                          (Date)
     AA5CB071C08F4FC...                                       4EE707F3680553849D...

14.  I.   Seller's/Landlord's Broker: A broker who lists a property, or a salesperson who is licensed to the listing broker,
15.      represents the Seller/Landlord and acts on behalf of the Seller/Landlord. A Seller's/Landlord's broker owes to
16.      the Seller/Landlord the fiduciary duties described on page two (2).[2] The broker must also disclose to the Buyer
17.      material facts as defined in MN Statute 82.68, Subd. 3, of which the broker is aware that could adversely and
18.      significantly affect the Buyer's use or enjoyment of the property. (MN Statute 82.68, Subd. 3 does not apply to
19.      rental/lease transactions.) If a broker or salesperson working with a Buyer/Tenant as a customer is representing the
20.      Seller/Landlord, he or she must act in the Seller's/Landlord's best interest and must tell the Seller/Landlord any
21.      information disclosed to him or her, except confidential information acquired in a facilitator relationship (see paragraph
22.      IV on page two (2)). In that case, the Buyer/Tenant will not be represented and will not receive advice and counsel
23.      from the broker or salesperson.

24.  II.  Buyer's/Tenant's Broker: A Buyer/Tenant may enter into an agreement for the broker or salesperson to represent
25.      and act on behalf of the Buyer/Tenant. The broker may represent the Buyer/Tenant only, and not the Seller/Landlord,
26.      even if he or she is being paid in whole or in part by the Seller/Landlord. A Buyer's/Tenant's broker owes to the
27.      Buyer/Tenant the fiduciary duties described on page two (2).[2] The broker must disclose to the Buyer material facts
28.      as defined in MN Statute 82.68, Subd. 3, of which the broker is aware that could adversely and significantly affect
29.      the Buyer's use or enjoyment of the property. (MN Statute 82.68, Subd. 3 does not apply to rental/lease transactions.)
30.      If a broker or salesperson working with a Seller/Landlord as a customer is representing the Buyer/Tenant, he or
31.      she must act in the Buyer's/Tenant's best interest and must tell the Buyer/Tenant any information disclosed to him
32.      or her, except confidential information acquired in a facilitator relationship (see paragraph IV on page two (2)). In
33.      that case, the Seller/Landlord will not be represented and will not receive advice and counsel from the broker or
34.      salesperson.

35.  III. Dual Agency - Broker Representing both Seller/Landlord and Buyer/Tenant: Dual agency occurs when one
36.      broker or salesperson represents both parties to a transaction, or when two salespersons licensed to the same
37.      broker each represent a party to the transaction. Dual agency requires the informed consent of all parties, and
38.      means that the broker and salesperson owe the same duties to the Seller/Landlord and the Buyer/Tenant. This
39.      role limits the level of representation the broker and salesperson can provide, and prohibits them from acting
40.      exclusively for either party. In a dual agency, confidential information about price, terms and motivation for pursuing
41.      a transaction will be kept confidential unless one party instructs the broker or salesperson in writing to disclose
42.      specific information about him or her. Other information will be shared. Dual agents may not advocate for one party
43.      to the detriment of the other.[3]

44.      Within the limitations described above, dual agents owe to both Seller/Landlord and Buyer/Tenant the fiduciary
45.      duties described below.[2] Dual agents must disclose to Buyers material facts as defined in MN Statute 82.68, Subd.
46.      3, of which the broker is aware that could adversely and significantly affect the Buyer's use or enjoyment of the
47.      property. (MN Statute 82.68, Subd. 3 does not apply to rental/lease transactions.)

48.  *PH*   *PB*        I have had the opportunity to review the Notice Regarding Predatory Offender Information on
     (initial)  (initial)
49.                     page two. (2)

MN:AGCYDICS-1 (8/14)



DocuSign Envelope ID: 9547E2F7-ED51-480E-9D84-EAD906C2FEDB

**Lakes | Sotheby's**
INTERNATIONAL REALTY

AGENCY RELATIONSHIPS IN
REAL ESTATE TRANSACTIONS

50. Page 2

**IV. Facilitator:** A broker or salesperson who performs services for a Buyer/Tenant, a Seller/Landlord or both but does not represent either in a fiduciary capacity as a Buyer's/Tenant's Broker, Seller's/Landlord's Broker or Dual Agent. THE FACILITATOR BROKER OR SALESPERSON DOES NOT OWE ANY PARTY ANY OF THE FIDUCIARY DUTIES LISTED BELOW, EXCEPT CONFIDENTIALITY, UNLESS THOSE DUTIES ARE INCLUDED IN A WRITTEN FACILITATOR SERVICES AGREEMENT. The facilitator broker or salesperson owes the duty of confidentiality to the party but owes no other duty to the party except those duties required by law or contained in a written facilitator services agreement, if any. In the event a facilitator broker or salesperson working with a Buyer/Tenant shows a property listed by the facilitator broker or salesperson, then the facilitator broker or salesperson must act as a Seller's/Landlord's Broker (see paragraph I on page one (1)). In the event a facilitator broker or salesperson, working with a Seller/Landlord, accepts a showing of the property by a Buyer/Tenant being represented by the facilitator broker or salesperson, then the facilitator broker or salesperson must act as a Buyer's/Tenant's Broker (see paragraph III on page one (1)).

(1) This disclosure is required by law in any transaction involving property occupied or intended to be occupied by one to four families as their residence.

(2) The fiduciary duties mentioned above are listed below and have the following meanings:

Loyalty - broker/salesperson will act only in client(s)' best interest.

Obedience - broker/salesperson will carry out all client(s)' lawful instructions.

Disclosure - broker/salesperson will disclose to client(s) all material facts of which broker/salesperson has knowledge which might reasonably affect the client(s)' use and enjoyment of the property.

Confidentiality - broker/salesperson will keep client(s)' confidences unless required by law to disclose specific information (such as disclosure of material facts to Buyers).

Reasonable Care - broker/salesperson will use reasonable care in performing duties as an agent.

Accounting - broker/salesperson will account to client(s) for all client(s)' money and property received as agent.

(3) If Seller(s)/Landlord(s) elect(s) not to agree to a dual agency relationship, Seller(s)/Landlord(s) may give up the opportunity to sell/lease the property to Buyer(s)/Tenant(s) represented by the broker/salesperson. If Buyer(s)/Tenant(s) elect(s) not to agree to a dual agency relationship, Buyer(s)/Tenant(s) may give up the opportunity to purchase/lease properties listed by the broker.

NOTICE REGARDING PREDATORY OFFENDER INFORMATION: Information regarding the predatory offender registry and persons registered with the predatory offender registry under MN Statute 243.166 may be obtained by contacting the local law enforcement offices in the community where the property is located, or the Minnesota Department of Corrections at (651) 361-7200, or from the Department of Corrections Web site at www.corr.state.mn.us.

MN:AGCYDISC-2 (8/14)



DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
This form approved by the Minnesota Association of REALTORS®,
which disclaims any liability arising out of use or misuse of this form.
© 2015 Minnesota Association of REALTORS®, Edina, MN

**Lakes | Sotheby's**
INTERNATIONAL REALTY

1. Date _____ 09/16/2015

2. Page 1 of _____ pages: RECORDS AND
3. REPORTS, IF ANY, ARE ATTACHED HERETO AND
4. MADE A PART HEREOF

| 5. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

6. NOTICE: This Disclosure Statement satisfies the disclosure requirements of MN Statutes 513.52 through 513.60.
7. Under Minnesota law, sellers of residential property, with limited exceptions listed on page nine (9), are obligated to
8. disclose to prospective buyers all material facts of which Seller is aware that could adversely and significantly affect
9. an ordinary buyer's use or enjoyment of the property or any intended use of the property of which Seller is aware.
10. MN Statute 513.58 requires Seller to notify buyer in writing as soon as reasonably possible, but in any event before
11. closing, if Seller learns that Seller's disclosure was inaccurate. Seller is obligated to continue to notify Buyer, in writing,
12. of any facts disclosed herein (new or changed) of which Seller is aware that could adversely and significantly affect the
13. Buyer's use or enjoyment of the property or any intended use of the property that occur up to the time of closing.
14. Seller has disclosure alternatives allowed by MN Statutes. See Disclosure Statement: Seller's Disclosure Alternatives
15. form for further information regarding disclosure alternatives. This disclosure is not a warranty or a guarantee of any
16. kind by Seller or licensee(s) representing or assisting any party in the transaction and is not a substitute for any
17. inspections or warranties the party(ies) may wish to obtain.

18. For purposes of the seller disclosure requirements of MN Statutes 513.52 through 513.60:

19. "Residential real property" or "residential real estate" means property occupied as, or intended to be occupied as, a
20. single-family residence, including a unit in a common interest community as defined in MN Statute 515B.1-103, clause
21. (10), regardless of whether the unit is in a common interest community not subject to chapter 515B.

22. The seller disclosure requirements of MN Statutes 513.52 through 513.60 apply to the transfer of any interest in
23. residential real estate, whether by sale, exchange, deed, contract for deed, lease with an option to purchase or any
24. other option.

25. INSTRUCTIONS TO BUYER: Buyers are encouraged to thoroughly inspect the property personally or have it inspected
26. by a third party, and to inquire about any specific areas of concern. NOTE: If Seller answers NO to any of the questions
27. listed below, it does not necessarily mean that it does not exist on the property, did not occur, or does not apply. NO
28. may mean that Seller is unaware.

29. INSTRUCTIONS TO SELLER: (1) Complete this form yourself. (2) Consult prior disclosure statement(s) and/or
30. inspection report(s) when completing this form. (3) Describe conditions affecting the property to the best of your
31. knowledge. (4) Attach additional pages, with your signature, if additional space is required. (5) Answer all questions.
32. (6) If any items do not apply, write "NA" (not applicable).

33. Property located at ____100   3rd Ave S #3201_____ ,

34. City of _____Minneapolis_____ , County of _____Hennepin_____ , State of Minnesota.

35. A. GENERAL INFORMATION: The following questions are to be answered to the best of Seller's knowledge.

36.  (1) What date _____3/2013_____ did you ☐ Acquire ☐ Build the home?
        ------------(Check one.)------------

37.  (2) Type of title evidence: ☒ Abstract   ☐ Registered (Torrens)   ☐ Unknown

38.     Location of Abstract: _____

39.     Is there an existing Owner's Title Insurance Policy? ☒ Yes   ☐ No

40.  (3) Have you occupied this home continuously during your ownership? ☐ Yes   ☒ No

41.     If "No," explain: _____

42.  (4) Is the home suitable for year-round use? ☒ Yes   ☐ No

43.  (5) Are you in possession of prior seller's disclosure statement(s)? (If "Yes," please attach.) ☐ Yes   ☒ No

44.  (6) Does the property include a manufactured home? ☐ Yes   ☒ No

45.     If "Yes," HUD #(s) is/are _____

46.     Has the title been surrendered to the Registrar of Motor Vehicles for cancellation? ☐ Yes   ☒ No

MN:DS:SPDS-1 (8/15)



Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT

47.    Page 2

| 48. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |

49.    Property located at    __100    3rd Ave S #3201__                    __Minneapolis__        .

50.    (7)  Is the property located on a public or a private road?    ☒ Public    ☐ Private    ☐ Public: no maintenance

51.    (8)  Flood Insurance: All properties in the state of Minnesota have been assigned a flood zone designation. Some
52.         flood zones may require flood insurance.

53.         (a)  Do you know which zone the property is located in?                    ☐ Yes    ☒ No

54.              If "Yes," which zone? _____

55.         (b)  Have you ever had a flood insurance policy?                    ☐ Yes    ☒ No

56.              If "Yes," is the policy in force?                    ☐ Yes    ☐ No

57.              If "Yes," what is the annual premium? $ _____

58.              If "Yes," who is the insurance carrier? _____

59.         (c)  Have you ever had a claim with a flood insurance carrier or FEMA?    ☐ Yes    ☒ No

60.              If "Yes," please explain: _____

61.         _____

62.         NOTE:  Whether or not Seller currently carries flood insurance, it may be required in the future. Flood insurance
63.                premiums are increasing, and in some cases will rise by a substantial amount over the premiums
64.                previously charged for flood insurance for the property. As a result, Buyer should not rely on the
65.                premiums paid for flood insurance on this property previously as an indication of the premiums that
66.                will apply after Buyer completes their purchase.

67.    Are there any

68.    (9)   encroachments?                    ☐ Yes    ☒ No

69.    (10)  association, covenants, historical registry, reservations, or restrictions, that affect
70.          or may affect the use or future resale of the property?                    ☐ Yes    ☒ No

71.    (11)  governmental requirements or restrictions that affect or may affect the use or future
72.          enjoyment of the property (e.g., shoreland restrictions, non-conforming use, etc.)?    ☐ Yes    ☒ No

73.    (12)  easements, other than utility or drainage easements?                    ☐ Yes    ☒ No

74.    (13)  Please provide clarification or further explanation for all applicable "Yes" responses in Section A:

75.    _____

76.    _____

77.    B.  GENERAL CONDITION: To your knowledge, have any of the following conditions previously existed or do they
78.        currently exist?

79.              (ANSWERS APPLY TO ALL STRUCTURES, SUCH AS GARAGE AND OUTBUILDINGS.)

80.    (1)  Has there been any damage by wind, fire, flood, hail, or other cause(s)?    ☐ Yes    ☒ No

81.         If "Yes," give details of what happened and when: _____

82.         _____

83.    (2)  Have you ever had an insurance claim(s) against your Homeowner's
84.         Insurance Policy?                    ☐ Yes    ☒ No

85.         If "Yes," what was the claim(s) for (e.g., hail damage to roof)? _____

86.         _____

87.         Did you receive compensation for the claim(s)?                    ☐ Yes    ☒ No

88.         If you received compensation, did you have the items repaired?    ☐ Yes    ☒ No

89.         What dates did the claim(s) occur? _____

MN:DS:SPDS-2 (8/15)



Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT

90.  Page 3

| 91. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

92.  Property located at __100  3rd Ave S #3201__                           __Minneapolis__                  .

93.  (3)  (a)  Has/Have the structure(s) been altered?
94.            (e.g., additions, altered roof lines, changes to load-bearing walls)        ☐ Yes    ☒ No
95.            If "Yes," please specify what was done, when and by whom (owner or contractor):

96.  _____

97.  _____

98.      (b)  Has any work been performed on the property? (e.g., additions to the property, wiring, plumbing,
99.            retaining wall, general finishing.)                                         ☐ Yes    ☒ No

100.            If "Yes," please explain: _____

101.  _____

102.      (c)  Are you aware of any work performed on the property for which
103.            appropriate permits were not obtained?                                    ☐ Yes    ☒ No

104.            If "Yes," please explain: _____

105.  _____

106.  (4)  Has there been any damage to flooring or floor covering?                       ☐ Yes    ☒ No

107.        If "Yes," give details of what happened and when: _____

108.  _____

109.  (5)  Do you have or have you previously had any pets?                               ☐ Yes    ☒ No

110.        If "Yes," indicate type _____ and number _____ .

111.  (6)  THE FOUNDATION: The type of foundation is (i.e., block, poured, wood, stone, other):

112.  _____ .

113.  (7)  THE BASEMENT, CRAWLSPACE, SLAB:
114.        (a) cracked floor/walls    ☐ Yes  ☒ No      (e) leakage/seepage   ☐ Yes  ☒ No
115.        (b) drain tile problem     ☐ Yes  ☒ No      (f) sewer backup      ☐ Yes  ☒ No
116.        (c) flooding               ☐ Yes  ☒ No      (g) wet floors/walls  ☐ Yes  ☒ No
117.        (d) foundation problem     ☐ Yes  ☒ No      (h) other             ☐ Yes  ☒ No

118.        Give details to any questions answered "Yes": _____

119.  _____

120.  _____

121.  (8)  THE ROOF:
122.        (a) what is the age of the roofing material?
123.            Home: _____8_____ years   Garage(s)/Outbuilding(s): ___NA___ years
124.        (b) has there been any interior or exterior damage?                           ☐ Yes  ☒ No
125.        (c) has there been interior damage from ice buildup?                          ☐ Yes  ☒ No
126.        (d) has there been any leakage?                                               ☐ Yes  ☒ No
127.        (e) have there been any repairs or replacements made to the roof?             ☐ Yes  ☒ No

128.        Give details to any questions answered "Yes": _____

129.  _____

130.  _____

MN:DS:SPDS-3 (8/15)

Instanet forms

Lakes | **Sotheby's**
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
131.  Page 4

| 132. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

133. Property located at _____ **100    3rd Ave S #3201** _____ **Minneapolis** _____ .

134.    (9) THE EXTERIOR AND INTERIOR WALLS/SIDING/WINDOWS:

135.        (a) The type(s) of siding is (e.g., vinyl, stucco, brick, other): _____

136.        (b) cracks/damage?                                    ☐ Yes    ☒ No

137.        (c) leakage/seepage?                                  ☐ Yes    ☒ No

138.        (d) other?                                            ☐ Yes    ☒ No

139.        Give details to any questions answered "Yes": _____

140.    _____

141. C.  APPLIANCES, HEATING, PLUMBING, ELECTRICAL, AND OTHER MECHANICAL SYSTEMS:

142. NOTE: This section refers only to the working condition of the following items. Answers apply to all such
143.        items unless otherwise noted in comments below. Personal property is included in the sale ONLY IF
144.        specifically referenced in the Purchase Agreement.

145.        CHECK "NA" FOR ONLY THOSE ITEMS NOT PHYSICALLY LOCATED ON THE PROPERTY.

146.                                    Working Order                              Working Order

| 147. | | Yes | No | NA | | Yes | No | NA |
|---|---|---|---|---|---|---|---|---|
| 148. | Air-conditioning | ☒ | ☐ | ☐ | Range/oven | ☒ | ☐ | ☐ |
| 149. | ☒ Central ☐ Wall ☐ Window | | | | Range hood | ☒ | ☐ | ☐ |
| 150. | Air exchange system | ☐ | ☐ | ☒ | Refrigerator | ☒ | ☐ | ☐ |
| 151. | Carbon monoxide detector | ☒ | ☐ | ☐ | Security system | ☐ | ☐ | ☒ |
| 152. | Ceiling fan | ☐ | ☐ | ☒ | ☐ Rented ☐ Owned | | | |
| 153. | Central vacuum | ☐ | ☐ | ☒ | Smoke detectors (battery) | ☐ | ☐ | ☒ |
| 154. | Clothes dryer | ☒ | ☐ | ☐ | Smoke detectors (hardwired) | ☒ | ☐ | ☐ |
| 155. | Clothes washer | ☒ | ☐ | ☐ | Solar collectors | ☐ | ☐ | ☒ |
| 156. | Dishwasher | ☒ | ☐ | ☐ | Sump pump | ☐ | ☐ | ☒ |
| 157. | Doorbell | ☒ | ☐ | ☐ | Toilet mechanisms | ☒ | ☐ | ☐ |
| 158. | Drain tile system | ☐ | ☐ | ☒ | Trash compactor | ☐ | ☐ | ☒ |
| 159. | Electrical system | ☒ | ☐ | ☐ | TV antenna system | ☐ | ☐ | ☒ |
| 160. | Exhaust system | ☒ | ☐ | ☐ | TV cable system | ☐ | ☐ | ☒ |
| 161. | Fire sprinkler system | ☒ | ☐ | ☐ | TV receiver | ☐ | ☐ | ☒ |
| 162. | Fireplace | ☒ | ☐ | ☐ | TV satellite dish | ☐ | ☐ | ☒ |
| 163. | Fireplace mechanisms | ☒ | ☐ | ☐ | ☐ Rented ☐ Owned | | | |
| 164. | Furnace humidifier | ☐ | ☐ | ☒ | Water heater | ☐ | ☐ | ☒ |
| 165. | Freezer | ☐ | ☐ | ☒ | Water purification system | ☐ | ☐ | ☒ |
| 166. | Garage door auto reverse | ☒ | ☐ | ☐ | ☐ Rented ☐ Owned | | | |
| 167. | Garage door opener | ☒ | ☐ | ☐ | Water softener | ☐ | ☐ | ☒ |
| 168. | Garage door opener remote | ☒ | ☐ | ☐ | ☐ Rented ☐ Owned | | | |
| 169. | Garbage disposal | ☒ | ☐ | ☐ | Water treatment system | ☐ | ☐ | ☒ |
| 170. | Heating system (central) | ☒ | ☐ | ☐ | ☐ Rented ☐ Owned | | | |
| 171. | Heating system (supplemental) | ☐ | ☐ | ☒ | Window treatments | ☒ | ☐ | ☐ |
| 172. | Incinerator | ☐ | ☐ | ☒ | Windows | ☒ | ☐ | ☐ |
| 173. | Intercom | ☐ | ☐ | ☒ | Wood-burning stove | ☐ | ☐ | ☒ |
| 174. | Lawn sprinkler system | ☐ | ☐ | ☒ | Other | | | |
| 175. | Microwave | ☒ | ☐ | ☐ | Other | | | |
| 176. | Plumbing | ☒ | ☐ | ☐ | Other | | | |
| 177. | Pool and equipment | ☒ | ☐ | ☐ | Other | | | |
| 178. | Propane tank | ☐ | ☐ | ☒ | Other | | | |
| 179. | ☐ Owned ☐ Rented | | | | Other | | | |



**THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE.**

Property located at 100 3rd Ave S #3201 Minneapolis.

Are there any items or systems on the property connected or controlled wirelessly, via internet protocol ("IP"), to a router or gateway or directly to the cloud? ☐ Yes ☒ No

Comments regarding issues in Section C: ______________________

______________________

D. SUBSURFACE SEWAGE TREATMENT SYSTEM DISCLOSURE:
(A subsurface sewage treatment system disclosure is required by MN Statute 115.55.) (Check appropriate box.)
Seller certifies that Seller ☐ DOES ☒ DOES NOT know of a subsurface sewage treatment system on or serving the above-described real property. (If answer is DOES, and the system does not require a state permit, see Disclosure Statement: Subsurface Sewage Treatment System.)
(Check one.)

☐ There is an abandoned subsurface sewage treatment system on the above-described real property. (See Disclosure Statement: Subsurface Sewage Treatment System.)

E. PRIVATE WELL DISCLOSURE: (A well disclosure and Certificate are required by MN Statute 103I.235.) (Check appropriate box.)

☒ Seller certifies that Seller does not know of any wells on the above-described real property.
☐ Seller certifies there are one or more wells located on the above-described real property. (See Disclosure Statement: Well.)

Are there any wells serving the above-described property that are not located on the property? ☐ Yes ☒ No
If "Yes":
(1) How many properties or residences does the shared well serve? ______________________
(2) Is there a maintenance agreement for the shared well? ☐ Yes ☒ No
If "Yes," what is the annual maintenance fee? $______________________
Is this property in a Special Well Construction Area? ☐ Yes ☒ No

F. PROPERTY TAX TREATMENT:

Valuation Exclusion Disclosure (Required by MN Statute 273.11, Subd. 18.)
There ☐ IS ☒ IS NOT an exclusion from market value for home improvements on this property. Any valuation exclusion shall terminate upon sale of the property, and the property's estimated market value for property tax purposes shall increase. If a valuation exclusion exists, Buyers are encouraged to look into the resulting tax consequences.
(Check one.)

Additional comments: ______________________

______________________

Preferential Property Tax Treatment
Is the property subject to any preferential property tax status or any other credits affecting the property? (e.g., Disability, Green Acres, CRP, RIM, Rural Preserve, Veterans' Benefits, Non-Profit Status) ☐ Yes ☒ No
If "Yes," would these terminate upon the sale of the property? ☐ Yes ☒ No
Explain: ______________________

______________________

Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
221.  Page 6

| 222. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

223. Property located at ___**100    3rd Ave S #3201**___                    **Minneapolis**                    .

224. G.  FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"): Section 1445 of the Internal Revenue Code
225.      provides that a transferee ("Buyer") of a United States real property interest must be notified in writing and must
226.      withhold tax if the transferor ("Seller") is a foreign person and no exceptions from FIRPTA withholding apply.

227.      Seller represents that Seller ☐ IS ☐ IS NOT a foreign person (i.e., a non-resident alien individual, foreign corporation,
          -------(Check one.)------

228.      foreign partnership, foreign trust, or foreign estate) for purposes of income taxation. This representation shall
229.      survive the closing of any transaction involving the property described herein.

230.      NOTE:   If the above answer is "IS," Buyer may be subject to income tax withholding in connection with the
231.              transaction (unless the transaction is covered by an applicable exception to FIRPTA withholding). In
232.              non-exempt transactions, Buyer may be liable for the tax if Buyer fails to withhold.
233.              If the above answer is "IS NOT," Buyer may wish to obtain specific documentation from Seller ensuring
234.              Buyer is exempt from the withholding requirements as prescribed under Section 1445 of the Internal
235.              Revenue Code.

236.      Due to the complexity and potential risks of failing to comply with FIRPTA, including Buyer's responsibility
237.      for withholding the applicable tax, Buyer and Seller should seek appropriate legal and tax advice regarding
238.      FIRPTA compliance, as the respective licensees representing or assisting either party will be unable to
239.      assure either party whether the transaction is exempt from the FIRPTA withholding requirements.

240. H.  METHAMPHETAMINE PRODUCTION DISCLOSURE:
241.      (A Methamphetamine Production Disclosure is required by MN Statute 152.0275, Subd. 2 (m).)

242.      ☒ Seller is not aware of any methamphetamine production that has occurred on the property.

243.      ☐ Seller is aware that methamphetamine production has occurred on the property.
244.          (See Disclosure Statement: Methamphetamine Production.)

245. I.  NOTICE REGARDING AIRPORT ZONING REGULATIONS: The property may be in or near an airport safety
246.     zone with zoning regulations adopted by the governing body that may affect the property. Such zoning regulations
247.     are filed with the county recorder in each county where the zoned area is located. If you would like to determine
248.     if such zoning regulations affect the property, you should contact the county recorder where the zoned area is
249.     located.

250. J.  NOTICE REGARDING CARBON MONOXIDE DETECTORS: MN Statute 299F.51 requires Carbon Monoxide
251.     Detectors to be located within ten (10) feet from all sleeping rooms. Carbon Monoxide Detectors may or may not
252.     be personal property and may or may not be included in the sale of the home.

253. K.  CEMETERY ACT: The following questions are to be answered to the best of Seller's knowledge.

254.     MN Statute 307.08 prohibits any damage or illegal molestation of human remains, burials or cemeteries. A person
255.     who intentionally, willfully and knowingly destroys, mutilates, injures, disturbs, or removes human skeletal remains
256.     or human burial grounds is guilty of a felony.

257.     Are you aware of any human remains, burials, or cemeteries located on the property?      ☐ Yes  ☒ No

258.     If "Yes," please explain: _____

259.     All unidentified human remains or burials found outside of platted, recorded or identified cemeteries and in
260.     contexts which indicate antiquity greater than 50 years shall be dealt with according to the provisions of MN
261.     Statute 307.08, Subd. 7.

262. L.  ENVIRONMENTAL CONCERNS: The following questions are to be answered to the best of Seller's knowledge.

263.     Animal/Insect/Pest Infestations?  ☐ Yes  ☒ No      Lead? (e.g., paint, plumbing)  ☐ Yes  ☒ No
264.     Asbestos?                         ☐ Yes  ☒ No      Mold?                          ☐ Yes  ☒ No
265.     Diseased trees?                   ☐ Yes  ☒ No      Soil problems?                 ☐ Yes  ☒ No
266.     Formaldehyde?                     ☐ Yes  ☒ No      Underground storage tanks?     ☐ Yes  ☒ No
267.     Hazardous wastes/substances?      ☐ Yes  ☒ No

268.     Other? _____      ☐ Yes      ☐ No



Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
269.  Page 7

| 270. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

271.  Property located at __100   3rd Ave S #3201__                    __Minneapolis__                    .

272.  Are you aware if there are currently, or have previously been, any orders issued on the property by any governmental
273.  authority ordering the remediation of a public health nuisance on the property?    ☐ Yes    ☒ No

274.  If answer above is "Yes," seller certifies that all orders ☐ HAVE ☒ HAVE NOT been vacated.
----------(Check one.)----------

275.  Please provide clarification or further explanation for all applicable "Yes" responses in Section L.

276.  _____

277.  _____

278.  M.  RADON DISCLOSURE: (The following Seller disclosure satisfies MN Statute 144.496.)

279.  RADON WARNING STATEMENT: The Minnesota Department of Health strongly recommends that ALL
280.  homebuyers have an indoor radon test performed prior to purchase or taking occupancy, and recommends having
281.  the radon levels mitigated if elevated radon concentrations are found. Elevated radon concentrations can easily
282.  be reduced by a qualified, certified, or licensed, if applicable, radon mitigator.

283.  Every buyer of any interest in residential real property is notified that the property may present exposure to
284.  dangerous levels of indoor radon gas that may place occupants at risk of developing radon-induced lung cancer.
285.  Radon, a Class A human carcinogen, is the leading cause of lung cancer in nonsmokers and the second leading
286.  cause overall. The seller of any interest in residential real property is required to provide the buyer with any
287.  information on radon test results of the dwelling.

288.  RADON IN REAL ESTATE: By signing this Statement, Buyer hereby acknowledges receipt of the Minnesota
289.  Department of Health's publication entitled Radon in Real Estate Transactions, which is attached hereto and
290.  can be found at www.health.state.mn.us/divs/eh/indoorair/radon/rnrealestateweb.pdf.

291.  A seller who fails to disclose the information required under MN Statute 144.496, and is aware of material facts
292.  pertaining to radon concentrations in the property, is liable to the Buyer. A buyer who is injured by a violation of MN
293.  Statute 144.496 may bring a civil action and recover damages and receive other equitable relief as determined by
294.  the court. Any such action must be commenced within two years after the date on which the buyer closed the
295.  purchase or transfer of the real property.

296.  SELLER'S REPRESENTATIONS: The following are representations made by Seller to the extent of Seller's actual
297.  knowledge.

298.      (a)  Radon test(s) ☐ HAVE ☒ HAVE NOT occurred on the property.
----------(Check one.)----------

299.      (b)  Describe any known radon concentrations, mitigation, or remediation. NOTE: Seller shall attach the most
300.          current records and reports pertaining to radon concentration within the dwelling:

301.  _____

302.  _____

303.      (c)  There ☐ IS ☒ IS NOT a radon mitigation system currently installed on the property.
--------(Check one.)--------

304.      If "IS," Seller shall disclose, if known, information regarding the radon mitigation system, including system
305.      description and documentation.

306.  _____

307.  _____

308.  EXCEPTIONS: See Section R for exceptions to this disclosure requirement.

MN:DS:SPDS-7 (8/15)



Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
309.   Page 8

| 310. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |

311.   Property located at ___**100   3rd Ave S #3201**_____**Minneapolis**_____ .

312.   N.   NOTICES/OTHER DEFECTS/MATERIAL FACTS: The following questions are to be answered to the best of
313.        Seller's knowledge.

314.        <u>Notices:</u> Seller ☐ HAS ☒ HAS NOT received a notice regarding <u>any</u> proposed improvement project from <u>any</u>
             ----------(Check one.)-------------
315.        assessing authorities, the costs of which project may be assessed against the property. If "HAS," please attach

316.        and/or explain : _____

317.        _____

318.        <u>Other Defects/Material Facts:</u> Are there any other material facts that could adversely and significantly affect an
319.        ordinary buyer's use or enjoyment of the property or any intended use of the property?        ☐ Yes        ☒ No

320.        If "Yes," explain: _____

321.        _____

322.   O.   WATER INTRUSION AND MOLD GROWTH: Studies have shown that various forms of water intrusion affect
323.        many homes. Water intrusion may occur from exterior moisture entering the home and/or interior moisture leaving
324.        the home.

325.        Examples of exterior moisture sources may be:
326.           • improper flashing around windows and doors,
327.           • improper grading,
328.           • flooding,
329.           • roof leaks.
330.        Examples of interior moisture sources may be:
331.           • plumbing leaks,
332.           • condensation (caused by indoor humidity that is too high or surfaces that are too cold),
333.           • overflow from tubs, sinks or toilets,
334.           • firewood stored indoors,
335.           • humidifier use,
336.           • inadequate venting of kitchen and bath humidity,
337.           • improper venting of clothes dryer exhaust outdoors (including electrical dryers),
338.           • line-drying laundry indoors,
339.           • houseplants—watering them can generate large amounts of moisture.

340.        In addition to the possible structural damage water intrusion may do to the property, water intrusion may also result
341.        in the growth of mold, mildew and other fungi. Mold growth may also cause structural damage to the property.
342.        Therefore, it is very important to detect and remediate water intrusion problems.

343.        Fungi are present everywhere in our environment, both indoors and outdoors. Many molds are beneficial to
344.        humans. However, molds have the ability to produce mycotoxins that may have a potential to cause serious health
345.        problems, particularly in some immunocompromised individuals and people who have asthma or allergies to
346.        mold.

347.        To complicate matters, mold growth is often difficult to detect, as it frequently grows within the wall structure. If you
348.        have a concern about water intrusion or the resulting mold/mildew/fungi growth, you may want to consider having the
349.        property inspected for moisture problems before entering into a purchase agreement or as a condition of your
350.        purchase agreement. Such an analysis is particularly advisable if you observe staining or musty odors on the
351.        property.

352.        For additional information about water intrusion, indoor air quality, moisture or mold issues, please view the
353.        Minnesota Association of REALTORS® Desktop Reference Guide at www.mnrealtor.com.

354.   P.   NOTICE REGARDING PREDATORY OFFENDER INFORMATION: Information regarding the predatory
355.        offender registry and persons registered with the predatory offender registry under MN Statue 243.166
356.        may be obtained by contacting the local law enforcement offices in the community where the property
357.        is located or the Minnesota Department of Corrections at (651) 361-7200, or from the Department of
358.        Corrections web site at www.corr.state.mn.us.

MN:DS:SPDS-8 (8/15)



Lakes | Sotheby's
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
359.  Page 9

| 360. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

361. Property located at ___**100   3rd Ave S #3201**_____**Minneapolis**_____ .

362. Q.  ADDITIONAL COMMENTS: _____

363.   _____

364.   _____

365. R.  MN STATUTES 513.52 THROUGH 513.60: SELLER'S MATERIAL FACT DISCLOSURE:

366.   <u>Exceptions:</u> The seller disclosure requirements of MN Statutes 513.52 through 513.60 <u>DO NOT</u> apply to

367.        (1)   real property that is not residential real property;

368.        (2)   a gratuitous transfer;

369.        (3)   a transfer pursuant to a court order;

370.        (4)   a transfer to a government or governmental agency;

371.        (5)   a transfer by foreclosure or deed in lieu of foreclosure;

372.        (6)   a transfer to heirs or devisees of a decedent;

373.        (7)   a transfer from a co-tenant to one or more other co-tenants;

374.        (8)   a transfer made to a spouse, parent, grandparent, child or grandchild of Seller;

375.        (9)   a transfer between spouses resulting from a decree of marriage dissolution or from a property agreement

376.              incidental to that decree;

377.        (10)  a transfer of newly constructed residential property that has not been inhabited;

378.        (11)  an option to purchase a unit in a common interest community, until exercised;

379.        (12)  a transfer to a person who controls or is controlled by the grantor as those terms are defined with

380.              respect to a declarant under section 515B.1-103, clause (2);

381.        (13)  a transfer to a tenant who is in possession of the residential real property; or

382.        (14)  a transfer of special declarant rights under section 515B.3-104.

383.   <u>MN STATUTES 144.496: RADON AWARENESS ACT</u>

384.   The seller disclosure requirements of MN Statute 144.496 DO NOT apply to (1)-(9) and (11)-(14) above. Sellers

385.   of newly constructed residential property must comply with the disclosure requirements of MN Statute 144.496.

386.   <u>Waiver:</u> The written disclosure required under sections 513.52 to 513.60 may be waived if Seller and the

387.   prospective Buyer agree in writing. Waiver of the disclosure required under sections 513.52 to 513.60 does not

388.   waive, limit or abridge any obligation for seller disclosure created by any other law.

389.   <u>No Duty to Disclose:</u>

390. A.  There is no duty to disclose the fact that the property

391.        (1)   is or was occupied by an owner or occupant who is or was suspected to be infected with Human

392.              Immunodeficiency Virus or diagnosed with Acquired Immunodeficiency Syndrome;

393.        (2)   was the site of a suicide, accidental death, natural death or perceived paranormal activity; or

394.        (3)   is located in a neighborhood containing any adult family home, community-based residential facility or

395.              nursing home.

396. B.  Predatory Offenders. There is no duty to disclose information regarding an offender who is required to

397.   register under MN Statute 243.166 or about whom notification is made under that section, if Seller, in a timely

398.   manner, provides a written notice that information about the predatory offender registry and persons registered

399.   with the registry may be obtained by contacting the local law enforcement agency where the property is

400.   located or the Department of Corrections.

401. C.  The provisions in paragraphs A and B do not create a duty to disclose any facts described in paragraphs A

402.   and B for property that is not residential property.

403. D.  Inspections.

404.        (1)   Except as provided in paragraph (ii), Seller is not required to disclose information relating to the real

405.              property if a written report that discloses the information has been prepared by a qualified third party

406.              and provided to the prospective buyer. For purposes of this paragraph, "qualified third party" means a

407.              federal, state or local governmental agency, or any person whom Seller or prospective buyer reasonably

408.              believes has the expertise necessary to meet the industry standards of practice for the type of inspection

409.              or investigation that has been conducted by the third party in order to prepare the written report.

410.        (2)   Seller shall disclose to the prospective buyer material facts known by Seller that contradict any information

411.              included in a written report under paragraph (i) if a copy of the report is provided to Seller.

MN:DS:SPDS-9 (8/15)



DocuSign Envelope ID: 9547E2F7-ED51-480E-9D84-EAD906C2FEDB

Lakes | **Sotheby's**
INTERNATIONAL REALTY

DISCLOSURE STATEMENT: SELLER'S
PROPERTY DISCLOSURE STATEMENT
412.  Page 10

| 413. | THE INFORMATION DISCLOSED IS GIVEN TO THE BEST OF SELLER'S KNOWLEDGE. |
|---|---|

414.  Property located at ___100___  ___3rd Ave S #3201___                    ___Minneapolis___        .

415.  S.  SELLER'S STATEMENT:
416.      (To be signed at time of listing.)

417.      Seller(s) hereby states the facts as stated above are true and accurate and authorizes any licensee(s)representing
418.      or assisting any party(ies) in this transaction to provide a copy of this Disclosure Statement to any person or entity
419.      in connection with any actual or anticipated sale of the property. A seller may provide this Disclosure Statement
420.      to a real estate licensee representing or assisting a prospective buyer. The Disclosure Statement provided to the
421.      real estate licensee representing or assisting a prospective buyer is considered to have been provided to the
422.      prospective buyer. If this Disclosure Statement is provided to the real estate licensee representing or assisting the
423.      prospective buyer, the real estate licensee must provide a copy to the prospective buyer.

424.      Seller is obligated to continue to notify Buyer in writing of any facts that differ from the facts disclosed
425.      herein (new or changed) of which Seller is aware that could adversely and significantly affect the Buyer's
426.      use or enjoyment of the property or any intended use of the property that occur up to the time of closing.
427.      To disclose new or changed facts, please use the Amendment to Disclosure Statement form.

428.      _____     _____
          (Seller)                          (Date)          (Seller)                          (Date)

429.  T.  BUYER'S ACKNOWLEDGEMENT:

430.      (To be signed at time of purchase agreement.)

431.      I/We, the Buyer(s) of the property, acknowledge receipt of this Seller's Property Disclosure Statement and agree
432.      that no representations regarding facts have been made other than those made above. This Disclosure Statement
433.      is not a warranty or a guarantee of any kind by Seller or licensee(s) representing or assisting any party in the
434.      transaction and is not a substitute for any inspections or warranties the party(ies) may wish to obtain.

435.      The information disclosed is given to the best of Seller's knowledge.

436.      _____     _____
          (Buyer)                          (Date)          (Buyer)                          (Date)

437.      LISTING BROKER AND LICENSEES MAKE NO REPRESENTATIONS HEREIN AND ARE
438.      NOT RESPONSIBLE FOR ANY CONDITIONS EXISTING ON THE PROPERTY.

MN:DS:SPDS-10 (8/15)



# R e a l   E s t a t e   T r a n s a c t i o n s



All Minnesota homes can have dangerous levels of radon gas in them. Radon is a colorless, odorless and tasteless radioactive gas that can seep into homes from the earth. When inhaled, its radioactive particles can damage the cells that line the lungs. Long-term exposure to radon can lead to lung cancer. About 21,000 lung cancer deaths each year in the United States are caused by radon, making it a serious health concern for all Minnesotans.

It does not matter if the home is old or new and the only way to know how much radon gas has entered the home is to conduct a radon test. MDH estimates 2 in 5 homes built before 2010 and 1 in 5 homes built since 2010 exceed the 4.0 pCi/L action level.

In Minnesota, buyers and sellers in a real estate transaction are free to negotiate radon testing and reduction.  Ultimately, it is up to the buyer to decide an acceptable level of radon risk in the home. Prospective buyers should keep in mind that it is inexpensive and easy to measure radon, and radon levels can be lowered at a reasonable cost. The MDH Radon Program website provides more detailed information on radon, including the MDH brochure "Keeping Your Home Safe from Radon."

The Minnesota Radon Awareness Act does not require radon testing or mitigation. However, many relocation companies and lending institutions, as well as home buyers, require a radon test when purchasing a house. The purpose of this publication is to educate and inform potential home buyers of the risks   radon exposure  and how to test for and reduce radon as part of real estate transactions.



## D i s c l o s u r e   R e q u i r e m e n t s

Effective January 1, 2014, the Minnesota Radon Awareness Act requires speci c disclosure and education be provided to potential home buyers during residential real estate transactions in Minnesota. This publication is being provided by the seller in order to meet a requirement of the Act. In addition, before signing a purchase agreement to sell or transfer residential real property, the seller shall disclose in writing to the buyer any knowledge the seller has of radon concentrations in the dwelling.

The disclosure shall include:

1.  whether a radon test or tests have occurred on the property;

2.  the most current records and reports pertaining to radon concentrations within the dwelling;

3.  a description of any radon concentrations, mitigation, or remediation;

4.  information regarding the radon mitigation system, including system description and documentation, if such system has been installed in the dwelling; and

5.  a radon warning statement

### Radon Warning Statement

"The Minnesota Department of Health strongly recommends that ALL homebuyers have an indoor radon test performed prior to purchase or taking occupancy, and recommends having the radon levels mitigated if elevated radon concentrations are found.  Elevated radon concentrations can easily be reduced by a quali ed, certi ed, or licensed, if applicable, radon mitigator.

Every buyer of any interest in residential real property is noti ed that the property may present exposure to dangerous levels of indoor radon gas that may place the occupants at risk of developing radon-induced lung cancer. Radon, a Class A human carcinogen, is the leading cause of lung cancer in nonsmokers and the second leading cause overall. The seller of any interest in residential real property is required to provide the buyer with any information on radon test results of the dwelling."

## R a d o n   F a c t s

### How dangerous is radon?
Radon is the number one cause of lung cancer in non-smokers and the second leading cause of lung cancer overall, next to tobacco smoking. Thankfully, much of this risk can be prevented through testing and taking action to reduce high levels of radon gas when and where they are found. Your risk for lung cancer increases with higher levels of radon gas, prolonged exposure and whether or not you are a smoker.

### Where is your greatest exposure to radon?
Radon is present everywhere, and there is no known safe level. Your greatest exposure is where it can concentrate indoors and where you spend most of your time. For most Minnesotans, this is at home. Whether a home is old or new, well-sealed or drafty, with or without a basement, any home can have high levels of radon.



### Where does Radon come from?
Radon comes from the soil. It is produced by the natural decay of uranium and radium commonly found in nearly all soils in Minnesota. As a gas, radon moves freely through the soil and eventually into the air you breathe.  Our homes tend to draw soil gases, including radon, into the structure.

### I have a new home, aren't radon levels reduced already?
Homes built in Minnesota since June 2009 are required to contain construction features that may limit radon entry.  These features are known as passive Radon Resistant New Construction (RRNC). While these passive RRNC features may lower the amount of radon in newer homes, it does not guarantee low levels. It is recommended all new homes be tested for radon, and if elevated levels are found, these passive RRNC features can be easily and inexpensively activated with the addition of a radon fan in the attic.  If you are buying a new home, ask if the home has any RRNC features and if the home has been tested.

### What is the recommended action based on my results?
If the average radon in the home is at or above 4.0 pCi/L, the house should be  xed. Consider  xing the home if radon levels are between 2 pCi/L and 3.9 pCi/L. While it isn't possible to reduce radon to zero, the best approach is to reduce the radon levels to as low as reasonably achievable. Any amount of radon, even below the recommended action level, carries some risk.



Because of the unique nature of real estate transactions, involving multiple parties and  nancial interests, there are special protocols for testing.



### Continuous
Radon Monitor
(CRM)

**Fastest**

Test is completed by a certi ed contractor with a calibrated CRM for a minimum of 48 hours.

Test report is analyzed to ensure that it is a valid test.



### Simultaneous
Short-term Testing

**Second fastest**

Two short-term test kits are used at the same time, placed 6-12 inches apart, for a mini- mum of 48 hours.

Test kits are sent to the lab for analysis.

The two test results are averaged to get the radon level.



### Sequential
Short-Term Testing

**Slowest**

One short-term test is performed for a minimum of 48 hours.

Test kit is sent to lab for analysis.

Another short-term kit is used in the same place as the  rst, started right after the  rst test is taken down. Test is performed for a minimum of 48 hours.

Test kit is sent to the lab for analysis.

The two test results are averaged to get the radon level.

**House conditions when testing**
Be aware that any test lasting less than three months requires closed-house conditions.

**Closed-house  onditions:**   ean keeping all windows and doors closed, except for normal entry

**Before Testing:** Begin closed-house conditions at least 12 hours before the start of the radon test.

**During Testing:** Maintain closed-house conditions during the entire duration of the short term test. Operate home heating or cooling systems normally during the test.

**Where the test should be conducted**
Any radon test conducted for a real estate transaction needs to be placed in the lowest livable area of the home suitable for occupancy. In Minnesota, this is typically in the basement, whether it is  nished or un nished.

The test kit should be placed:
- two to six feet above the  oor
- at least three feet from exterior walls
- four inches away from other objects
- in a location where it won't be disturbed
- not in enclosed areas
- not in areas of high heat or humidity

If the house has multiple foundation types, it is recommended that each of these be tested. For instance, if the house has one or more of the following foundation types--basement, crawl space, slab-on- grade--a test should be performed in the basement and in at least one room over the crawlspace and one room with a slab-on-grade area.

**Who should conduct radon testing in real estate transactions?**
All radon tests should be conducted in accordance with national measurement protocols, by a certified and MDH listed professional. This ensures the test was conducted properly, in the correct location  and under appropriate building conditions.  A list of these radon measurement professionals can be found at MDH's Radon web site. A seller may have previously conducted testing in a property. If the test



fan

**Sub-Slab Suction**

sump suction pipes penetrate beneath slab

sealant

seal floor & wall cracks

radon

## Radon Mitigation

**Lowering radon in existing homes – Radon Mitigation**
When elevated levels of radon are found, they should be mitigated. Elevated radon concentrations can be easily reduced by a nationally certified and MDH listed radon mitigation professional. A list of these radon mitigation professionals can be found at MDH's Radon web site.

Radon mitigation is the process or system used to reduce radon concentrations in the breathing zones of occupied buildings. The goal of a radon mitigation system is to reduce the indoor radon levels to below the EPA action level of 4.0 pCi/L. A quality radon reduction (mitigation) system is often able to reduce the annual average radon level to below 2.0 pCi/L

Active sub-slab suction (also called sub-slab depressurization, or SSD) is the most common and usually the most reliable type of system because it draws radon- lled air from beneath the house and vents it outside. There are standards of practice that need to be followed for the installation of these systems. More information on radon mitigation can be found at the MDH Radon website.

**After a radon reduction system is installed**
Perform an independent short-term test to ensure that the reduction system is effective. Make sure the radon system is operating during the entire test. Once a con rmatory radon test shows low levels of radon in the home, be sure to retest the house every two years to con rm continued radon reduction.

Contact the MDH Radon Program if you are uncertain about anything regarding radon testing or mitigation.

The MDH Radon Program can provide:
- Information about radon health effects, radon testing and radon mitigation;
- Names of trained, certified and MDH listed radon professionals;

MDH Radon Program
625 Robert St N
P.O. Box 64975
St. Paul, MN 55164-0975
(651) 201-4601
1(800) 798-9050



Email: health.indoorair@state.mn.us
Web: www.health.state.mn.us/radon



10/2013  IC# 141-3722

Lakes | Sotheby's
INTERNATIONAL REALTY

INTERNET DISPLAY OPTIONS

This form approved by the Minnesota Association of REALTORS®,
which disclaims any liability arising o t of  se or mis  se of this form
© Minnesota Association of REALTORS®, Edina, M
age

This form is Seller's Owner's instr ctions pertaining to the  nternet display of the MLS inp t data for the property

located at ___**100    3rd Ave S #3201**_____ ,

 ity of _____**Minneapolis**_____ ,  o nty of _____**Hennepin**_____ , State of Minnesota

Listing  ontract dated _____ , _____

EXPLANATIONS AND DEFINITIONS

"IDX site" means a web site operated by a bro  er participating in the MLS on which the bro  er can advertise the listings of other bro  ers in MLS, s  b ect to certain MLS r  les  The cons  mer visiting an       site is not re  ired to register on the site or to have a bro  erage relationship with the bro  er displaying listings on the site

"Virtual of  ce we  site  VO    " means a web site operated by a bro  er participating in the MLS that delivers bro  erage services to cons  mers over the world wide web   isitors to a  O    are re  ired to register on the site with their name and a real e  mail address  and enter a bro  erage relationship with the bro  er operating the  O   The bro  er operating the  O    can then show the visiting c  stomer client nearly all of the information available to the bro  er in MLS  The seller s  owner s of a listing have the right to opt o  t of certain  inds of data display  nder the MLS's  O    policy  The MLS imposes vario  s other r  les and restrictions on  O  s

 O  tio        Listi     is a  o  t el  ter  et
            f Seller Owner selects " o," this listing will not be incl ded in MLS data feeds to  nternet web sites that display property listing data, whether intended for advertising the property or providing online bro  erage services  e g ,  O s  ers participating in MLS can still disclose the listing to c  stomers clients via other means, incl  ding e  mail, fa  , mail, hand delivery and orally

 O  tio        Listi   a  ress  ouse a  u it u  ers a    street a  e  is a  o  t el  ter  et
            f Seller Owner selects " o," the address of the property will be hidden on web sites receiving data feeds from MLS that res  lt in  nternet listing display, whether intended for advertising the property or providing online bro  erage services  e g ,  O s  ro  ers participating in MLS can still disclose the address to c  stomers clients via other means, incl  ding e  mail, fa  , mail, hand delivery and orally

 O  tio        A   auto  ate   aluatio  of t e  ro  ert  listi    or a li   to a  auto  ate   aluatio  of it  a
             e  is a  e a  a  ace  t to t  e listi
            Some  O  s or     sites may provide an  tomated val ation model  A M  f nction service  An A  M  ses statistical calc lations to estimate the val e of a property based  pon data from p  blic records, MLS and other so  rces and incorporating certain ass  mptions  The acc  racy of A  Ms has sometimes been critici  ed beca  se they do not ta  e into consideration all relevant factors in val  ing a property  Seller Owner, by selecting " o," may prohibit display of an a  tomated val ation of his or her listing ad acent to the listing

 O  tio         o    e ts or re  iews of t e  ro  ert       erso  s  ot  ter a te is a  ai    ro   er a  e
             is a  e  wit  or attac  e  as a li    to t e listi    ata of t e  ro  ert
            Some  O  s or     sites may provide f  nctionality that permits the c  stomers clients  sing the  O   or    site to enter comments or reviews of the listed properties  f " o" is selected, a  O   or    site may not display comments or reviews with the listing or by hyperlin  to s  ch comments or reviews   ote that the bro  er displaying the listing on his or her  O   or    site may add commentary representing his or her professional   dgment regarding the listing's val  e, etc

M   O



DocuSign Envelope ID: 9547E2F7-ED51-480E-9D84-EAD906C2FEDB

Lakes | Sotheby's
INTERNATIONAL REALTY

INTERNET DISPLAY OPTIONS
...age

...or the property located at __100  3rd Ave S #3201_____ ,

...ity of _____Minneapolis_____, ...o...nty of _____Hennepin_____, State of Minnesota

...or each option below, the MLS system a...tomatically defa...lts to "...es" See page one ...for de£nitions and e...planations of these options

O...tio...  Shall the property listing be displayed on the ...nternet, incl...ding sold information  ☑ ...es ☐ ...o

Seller Owner ...nderstands and ac...nowledges that if Seller Owner has selected "...o" for Option ..., cons...mers who cond...ct searches for listings on the ...nternet will not see information abo...t the listed property in response to their searches

If "No" was selecte...at O...tio... ...s...i...O...tio...s...a...si...elow If "Yes" was selecte...for O...tio...  co...ti...ue to O...tio...

O...tio...  Shall the listing address ho...se and ...nit n...mbers and street name ...be displayed on the ...nternet  ☑ ...es ☐ ...o

O...tio...  Shall an a...tomatic val...ation of the property listing or a lin...to an a...tomated val...ation be displayed ad...acent to the listing  ☑ ...es ☐ ...o

O...tio...  Shall comments or reviews of the property by persons other than the displaying bro...er be displayed with or attached as a lin...to the listing data of the property  ☐ ...es ☑ ...o

DocuSigned by:
*Paul Hansmeier*
Seller...S...O...r...S...g...re...  ...ate

DocuSigned by:
*Padraigin Browne*
Seller...S...O...r...S...g...re...  ...ate

M...O



# In The Matter Of:

*In re: Paul Hansmeier*

---

*Padraigin Browne*
*February 18, 2016*

---

*Shaddix & Associates*
*9100 West Bloomington Freeway*
*Suite 122*
*Bloomington, Minnesota 55431*

Min-U-Script® with Word Index

EXHIBIT 2

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2                  DISTRICT OF MINNESOTA
 3   ----------------------------------------------------------------
 4   In re:
 5   Paul Hansmeier,                    BKY No. 15-42460
 6          Debtor.
 7   ----------------------------------------------------------------
 8                   DEPOSITION and EXHIBITS of PADRAIGIN BROWNE,
 9   taken in the above-styled cause pursuant to Notice at Suite 132,
10   12400 Portland Avenue South, City of Burnsville, County of
11   Dakota, State of Minnesota, before Colleen M. Sichko, Registered
12   Professional Reporter and notary public, on the 18th day of
13   February, 2016, commencing at approximately 12:30 p.m.
14                          *     *     *
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2              RANDALL L. SEAVER, Attorney at Law,
 3   FULLER, SEAVER, SWANSON & KELSCH, PA, Suite 132,
 4   12400 Portland Avenue South, Burnsville, Minnesota
 5   55337, rseaver@fsswlaw.com, appeared as counsel for and
 6   on behalf of the trustee.
 7              DAVE BURNS, Attorney at Law, DAVE BURNS
 8   LAW OFFICE, LLC, 475 Grain Exchange North, 301 Fourth
 9   Avenue South, Minneapolis, Minnesota  55415,
10   dave@daveburnslaw.com, appeared as counsel for and on
11   behalf of the witness.
12
13
14
15
16
17
18
19
20
21
22
23              (Whereupon, the following proceedings were
24   duly had, and entered of record, to-wit:)
25
```

Page 3

```
 1                I N D E X
 2   WITNESS                                              PAGE
 3   PADRAIGIN BROWNE
 4       Examination by Mr. Seaver                          4
 5
     BROWNE DEPOSITION EXHIBITS                         MARKED
 6
 7   1 - Letter to Ms. Browne from Mr. Swanson             7
         dated 12/23/15
 7
 8   2 - Email to Mr. Swanson from Mr. Burns               8
         dated 2/5/16
 9
10   3 - Letter to Mr. Burns from Mr. Swanson             11
         dated 1/12/16
11   4 - Scottrade Authorization to Wire Brokerage        12
         Funds dated 7/30/13
12
13   5 - Schedule B - Personal Property                   14
14   6 - TCF account statements                           15
15   7 - TCF Bank (3276) Deposits and Cash Withdrawn      16
16   8 - Associated Bank statements 2013                  32
17   9 - Associated Bank (1853) Possible Cash Deposits    36
         2014
18   10 - Associated Bank statements 2014                 37
19   11 - Associated Bank statements 2015                 43
20   12 - Associated Bank (1853) Possible Cash Deposits   43
          2015
21
22   13 - Associated Bank deposit slip and GL Debit slip  63
23   14 - Lakes Sotheby's Listing Contract dated 9/16/15  70
24   15 - Coldwell Banker Burnet Purchase Agreement       76
          dated 11/9/15
25   16 - Residential Lease dated 9/26/15                 77
```

Page 4

```
 1                I N D E X   (CONTINUED)
 2   BROWN DEPOSITION EXHIBITS (Continued)             MARKED
 3   17 - ALTA Settlement Statement - Seller, dated 12/15/15  79
 4   18 - Fix Design Haus invoice dated 10/5/15         82
 5   19 - Duane's Floor Service invoice dated 10/9/15   82
 6   20 - Midwest Interiors invoice dated 11/3/15       82
 7   21 - Pride Electric invoice dated 10/30/15         82
 8   22 - CR Heating invoice dated 12/1/15              82
 9   23 - Polina's Cleaning invoice, undated            82
10   24 - J. Nordstrom Plumbing invoice dated 10/7/15   82
11   25 - Roell Painting Company invoice dated 10/20/15 82
12   26 - Letter to Mr. Seaver from Mr. Burns dated 2/17/16  86
13   27 - Transcript of proceedings held 10/28/15       88
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1         PADRAIGIN BROWNE,
2      having been first duly sworn, was
3    examined and testified on her oath as follows:
4           EXAMINATION
5  BY MR. SEAVER:
6  Q    Would you state your name, please?
7  A    Padraigin Browne; P-a-d-r-a-i-g-i-n; Browne, B-r-o-w-n-e.
8  Q    And Ms. Browne, you're here pursuant to a subpoena that I
9      had served on you, correct?
10 A    That is correct.
11 Q    And you've had your deposition taken -- was it just once
12     before this --
13 A    Yes.
14 Q    -- in this bankruptcy case?
15 A    That's correct.
16 Q    All right.  The testimony that you gave at that time, was
17     that truthful testimony?
18 A    Yes.
19 Q    Okay.  You're an attorney; is that correct?
20 A    Yes.
21 Q    Are you currently practicing?
22 A    I'm currently doing some doc review.
23 Q    Okay.  For what law firm?
24 A    For Kroll On Track.
25 Q    What's Kroll On Track?

Page 6

1  A    They are a very large company that does a variety of
2      support services, not just in the legal field, but they
3      have a legal support division.
4  Q    Okay.  You're no longer, at least at this point, you're not
5      employed as a patent attorney?
6  A    That's correct.
7  Q    The law firm that you were employed with as a patent
8      attorney, when they paid you, did they do withholding?
9  A    Do you mean on taxes?
10 Q    Right, that's what I mean, did they do federal and state
11     withholding?
12 A    No.
13 Q    Okay.  You weren't an independent contractor?
14 A    No, I got a paycheck.
15 Q    Okay, okay.  So I know you've had your deposition taken
16     once, but I'll just run through it again.  You understand
17     that you're answering questions under oath, right?
18 A    Yes.
19 Q    If I ask you a question that you don't understand, just
20     tell me that and I'll rephrase it.  All right?
21 A    Okay.
22 Q    And we have to try not to talk at the same time.
23 A    Okay.
24 Q    All right.  One last thing:  Don't shake or nod your head
25     yes or no because the court reporter can't take that.  All

Page 7

1      right?
2  A    Okay.
3         (Browne Deposition Exhibit 1 was marked for
4           identification by Mr. Seaver and attached
5           hereto.)
6  BY MR. SEAVER:
7  Q    All right.  I'm showing you what has been marked as
8      Deposition Exhibit Number 1, and the first page of that,
9      ma'am, if you would look at it, is a copy of a letter from
10     Matthew Swanson of my law firm to you dated December 22,
11     2015, sending to you a copy of the subpoena that had --
12     that was served in this case, correct?
13 A    Yes.
14 Q    Did you receive this letter?
15 A    I believe so, yes.
16 Q    All right.  And he's saying in the letter, in the third
17     sentence, "I want to make sure you get a copy of this
18     subpoena as soon as possible because some of the
19     information sought by the subpoena relates to the recent
20     sale of the property at 100 Third Avenue South, #3201,
21     Minneapolis," correct?
22 A    Yes.
23 Q    And he's telling you, "We need all of the information
24     relating to that sale as soon as possible in order to
25     analyze rights and claims," correct?

Page 8

1  A    Yes.
2  Q    Now let's turn to the attachment to the subpoena that has
3      the list of documents to be produced.  Ma'am, do you know
4      the day that the documents were actually produced per the
5      subpoena?
6  A    No, I don't.
7  Q    Does February -- even if you don't, does February 5th sound
8      correct to you?
9  A    It seems reasonable.
10        MR. SEAVER: Okay.  Mr. Burns, could you just
11     confirm that was the day the documents --
12        MR. BURNS: I would have to look at my
13     records.
14        MR. SEAVER: Sure, let me just -- we can just
15     mark this while we're talking.
16        (Browne Deposition Exhibit 2 was marked for
17           identification by the court reporter and
18           attached hereto.)
19 BY MR. SEAVER:
20 Q    So I'm marking what is just an email that I'm marking as
21     Exhibit Number 2, and it's an email from Mr. Burns.  He's
22     your attorney, correct?
23 A    He is.
24 Q    All right.  It's an email from him to Mr. Swanson
25     indicating that documents are available in a dropbox,

Page 9

1  correct?
2  A  Yes.
3  Q  Okay. Now, back to the subpoena itself, item 1 -- I'm not
4  going to read through it all, but it's checking account
5  statements. Did you provide all the checking account
6  statements and registers for the sorts of accounts
7  indicated?
8  A  I believe so.
9  Q  Okay.
10  A  I believe that I had not put in the most recent one and you
11  asked for those and we gave those to you this morning.
12  Q  Okay. Then down at item number 4, it's the copies of
13  documents relating or evidencing moneys contributed by you
14  for the payment of any of the following and, specifically,
15  I am directing your attention to item 4A at this point.
16  When you -- when the original purchase occurred, that was
17  in March of 2013, correct?
18  A  Yes, March 15th, I believe.
19  Q  All right. When that occurred, the money to close on it
20  came from two sources, a check from Mr. Hansmeier and the
21  mortgage that you both signed; is that correct?
22  A  I believe so, yes.
23  Q  Okay. And there had been an earlier earnest money payment,
24  too, just to be absolutely correct?
25  A  Yes.

Page 10

1  Q  Okay. In item 6 of this Exhibit A is the -- looking for
2  documents relating to payment of any student loans by
3  Mr. Hansmeier, any of your student loans by Mr. Hansmeier.
4  A  Mm-hmm.
5  Q  I didn't see any documents in there other than bank account
6  statements showing some student loan payments. Other than
7  that, I didn't see anything indicating -- confirming
8  Mr. Hansmeier's payments of any of your student loans.
9  A  So he gave me money. I believe there's -- I don't have --
10  I don't have the deposit slips, but he gave me money and
11  then I deposited that in my account and paid off my student
12  loans with that money.
13  Q  Okay. And when did the student loan payoff actually
14  happen?
15  A  In 2012, I believe.
16  Q  Okay. And what was the rough amount? I'm not looking for
17  an exact amount. Was it less than 10,000?
18  A  I think it was -- I think it was closer to 40, but I'm
19  not --
20  Q  Okay.
21  A  I'm not positive how much it was.
22  Q  Okay, okay. Under 50,000 do you think?
23  A  I think so. I know that my total was 80 when I graduated,
24  it was around 80, and I know that I had been making
25  payments for a while.

Page 11

1  Q  Okay.
2  A  So I think it was probably under 50.
3  Q  Okay. Under 60,000 for sure; could that be right?
4  A  Yeah.
5  Q  Okay. And then the last page of the exhibit to the
6  subpoena, if you would just turn to it, it's item number 9
7  and it's "Copies of checks or other instruments by which
8  the security deposit and all lease payments were made," and
9  specifically the security deposit, how was that paid?
10  A  With a certified check. If you don't have -- I don't have
11  I don't have -- I don't have the little slip that's left.
12  Q  Sure.
13  But you can see the withdrawal that occurred to make the
14  certified check out of the Associated Bank account.
15  Q  Okay. Is it a withdrawal out of the account just in your
16  name?
17  A  I'm 95 percent sure it was out of mine.
18  Q  Okay. It wasn't a cash transaction?
19  A  That's correct.
20  Q  Okay.
21      (Browne Deposition Exhibit 3 was marked for
22       identification by Mr. Seaver and attached
23       hereto.)
24  BY MR. SEAVER:
25  Q  All right. I'm showing you now what has been marked as

Page 12

1  Exhibit Number 3. Exhibit Number 3 is a letter to your
2  attorney, Mr. Burns, from Matthew Swanson at my firm
3  attempting to reschedule your examination in this case and
4  talking about the document production, correct?
5  A  Yes.
6  Q  Have you seen this letter before today?
7  A  Yes.
8  Q  Okay. So you were aware that my office was trying to get
9  these documents and get your deposition scheduled earlier?
10  A  Yes.
11      (Browne Deposition Exhibit 4 was marked for
12       identification by Mr. Seaver and attached
13       hereto.)
14  BY MR. SEAVER:
15  Q  All right. I'm putting in front of you now what has been
16  labeled as Exhibit Number 4, and Exhibit Number 4 is just
17  four of the Scottrade authorization forms stapled together;
18  and you've seen these before, haven't you?
19  A  I have.
20  Q  All right. And the first page of Exhibit 4 is a -- it's a
21  $5,000 wire transfer from a Scottrade account held in the
22  name of -- is it pronounced Monyet?
23  A  I don't know.
24  Q  Okay. It's a wire transfer to your account at Associated
25  Bank, correct?

Page 13

1   A   I believe so, yes.
2   Q   And that's -- it says that it's dated July 30, 2013,
3       correct?
4   A   Yes.
5   Q   All right.  And then turn to the second page of this
6       exhibit, if you would.  This is another authorization to
7       transfer money and this is a $30,000 transfer to your TCF
8       account from the Monyet account, correct?
9   A   Yes.
10  Q   And it's your husband who signed both of those transfer
11      authorizations at the bottom, correct?
12  A   I believe so, yes.
13  Q   Okay.  The third page of this exhibit is a $17,500 wire
14      transfer to your TCF account from the Monyet Scottrade
15      account, correct?
16  A   Yes.
17  Q   All right.  And that's your husband's signature down there
18      again, correct?
19  A   I believe so, yes.
20  Q   And Paul Hansmeier is your husband?
21  A   Yes, he is.
22  Q   All right.  The last page of this exhibit is another wire
23      transfer authorization and this is transferring $70,000 to
24      your TCF account on February 7 of 2014, correct?
25  A   Yes.

Page 14

1   Q   So, Ms. Browne, you had received 175,000 in November.  You
2       hadn't spent all that money by February, had you?
3   A   No, I had not.
4   Q   Okay.  So why was another $70,000 being wired to you in
5       February of 2014?
6   A   I believe that we had liquidated the stocks that were in
7       Monyet and so we were taking the money out of Scottrade.
8   Q   Okay.  And why was it being taken out of Scottrade?
9   A   So that we could use it for our living expenses going
10      forward when necessary.
11          (Browne Deposition Exhibit 5 was marked for
12          identification by Mr. Seaver and attached
13          hereto.)
14  BY MR. SEAVER:
15  Q   Let me show you what I'm marking as Exhibit 5, and this is
16      one page from Mr. Hansmeier's bankruptcy schedules in
17      his -- well, what was a Chapter 13 at the time, and you'll
18      see one line there at item 2 that says "Self settled trust
19      Monyet."  Do you see where I am?
20  A   Yep.
21  Q   And it says $8,554 and he has a J there next to it.  Is
22      this $8,554, is that the amount of cash that was left at
23      the time he filed bankruptcy?
24  A   Yes.
25  Q   Okay.  And that was cash -- where was that cash?

Page 15

1   A   In a box in our bedroom.
2   Q   In the condominium you were living in at the time?
3   A   Yes.
4   Q   What kind of box was it in?
5   A   One that came from the bank, just like a normal box.
6   Q   Okay.  And has that money all been spent?
7   A   I think there's a little bit left, but not very much.
8   Q   What does that mean?
9   A   Under 500.
10  Q   Under 500 left?
11  A   Yes.
12  Q   Are those in $100 bills?
13  A   No.
14  Q   No?
15  A   There might be one, but it's mainly twenties at this point.
16  Q   Okay.  I'm sorry, what did you say again?  Under 500, is
17      that what you said?
18  A   Yeah.
19  Q   Okay.
20          (Browne Deposition Exhibit 6 was marked for
21          identification by Mr. Seaver and attached
22          hereto.)
23  BY MR. SEAVER:
24  Q   I'm showing you what's been marked as Deposition Exhibit
25      Number 6, and Exhibit Number 6 is a group of statements

Page 16

1       stapled together that are TCF statements for an account
2       held in your name.
3           (Browne Deposition Exhibit 7 was marked for
4           identification by Mr. Seaver and attached
5           hereto.)
6   BY MR. SEAVER:
7   Q   Let me also put in front of you what I'm marking as
8       Deposition Exhibit Number 7, and Exhibit Number 7 is a
9       document that I had prepared in my office to try and track
10      moneys going into and out of the TCF account during a
11      certain time period.
12          So Exhibit 6, which is the group of account
13      statements from TCF that are stapled together --
14  A   Mm-hmm.
15  Q   -- the top page of that is a statement date of 6/23/2014,
16      correct?
17  A   Yes.
18  Q   And that has an ending balance of zero, correct?
19  A   Yes.
20  Q   All right.  And then if you go to the very last page of
21      this exhibit, there is a statement date of 8/21/2013, and
22      that shows the opening deposit into this account, correct?
23  A   Yes.
24  Q   And why was this account opened?
25  A   TCF Bank asked us to open an account or asked us to do our

Page 17

1    mortgage payments out of a TCF account for a quarter
2    percentage point cut on our mortgage rate.
3  Q    All right. And let's turn -- let's start at the back of
4    this exhibit, the page next to the very last page. There
5    is a -- do you have that in front of you?
6  A    So I'm just flipping one forward?
7  Q    That's it.
8  A    Okay.
9  Q    So the statement date is 9/20 up at the top. Do you see
10    that? They are up here (indicating).
11  A    Yes.
12  Q    All right. And there is a $30,000 deposit. It's a
13    transfer deposit made on September 27, 2013. Do you see
14    that?
15  A    Yes.
16  Q    And that's one of the transfers from the Monyet Scottrade
17    account, correct?
18  A    Yes.
19  Q    All right. And if you look at this Exhibit 7, the sheet I
20    had prepared, the first line is showing that $30,000
21    deposit, correct?
22  A    Yes.
23  Q    All right. Let's continue on with this exhibit. Turn one
24    more page towards the front or two more pages towards the
25    front so you have the 10/22/2013 statement in front of you.

Page 18

1  A    Okay.
2  Q    So there's an automatic withdrawal out of here and that's
3    the 4,200? It's hard to read this, it's faint print, but
4    that 4,200 roughly, that's your mortgage payment, correct?
5  A    That is correct.
6  Q    What is the other -- it's five thousand something and it
7    says "authorized withdrawal"?
8  A    I believe it says "State of Minnesota," so I'm guessing
9    that was our State taxes.
10  Q    Okay. Your best --
11  A    That's my best guess, particularly in light of fact
12    that the check was to the tax preparer.
13  Q    Oh, the page before -- the page towards the back that says
14    at the bottom "General Page 13," that's a check to the tax
15    preparer --
16  A    Yes.
17  Q    -- for you and your husband's tax returns?
18  A    Yes.
19  Q    All right. And then go -- keep going towards the front a
20    couple more pages to the 11/20/2013 statement, and down in
21    the Deposit section of this statement there is -- again,
22    it's very hard to read this, but it looks like it's a
23    number over 9,000 and it says "Automatic Deposit, IRS." Do
24    you know what that deposit is?
25  A    I'm going to guess it was a tax refund, but I'm not

Page 19

1    positive.
2  Q    If it's coming from the IRS -- would that be the only
3    possible thing that could be coming from the IRS?
4  A    As far as I know, yes.
5  Q    You didn't work for the IRS?
6  A    I did not work for the IRS.
7  Q    Okay. And then continuing going towards the front here, I
8    want to go up to the November 20, 2013 TCF statement.
9  A    I'm sorry, what --
10  A    November 20, 2013.
11  A    Weren't we just on November? Do you want December?
12  Q    I think I said December, didn't I? Let's go to December.
13    I meant to say December.
14  A    Okay.
15  Q    It says "General Page 8" at the bottom of it.
16  Q    Okay.
17  Q    Do you have that in front of you?
18  A    I do.
19  Q    And on this statement, in the Withdrawals section, we see
20    an $11,987 and some cent automated withdrawal to Citi Card.
21    What is that?
22  A    A credit card payment.
23  Q    Okay. Is the credit card held in both of your names?
24  A    No.
25  Q    Is it just you, ma'am?

Page 20

1  A    Yes.
2  Q    Okay. And then there's -- further down in the withdrawals
3    there's an automated withdrawal to the Bank of America for
4    $5,000. Is that another credit card payment?
5  A    Yes.
6  Q    And is that in both of your names?
7  A    No.
8  Q    Just yours?
9  A    That's correct.
10  Q    And then there's the TCF withdrawal and that's the
11    mortgage, right?
12  A    Yes.
13  Q    All right. And then up in the section right above that,
14    the Checks Paid, you see there are two separate $2,000
15    checks? Do you see those?
16  A    Yes.
17  Q    And if we turn one page towards the back, which says
18    "General Page 9," those two checks for 2,000 each are
19    checks to you, correct?
20  A    Yes.
21  Q    Did you get cash for those checks?
22  A    I don't remember what -- I don't remember. I'm guessing I
23    deposited them in a different -- my other account.
24  Q    When you say "other account," what account are you --
25  A    Associated, but I don't remember.

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 21

1 Q    Okay.  So would it be two things, it's either cash that
2      you're getting or those checks are deposited into the other
3      Associated account held in the name of -- or held in your
4      name?
5 A    Yes.
6 Q    Okay, okay.  And then continuing on, down at the bottom --
7      oh, go back to General Page 8 if you would, which is the
8      statement, you'll see down there there is the deposit
9      coming in of $175,000, correct?
10 A    Yes.
11 Q    And that's a wire transfer from the Monyet Scottrade
12      account, correct?
13 A    Yes.
14 Q    And then there's -- back in the Withdrawals section, there
15      is a $150,000 withdrawal.  Do you see that?
16 A    Yep.
17 Q    And that's a cash withdrawal, isn't it?
18 A    That is correct.
19 Q    So you withdrew $150,000 in cash from this account on
20      December 13, correct?
21 A    Yes.
22 Q    Did you call ahead to TCF to tell them that you were going
23      to come in and take 150,000 in cash out?
24 A    Yeah.  It took about a week.
25 Q    Okay.  So you had called about a week before that?

Page 22

1 A    Well, I stopped by the branch.
2 Q    Okay.
3 A    And talked to them about it.
4 Q    And why did you take out 150,000 in cash?
5 A    Because we were -- I wanted to make sure that we were still
6      able to make our payments on our everyday living expenses.
7      We had recently had a judgment entered against Paul without
8      him being served at all or being aware of it and I was
9      concerned that, because the attorneys that were
10      representing people against him were getting things without
11      letting us know, that they would freeze my account without
12      ever letting us know and we wouldn't be able to pay for
13      things.
14 Q    So you were concerned if you left the money in the account,
15      that somehow it would get tied up by some creditor?
16 A    Without notice.
17 Q    Okay.
18 A    So in Massachusetts -- I think it was in Massachusetts,
19      there was a case that we never heard of, neither of us were
20      ever aware of, and then they got a judgment for over
21      $70,000 entered against Paul in his name, and so I was very
22      concerned that if they could get a judge to do that without
23      ever serving him with anything, that they could also get
24      our -- get my bank accounts frozen without me being made
25      aware of and being able to contest their right to access

Page 23

1      that money.
2 Q    Okay.  So what did you tell TCF when you called them and
3      told them that you were coming in to get 150,000 in cash?
4      Did you explain it to them that way?
5 A    No, I just said I wanted the money in cash.
6 Q    Okay.  And what did you tell them you wanted the
7      denominations of the bills to be?
8 A    I didn't specify.
9 Q    Did they all end up being $100 bills?
10 A    They did.
11 Q    All right.  What branch was this at?
12 A    The one in the IDS Center in downtown Minneapolis.
13 Q    Okay.  So I would like you to just walk me through you
14      going over to get that money.  Did you bring some sort of
15      something to carry that money in?
16 A    A large purse.
17 Q    Okay.  And so you went into the bank and did you do a
18      counter check for the 150,000; is that what you did?
19 A    I'm not sure what you mean by that.
20 Q    Sure.  You filled out some form to authorize them to take
21      the 150,000 out of your account?
22 A    Yeah.  I don't remember what the form looked like or
23      anything, but yes.
24 Q    Sure, okay.  And it was all in $100 bills?
25 A    Yes.

Page 24

1 Q    And did they put it in a box for you?
2 A    Yes.
3 Q    Okay.  How big was the box?
4 A    About the size of a sheet of paper.
5 Q    A sheet of paper?
6 A    Yeah.
7 Q    Okay.  And then what did you do with it after that?  What
8      did you do with the box of money after that?
9 A    I put it in the closet.
10 Q    Okay.  So it was sitting in the closet.  It wasn't locked
11      up or anything in the closet?
12 A    That's correct.
13 Q    Okay.  So both you and Mr. Hansmeier had access to it in
14      the closet?
15 A    Yeah.
16 Q    Okay.  And you had -- at the time that you took that
17      $150,000 in cash out of the bank, you also had accounts --
18      you had an account at Associated Bank, right?
19 A    Yes.
20 Q    And you had an account at Capital One, correct?
21 A    I think it was called ING at the time.
22 Q    Okay.  But you had an open account there?
23 A    Yes.
24 Q    Okay.  And you had one -- it was -- oh, State Farm Bank,
25      you had an open account there, as well, correct?

---

Page 25

1  A   Yes.
2  Q   But you thought having $150,000 in a box in your closet was
3      safer than having it in any one of those accounts?
4  A   Yes.  The Carlyle has a 24-hour doorman and you need a fob
5      to get up to our place and no one would be able to freeze
6      the account and stop me from being able to access it.
7  Q   Okay.  Whose money did you think that was?
8  A   I thought it was mine to spend on myself and my family.
9  Q   But Mr. Hansmeier had equal access to the cash in that box
10     in your closet, correct?
11 A   He had -- in the respect that he could have stuck his hand
12     in there, yes, but the ability to determine how it was
13     spent, no.
14 Q   That was solely up to you?
15 A   Yes.
16 Q   And you made all the decisions on how to spend that money?
17 A   Yes.
18 Q   Okay.  Let's go back to Exhibit 6, if you would, which
19     is -- again, it's the -- yeah, you have it in front of you.
20     So we just looked at the December payment or December
21     statement and go to -- well, it says "General Page 6" down
22     at the bottom.  That's the 1/23/2014 statement.  Do you
23     have that in front of you?
24 A   Yes.
25 Q   And that is -- that statement shows an automatic withdrawal

---

Page 26

1      for the mortgage loan, correct?
2  A   Yep.
3  Q   And an automatic withdrawal for Gittleman.  Is that the
4      condo association?
5  A   Yes.
6  Q   Okay.  And no deposits that month, correct?
7  A   I don't see any deposits.
8  Q   Okay.  And then go about one more page towards the front to
9      General Page 5.  That's what it says at the bottom.
10 A   Okay.
11 Q   And this is the February 21st, 2014 statement, correct?
12 A   Yes.
13 Q   All right.  Before we look at that, though, just look at
14     this Exhibit 7 that you have there and still up at the top
15     in the Deposits section, there's the $17,500 deposit that
16     we just looked at in the TCF account, correct?
17 A   Yes.
18 Q   So that second line is accurate, right?
19 A   Yes.
20 Q   All right.  Now we can see on the TCF statement, General
21     Page 5, Exhibit 6, there is a $70,000 deposit on
22     February 10 of 2014, correct?
23 A   Yes.
24 Q   And that's another wire transfer from the Scottrade Monyet
25     account, correct?

---

Page 27

1  A   Yes.
2  Q   All right.  So if you look at Exhibit 7, we see the $70,000
3      coming in there, correct?
4  A   Yes.
5  Q   So that brings the total of moneys transferred into your
6      accounts from September of 2013 to February of 2014 to
7      275,000, correct?
8  A   Yes.
9  Q   All right.  And that's all into the TCF account, right?
10 A   Yes.
11 Q   All right.  So this money is coming over from the Scottrade
12     account in February and that's about three months after the
13     175,000 came over, correct?
14 A   Yes.
15 Q   So if you folks were so worried about someone seizing the
16     money, so worried that you had to put $150,000 in cash in
17     your home, why did you just leave 70,000 sitting in the
18     Scottrade account?
19 A   Well, I didn't.  I started withdrawing it in smaller
20     amounts.
21     No, in the Scottrade account.  It was still in the
22     Scottrade account until February.
23 A   Oh.
24 Q   Do you see?
25 A   I'm pretty sure we needed to do some liquidation between

---

Page 28

1      those times.
2  Q   Okay.  So that's your belief?
3  A   I think so, yes.
4  Q   Okay.  And so you put the $70,000 deposit in or it goes in
5      on February 10, correct?
6  A   Yes.
7  Q   All right.  And then you start withdrawing cash from that
8      account, correct?
9  A   Yes.
10 Q   And tell me why you're withdrawing cash from that account
11     then?
12 A   For the same reason as the previous money, to make sure
13     that we had it in cash.
14 Q   Okay.  For the same reasons you testified to --
15 A   Yes.
16 Q   -- about the $150,000 withdrawal?
17 A   Yes.
18 Q   Okay.  So I want to just go through these, ma'am, and just
19     match up the cash withdrawals with what I have on
20     Exhibit 7.  So looking in the cash withdrawn -- at
21     Exhibit 7, now, the cash withdrawn on and about
22     November 22, 2013, you see those two November 22, 2013,
23     those are the two checks that we saw, correct?
24 A   Yes.
25 Q   Which may -- as I understand your testimony, it's either

---

1    cash or it went into your Associated Bank account?

2  A    Right.

3  Q    Okay. And then we see the December 13 $150,000 withdrawal,

4    right?

5  A    Yes.

6  Q    All right. So now in February, that $2,000 withdrawal on

7    the 13th, that's a cash withdrawal, correct?

8  A    Yes.

9  Q    And then there's a $2,020 withdrawal on the 17th. Is that

10    a cash withdrawal?

11  A    Yes.

12  Q    And a $2,000 withdrawal on the 20th. Is that a cash

13    withdrawal?

14  A    Yes.

15  Q    And a $2,000 withdrawal on the 21st. Is that a cash

16    withdrawal?

17  A    Yes.

18  Q    Why didn't you just withdraw all this money at once? Why

19    did you just keep withdrawing in increments of $2,000?

20  A    Because the first time I did a large one it stressed me out

21    and it took a lot -- you have to do a lot of working with

22    the bank. It's much easier to just be able to go in and

23    get some money.

24  Q    Well, I understand a $150,000 withdrawal would be like

25    that, but my question -- and I didn't articulate it very

1    well. So over the course of eight days, you made four

2    withdrawals, which totaled $8,020. Why not just take out

3    $8,000?

4  A    Because the bank doesn't have that much money on hand. You

5    can't just go in and ask for $8,000.

6  Q    Did you try that?

7  A    Well, I asked them what was something that was reasonable

8    for me to be able to get if I just walked into the door.

9  Q    Okay. And they told you 2,000?

10  A    Yeah.

11  Q    All right. So back just looking at Exhibit 7, so those

12    first four withdrawals under Cash Withdrawn 2014 on

13    Exhibit 7, we have confirmed those, right?

14  A    Yes.

15  Q    So let's turn another one page towards the front of this

16    statement. It says "General Page 4" at the bottom, it's

17    Exhibit 6, and there are a series of cash withdrawals here

18    and every one of those withdrawals is in the amount of

19    $2,000, correct?

20  A    Yes.

21  Q    So on 2/24, the $2,000, that's a cash withdrawal?

22  A    Yes.

23  Q    2/28 is a cash withdrawal?

24  A    Yes.

25  Q    March 3rd is a cash withdrawal?

1  A    Yes.

2  Q    March 4th is a cash withdrawal?

3  A    Yes.

4  Q    And then all of those, all of those $2,000 withdrawals from

5    March 6 to March 18th, those are all cash withdrawals,

6    right?

7  A    Yes.

8  Q    All right. So that gets us down, back on Exhibit 7, if you

9    just want to -- if you would just correlate those

10    withdrawals, I just want to make sure Exhibit 7 is

11    accurate. That indicates the withdrawals for the March

12    statement accurately, correct?

13  A    I believe so, yes.

14  Q    All right. So we can see -- and we're looking at -- I'm

15    looking at Exhibit 7 now, the total cash out, which

16    includes those two $2,000 checks that you're not sure of,

17    and we'll look at that in a minute, but the total cash out

18    at the bottom, if the addition is correct, is $182,020,

19    correct?

20  A    Yes. I mean, I haven't done the math, but I'm going to

21    trust you on that.

22  Q    I'm just asking you to trust that the addition is correct.

23  A    Yes.

24  Q    And if it's not correct, then that's not the right number,

25    correct?

1  A    Right.

2  Q    So did you have -- again, we have to look at those two

3    checks for $2,000, but did you have about $180,000 sitting

4    in that box at the end of March of 2014?

5  A    I believe so, yes.

6        (Browne Deposition Exhibit 8 was marked for

7         identification by the court reporter and

8         attached hereto.)

9  BY MR. SEAVER:

10  Q    All right. I'm showing you now what's been marked as

11    Exhibit 8, and Exhibit Number 8 is -- it's a group of

12    Associated Bank statements that are stapled together and

13    I'll just tell you what I did. I stapled together -- the

14    Associated Bank statements, there was a large number of

15    them, so I stapled together the statements roughly for 2013

16    and roughly for 2014.

17  A    Okay.

18  Q    So this one, the front page of this Exhibit Number 8 is the

19    statement ending 6/20 of 2013, correct?

20  A    Yes.

21  Q    And then the very last -- the next-to-last page of this

22    exhibit is the first page of a statement ending on

23    January 20 of 2014, correct?

24  A    Yes.

25  Q    All right. So in this statement, turn, if you would, to --

Page 33

1    I handwrote page numbers on there, just to make it easy,
2    too.
3  A    Okay.
4  Q    Turn to page 13, if you would.  Do you see there in the
5    Deposits section on this page, which is the statement
6    ending 12/22/2013, there is an 11/21/2013 deposit for
7    $2,000.  Do you see that?
8  A    I do.
9  Q    Do you think that's one of those $2,000 checks?
10  A    Probably.
11  Q    Okay.  And so it looks like, if that's what it was, then
12    one of the $2,000 checks got deposited into this account,
13    correct?
14  A    Yes.
15  Q    And then look at the next -- page 15 of this Exhibit
16    Number 8.
17  A    Mm-hmm.
18  Q    And that's the December -- well, it ends on January 20th,
19    2014, and there is a customer deposit there for $258.  Do
20    you know the source of that deposit?
21  A    I have no idea.
22  Q    You don't know if it was cash or --
23  A    I don't know.
24  Q    You just don't know?
25  A    I literally have no idea.

Page 34

1  Q    Okay.  So going back to Exhibit Number 7, that was that
2    summary that we went through of the deposits, so it looks
3    like, if you go up to the November cash withdrawals, it
4    looks like one of those checks probably got deposited into
5    your Associated account, right?
6  A    Yes.
7  Q    Okay.  So assuming that's the case, one of those checks
8    didn't get turned into cash?
9  A    I have no idea.  I just don't remember.
10  Q    You aren't sure?
11  A    I have literally no idea.
12  Q    And I'm not trying to -- well, so if one of those two
13    check, $2,000 checks is, in fact, that $2,000 deposit into
14    your Associated account, that would mean that you didn't
15    get cash that day at TCF?
16  A    Right, for that check, yeah.  I mean --
17  Q    All right.  What would be -- the $258, what would be the
18    source of that money other than cash?  Do you have any
19    idea?  I'm talking about the $258 deposit.
20  A    I really have no idea.  I mean, it's an odd number.  I have
21    no idea.
22  Q    Okay.  In the same Exhibit 8, turn to page 9, if you would.
23  A    I'm sorry, did you say 9?
24  Q    Yeah, 9, and that's the statement that ends on 10/20 of
25    2013.  There are a number of Ticketmaster resale ticket

Page 35

1    deposits there.  What are those?
2  A    Vikings tickets that were put up for sale on Ticketmaster
3    and sold.
4  Q    Are those the Vikings tickets that are in Mr. Hansmeier's
5    grandfather's name?
6  A    They were at that time, yes.
7  Q    Whose name are they in now?
8  A    I'm not sure.  I'm not sure what happens when the -- with
9    the new stadium.
10  Q    Oh, okay.  Up until the new stadium thing, they were
11    tickets in his father's name?
12  A    His grandfather's name.
13  Q    I'm sorry, his grandfather's name?
14  A    Yes.
15  Q    Okay.  So do you know what, if anything, has been done with
16    those tickets with respect to the new stadium?
17  A    I believe that we put down a deposit to purchase, but --
18  Q    Would "we" be you and Mr. Hansmeier?
19  A    Yes, but I don't -- I don't think -- I think there's a
20    significant balance on the seat license still.
21  Q    Okay.  So how much do you think the deposit was that was
22    put down?
23  A    I really can't remember if they asked for -- they might
24    have asked for 25 percent.  I'm not sure.  I don't
25    remember.

Page 36

1  Q    Okay.  If it was, I'm not -- I understand you don't
2    remember if it was 25 percent, but I'm just trying to get a
3    range of a number if it was 25 percent.
4  A    I'm not even positive, so I think --
5  Q    Was it less than $5,000 down?
6  A    Yes, for sure.  I'm pretty sure the total cost was 10.
7  Q    Okay.
8  A    I don't think it was more than 25 that was put down.
9  Q    Okay.  You think it was probably less than 2,500 put down?
10  A    Yeah.
11  Q    And when would that have been put down?
12  A    I'm so bad at dates.
13  Q    Okay.  If we can --
14  A    Whenever they first started selling tickets.
15  Q    Okay.  Was that before Mr. Hansmeier filed bankruptcy?
16  A    It would have been, like, 2013 possibly.  Like, when they
17    literally announced the stadium, they started selling
18    tickets.
19  Q    Okay, okay.
20  A    So it was a long time ago.
21  Q    Okay.
22        (Browne Deposition Exhibit 9 was marked for
23          identification by the court reporter and
24          attached hereto.)
25  BY MR. SEAVER:

Page 37

1  Q    I'm putting in front of you now what's been marked as
2      Exhibit Number 9 and this is another document that I had
3      prepared at my firm and it says "Padraigin Browne,
4      Associated Bank, Possible Cash Deposits 2014," and what I
5      did, just so you understand, I went through your Associated
6      Bank account and I looked at deposits and tried to figure
7      out the source of them and created this document.
8                  (Browne Deposition Exhibit 10 was marked for
9                  identification by the court reporter and
10                  attached hereto.)
11  BY MR. SEAVER:
12  Q    So I next want to go to Exhibit Number 10, which --
13  A    Am I done with 8?
14  Q    Yeah, you're done with 8, so if you keep 9 and 10 in front
15      of you, that would be great.  So 9 is the document that I
16      had prepared and 10 is a group of Associated Bank
17      statements stapled together and I've put handwritten
18      numbers on the bottom, 1 through 21, and it's for the
19      account ending in 1853.  I want to run through this with
20      you starting with the top page, which has the handwritten
21      number 1.  There's a deposit there for $484.  Do you know
22      if that was cash or do you know the source of it?
23  A    I don't.
24  Q    Okay.  And then there's another deposit of 2/13/2014 for
25      $400 even.  Do you know if that was cash?

Page 38

1  A    I don't -- I have no idea.
2  Q    Don't know, okay.  So on my Exhibit 9 where I have question
3      marks there, we can keep the question marks there for those
4      three, right?
5  A    Yes.
6  Q    All right.  Then turn, if you would, to the page that has
7      number 3 on it, the handwritten number 3.  There's a
8      deposit there that says it's a customer deposit of $134.99.
9      You don't know the source of that, do you?
10  A    No.
11  Q    Okay.  And the other deposits here are coming from your
12      employment, correct?
13  A    Yes.
14  Q    All right.  Turn to page 5 of this, if you would, of
15      Exhibit 10.
16  A    Okay.
17  Q    And that's the statement that ends on 4/20 of 2014 and
18      there's a deposit there of $100.  Do you know if that was a
19      cash deposit?
20  A    I don't know.
21  Q    Don't know, okay.  And then turn to -- still in this same
22      exhibit, turn to page 7, if you would.  There are no cash
23      deposits there, correct?  That's the month ending 5/20 of
24      2014?
25  A    I don't see any.

Page 39

1  Q    Okay.  It's just your employment deposits?
2  A    Yes.
3  Q    All right.  And then go to the next page, which -- go to
4      page number 9, handwritten number 9.  It's the statement
5      ending 6/22/2014, and there's a deposit there on June 18 of
6      2014 for $4,055.88.  Do you know the source of that?
7  A    No.
8  Q    Okay.  So back on my sheet, I have -- that's one that I
9      have a question mark by.
10  A    Mm-hmm.
11  Q    So the question mark stays there, right?
12  A    Yes.
13  Q    All right.  And then continue on with this exhibit, if you
14      would, to page 11, and that is the statement ending 7/20 of
15      2014, and you'll see a deposit there on July 17 of 2014 of
16      $4,300.  Do you see that?
17  A    I do.
18  Q    Is that a cash deposit?
19  A    Probably.
20  Q    Okay.  So over on this other side, on this sheet that I had
21      prepared, I had 43 -- I had the $100 one that's a question
22      mark, but the $4,300 you're sure was a cash deposit.  You
23      said probably a cash deposit?
24  A    Yeah.
25  Q    You're pretty sure it is, though, aren't you?

Page 40

1  A    Yeah.
2  Q    Are you positive it is?
3  A    Not -- I mean, I'm -- I would say that it's much more
4      likely than not that it is.
5  Q    Okay.  And then turn to page 13 of this exhibit, if you
6      would.  The only deposit there is your payroll, correct?
7  A    Yes.
8  Q    All right.  And then turn to page 15 of this exhibit, and
9      that's the statement ending 9/21 of 2014.  There's a $5,000
10      deposit there; do you see that?
11  A    I do.
12  Q    Is that a cash deposit, do you think?
13  A    Probably.
14  Q    Okay.  And then turn, if you would, to the page with
15      handwritten number 17 on it, and that's the statement
16      ending 10/20 of 2014, and you'll see that there's a $4,400
17      even deposit.  Do you believe that's a cash deposit?
18  A    I do.
19  Q    Okay.  So back here on my sheet again, that $4,400 you
20      believe would be accurate as a cash deposit?
21  A    Yes.
22  Q    Okay.  And then there is the 10/2 Minnesota Department of
23      Revenue deposit of $3,796.  What's that?
24  A    I'm not positive, but based on the time of year, I would
25      guess it's our property tax refund.

Page 41

1  Q  Oh, yeah, okay.  You didn't work for the Department of
2     Revenue?
3  A  No, I did not.
4  Q  Okay.  So it's a refund of some sort and probably the
5     property tax refund?
6  A  Probably.
7  Q  Okay.
8  A  But -- yeah.
9  Q  All right.  And then continue with this exhibit, go to
10    page 19, if you would, and that is -- it's the statement
11    ending 11/20 of 2014 and there is a $4,000 deposit there on
12    10/27.  Do you believe that would be a cash deposit?
13 A  Yes.
14 Q  All right.  So over here on the list I had prepared again,
15    that would be right, the $4,000, correct?
16 A  Yes.
17 Q  And then there's a deposit of $3,300.  Does it appear to
18    you that would be a cash deposit?
19 A  Probably.
20 Q  All right.  So, again, on Exhibit 9 you'll see the $3,300
21    and that would be right, correct?
22 A  Yes.
23 Q  And then there's a deposit for $11,079.  Do you know the
24    source of that deposit?
25 A  No.

Page 42

1  Q  Okay.
2  A  I'm -- no.
3  Q  Do you think it's cash?
4  A  It's quite possible it is, but I'm --
5  Q  The odd number is throwing you?
6  A  Right, that's -- I mean, for all the ones that are odd
7     numbers, I'm just not as positive and I just don't
8     remember.
9  Q  All right.  And then go to page 21, if you would, of the
10    same exhibit, which is the statement ending 12/21 of 2014.
11    The only deposit there is from your employment, correct?
12 A  Yes.
13 Q  All right.  So back -- let me just go back to Exhibit 9, if
14    you would.  That's the summary?
15 A  Yep.
16 Q  So the $11,079 deposit which I have in the right column
17    with a question mark, you don't know, it could be cash, it
18    might be --
19 A  I mean, for any of the odd number ones, I think it might be
20    a mix of cash and a check.
21 Q  Okay, okay.
22 A  Just -- I mean, but that's just a guess.
23 Q  Sure, I understand, but the for sure cash deposits, at
24    least that we've looked at so far, they are the -- here,
25    let me just do this real quickly and run through them.  The

Page 43

1     ones that we know for sure from your testimony are cash
2     deposits are the ones that I have drawn that really rough
3     circle around, right?
4           MR. BURNS:  I would just object that that
5     misstates the testimony.  I don't think there's been any
6     for sure cash deposits.
7  BY MR. SEAVER:
8  Q  Okay.  More probable than not or most likely, what I have
9     drawn a circle around were cash deposits?
10 A  Yes.
11 Q  Okay.  And the other ones that are on this sheet you just
12    aren't sure of?
13 A  Correct.
14          (Browne Deposition Exhibit 11 was marked for
15          identification by the court reporter and
16          attached hereto.)
17 BY MR. SEAVER:
18 Q  I'm having marked Exhibit 11 now, which is -- it's
19    another -- it's a group of bank statements stapled
20    together.
21          (Browne Deposition Exhibit 12 was marked for
22          identification by the court reporter and
23          attached hereto.)
24 BY MR. SEAVER:
25 Q  And then I'm also putting in front of you Exhibit

Page 44

1     Number 12, which is another one of these documents that was
2     prepared by my firm when I looked at deposits and I was
3     trying to figure out what were cash deposits, and so we'll
4     run through this in the same way we've been doing these
5     others.  So Exhibit 11 is a group of Associated Bank
6     statements for the account held in your name?
7  A  Yep.
8  Q  Starting -- the first page is the statement ending 2/20 of
9     '14 and then the last -- or the next-to-last page is the
10    first page of the statement ending 12/21 of 2014, correct?
11 A  Of 2016?
12 Q  I think I might be looking at the -- I might have the wrong
13    exhibit that I'm looking at here.  Yep, I'm looking at the
14    wrong one.
15          All right, let me go over that again.  So the
16    Exhibit Number 11 is a group of Associated Bank statements
17    for the account in your name, correct?
18 A  Yes.
19 Q  And the front page ends on 1/20 of 2015, correct?
20 A  Yes.
21 Q  And the next-to-last page is the first page of the
22    statement ending on 1/20 of 2016, correct?
23 A  Yes.
24 Q  And those last two pages are the ones that you provided
25    today, correct?

Page 45

1  A    Yes.
2  Q    Okay, thank you.  All right.  Then what is Exhibit
3      Number 12 is, again, a compilation of when I looked through
4      and saw deposits, I was trying to determine what they were.
5        So the first one, let's go to page 1 of Exhibit 11.
6      There's a $100 deposit there on 12/23 of 2014.  Do you know
7      if that was cash or not?
8  A    I have no idea.
9  Q    Okay.  And then continuing on in the statement, go to the
10     page with number 3, handwritten number 3 on it and
11     handwritten number 3, there's a $4,400 deposit.  Is that a
12     cash deposit?
13 A    Probably.
14 Q    More likely than not?
15 A    Yes.
16 Q    All right.  And right under that, a $3,000 deposit, more
17     likely than not cash?
18 A    Yes.
19 Q    And then there are two deposits, one on 2/13 of $1,000 and
20     one on 2/18 of $2,000.  More likely than not, those are
21     cash deposits?
22 A    Yes.
23 Q    Okay.  And this is the cash coming from that box at your
24     house?
25 A    Yes.

Page 46

1  Q    Okay.  On this same page, ma'am, on 2/6, in the Withdrawals
2      section on 2/6 of 2015, there is something that says Browne
3      Padraigin Transfers, $836.99, and I see a recurring
4      transfer that says something like that.  What is that?
5  A    That is transferred from this account to my State
6      Farm account to pay for my car.
7  Q    Okay.  So was that your monthly car payment?
8  A    Yes, that's my monthly car payment.
9  Q    Okay.  And then go to page 5 of this exhibit, if you would,
10     and on page 5 there is a -- in the deposits -- this is a
11     3/22/2015 ending statement?
12 A    Mm-hmm.
13 Q    There is a deposit of $14,565.  Is that a tax refund?
14 A    Possibly.  I'm not sure.
15 Q    All right.  Then let's go to the -- so just to finish off
16     on that, though, it's possibly a tax refund, you're just
17     not sure as you sit here today?
18 A    Yeah.
19 Q    If the documents show it was a tax refund, that's what it
20     is?
21 A    Right.
22 Q    Okay.  Then go to page 7 of this, if you would, and in the
23     Deposits section there is a $4,164 deposit from the
24     Minnesota Department of Revenue.  Do you see that?
25 A    Yes.

Page 47

1  Q    That is a tax refund, right?
2  A    I believe so, yeah.
3  Q    And it would be the joint refund for you and Mr. Hansmeier?
4  A    Yep, we filed joint taxes.
5  Q    Right.  And then right under that there is a customer
6      deposit of $3,000.  More likely than not, that's a cash
7      deposit, correct?
8  A    Yes.
9  Q    And on this list -- I forgot to do this last time -- the
10     January and February numbers -- and we can go back and look
11     at it, but those numbers are accurately depicting what is
12     more likely than not cash deposits, correct?
13 A    Yes.
14 Q    Okay.  And now for these deposits, March 27, $3,000, and
15     April 17th of 2,000 on this list, those are more likely
16     than not cash payments -- or deposits, right?
17 A    Yes.
18 Q    Then turn to the page that has number 9 on it here and the
19     page with number 9 is the first page of the statement
20     ending 5/20/15, and there's a cash deposit on 4/27 of 2015
21     of $3,000, correct?
22 A    Yes.
23 Q    More likely than not a cash deposit, right?
24 A    Yes.
25 Q    And that is reflected on this sheet, this Exhibit 12,

Page 48

1      right?
2  A    Yes.
3  Q    And then, again, on 5/6 of 2015, another $2,000 deposit,
4      correct?
5  A    Yes.
6  Q    More likely than not a cash deposit, correct?
7  A    Yes.
8  Q    And that's accurately reflected on Exhibit 12, correct?
9  A    Yes.
10        MR. BURNS: I think you may have misspoke,
11     Randy.  On 4/27 of 2015, you said that was a cash deposit,
12     but it does say "customer deposit."
13        MR. SEAVER: Okay.  If I said that it said
14     cash deposit, I'm wrong.
15        MR. BURNS: You did.
16 BY MR. SEAVER:
17 Q    It says "customer deposit."  What I meant to say was it's
18     more likely than not that was a customer deposit of cash,
19     right?
20 A    Yes.
21 Q    Okay.  And then on page 5 -- moving to page 11 of these
22     statements, on 5/22 of 2015 there's a deposit of $3,000,
23     correct?
24 A    Yes.
25 Q    More likely than not, that is a deposit of cash?

Page 49

1　A　　Yes.

2　Q　　And that is accurately reflected on Exhibit 12, correct?

3　A　　Yes.

4　Q　　And then on 5/27, there is a $5,100 deposit and more likely

5　　　than not, that is a cash deposit, correct?

6　A　　Yes.

7　Q　　And in the cash -- when I ask you about these cash

8　　　deposits, you understand I'm referring to the cash coming

9　　　from the box in your room, right?

10　A　　Yes.

11　Q　　Okay.  And that second one, the $5,100 is accurately

12　　　reflected on Exhibit 12, correct?

13　A　　Yes.

14　Q　　All right.  Page 13 of this exhibit now, which is the

15　　　statement ending 7/20 of 2015 -- and just for reference as

16　　　we go through this, Mr. Hansmeier's filing date for the 13

17　　　was July 13th of 2015.

18　A　　Okay.

19　Q　　So on your statement, we see a deposit of $5,900 on 6/23

20　　　and more likely than not, that's a cash deposit, correct?

21　A　　Yes.

22　Q　　And that's accurately reflected over on Exhibit 12?

23　A　　Yes.

24　Q　　All right.  And then on June 25th, there's a $3,000

25　　　deposit, correct?

Page 50

1　A　　Yes.

2　Q　　More likely than not, that's a cash deposit, correct?

3　A　　Yeah, I think so.

4　Q　　And that's accurately reflected on Exhibit 12, correct?

5　A　　Yes.

6　Q　　All right.  And then there's a $20,000 deposit on July 9 of

7　　　2015, correct?

8　A　　Yes.

9　Q　　And that is a cash deposit, correct?

10　A　　Yes.

11　Q　　Okay.  And that's accurately reflected on this Exhibit 12,

12　　　correct?

13　A　　Yes.

14　Q　　And then turn to page 14 of this exhibit and you'll see a

15　　　check going out, it's check number 1309?

16　A　　Yep.

17　Q　　And there may be -- if you turn to page 25 of this exhibit,

18　　　there is a check for $15,305 going to Barbara May, correct?

19　A　　Yes.

20　Q　　And that's for your husband's bankruptcy?

21　A　　That is correct.

22　Q　　Okay.  So if we look, go back to page 14, if you would, and

23　　　on the day of his filing, July 13, there was a balance in

24　　　this account of $7,709.64, correct?

25　A　　I'm sorry, where am I looking?

Page 51

1　Q　　Page 14, look at the running Balance Summary section and

2　　　you'll see on July 13, there's a balance of $7,709.64,

3　　　correct?

4　A　　Yes.

5　Q　　All right.  And then go back, if you would, to page 13, the

6　　　page right before that, and the very last deposit showing

7　　　up there is the 7/9/2015 of $20,000 in cash, correct?

8　A　　Yes.

9　Q　　And that $20,000 is represented accurately in Exhibit 12,

10　　　correct?

11　A　　Yes.

12　Q　　Okay.  Now, continuing on with Exhibit 11 -- and say, if

13　　　you need a break at any time, just let me know.

14　A　　Okay.

15　Q　　So continuing on with this, at page 17 -- I'm sorry, it's

16　　　two pages back, page 19, this is the statement -- no, let's

17　　　go back.  I got ahead of myself here.  Let's go back to

18　　　page 15 of Exhibit 11, and that's the statement that has an

19　　　end date of August 20, 2015, correct?

20　A　　Yes.

21　Q　　And there is a $5,900 deposit on 7/27.  Do you see that?

22　A　　Yes, I do.

23　Q　　And more likely than not, that's a cash deposit, correct?

24　A　　Yeah, I think so.

25　Q　　And that's -- you aren't certain, but it's more likely than

Page 52

1　　　not, right?

2　A　　Yeah.

3　Q　　Where else would you get $5,900 to deposit, then?

4　A　　It might have been a check from Paul.

5　Q　　If it was a check from Paul, what account would it have

6　　　been coming out of?

7　A　　His Class Justice.

8　Q　　So there are two possibilities for that $5,900, either cash

9　　　or a check from Class Justice?

10　A　　Yes.

11　Q　　If it was a check from Class Justice, why would you be

12　　　getting a check from Class Justice?

13　A　　Because our mortgage payment comes out of my account, or it

14　　　came out of my account and I may have just deposited it in

15　　　there.

16　Q　　You aren't certain?

17　A　　No, I'm not.

18　Q　　And then on page 16, there is --

19　A　　Yeah, I really am not certain about what that payment is at

20　　　all.

21　Q　　Okay.  Let's go back just to make sure we're clear on what

22　　　you're talking about.

23　A　　Right.

24　Q　　The $5,900 --

25　A　　Right.

Page 53

1  Q    -- you're not clear on?

2  A    I am not clear at all.

3  Q    There are two possibilities, cash or a check from Class

4       Justice?

5  A    Yeah, I think, or a check from -- yeah, because he doesn't

6       have -- yeah.  Yeah, but I'm really not sure.

7  Q    Sure.  And then on page 16, there is a deposit there of

8       $2,120.  Do you see that?

9  A    I do.

10  Q    And is that your property tax refund?

11  A    I believe so.

12  Q    Okay.  So it would have been a joint property tax refund

13       for you and Mr. Hansmeier, correct?

14  A    Yes.

15  Q    All right.  And then continuing on with this exhibit at

16       item -- at page 17, looking at deposits again, and this is

17       a statement ending 9/20 of 2015, there is a $10,000 deposit

18       on September 2, 2015.  Do you see that?

19  A    Yes.

20  Q    More likely than not, that is a cash deposit, correct?

21  A    Yes.

22  Q    All right.  And then continuing on here going to page 19 of

23       this exhibit, there are some Ticketmaster resales in the

24       Deposits section?

25  A    Yes.

Page 54

1  Q    And those are the Vikings tickets, correct?

2  A    Yes.

3  Q    Okay.  There's also a payment, a withdrawal to Maplewood

4       Toyota for $1,000 on October 6 of 2015.  Do you see that?

5  A    Yes.

6  Q    What's that for?

7  A    When -- it's for a car, a Prius.

8  Q    Is that a purchase of a car?  Is it towards a purchase?

9  A    It's a lease, so it's the down payment, you know, like the

10       first payment and tax, title or whatever.

11  Q    Is that different than the car, the State Farm payment?

12  A    Yes.

13  Q    Okay.  Is this a new lease?

14  A    Yes.

15  Q    Okay.  The State Farm payment, what was that going for,

16       what vehicle?

17  A    The Audi Q7.

18  Q    Okay.  Is that -- was that a lease payment?

19  A    No, that car is a purchase.

20  Q    Okay.  So the Prius, is that Paul's car or is that your

21       car?

22  A    We switch off.  Until this past weekend, we only had one

23       set of car seats, so depending on who was doing dropoff, we

24       switched.

25  Q    So those are the two vehicles you folks have?

Page 55

1  A    Yes.

2  Q    And then continuing with this exhibit, at page 20, there is

3       a check number 1315 in the amount of $3,000.  Do you see

4       that?

5  A    I do.

6  Q    Do you know what that is?

7  A    I don't.

8  Q    All right.  And then was this about -- let me go back and

9       just see if I can help you.  Is this about the time you

10       guys did the lease?  It's a little after the lease, right?

11             MR. BURNS: The lease for what?

12             THE WITNESS: No, because the 1,635 is our

13       first month's rent.

14  BY MR. SEAVER:

15  Q    Okay.  So the 1,635 is your first month's rent?

16  A    Yep.

17  Q    Okay.  Can you show me -- is this the account that you

18       thought the deposit came out of, the security deposit?

19  A    Yes.

20  Q    Okay.  Can you show me where that is, ma'am?

21  A    Let's see, I think it came out of this one.  It would have

22       been for, like, $2,200 about, give or take.

23  Q    And I think it's 2,150 if it's --

24  A    Right, but it was 2,150 plus, like, 35 or something for the

25       fee for the certified check.

Page 56

1  Q    Okay.

2  A    So -- but I could be wrong.  I mean, it could have come out

3       of our joint account, I just don't remember.

4  Q    You're pretty sure it came out of one of the Associated

5       accounts?

6  A    Well, I know it came out of one of the Associated accounts,

7       that I'm very comfortable saying.  I'm not as positive on

8       which one.

9  Q    You're not seeing it as you quickly look through?

10  A    No, I'm not seeing it as I quickly look through.

11  Q    Okay.  And then continuing on with this exhibit, Exhibit

12       Number 11, if you would go to page number 23, there are two

13       deposits there, and this is the statement ending 12/20 of

14       2015.  There are two deposits there, one for $5,000 and the

15       other for $3,000.  Do you see that?

16  A    I do.

17  Q    Where is the $5,000 deposit -- what's the source of that;

18       do you know?

19  A    Cash.

20  Q    Okay.  And the $3,000, where did that come from?

21  A    My personal Scottrade account.

22  Q    I don't recall seeing copies of a Scottrade account -- are

23       those Scottrade accounts statements in the documents

24       produced?  Did you produce those?

25  A    I thought I did, but maybe I didn't.

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 57

1 Q Okay, and I could have missed them too. How much do you
2    have in your Scottrade account?
3 A Now there's approximately $800. There was 3,800,
4    approximately, and now there's approximately 800 in cash
5    and there's some stock, but the total amount is -- it's
6    very little in stock, so it's maybe 2,000 total.
7 Q When did that -- I'm sorry, go ahead.
8 A So there's maybe, like -- between stock and cash, there's
9    maybe $2,000 in there total.
10 Q When did that Scottrade account get opened?
11 A 2007.
12 Q Okay.
13 A 2008, somewhere around there. I was still in law school
14    when it was opened.
15 Q Okay. I'm just going to pick -- because I haven't seen the
16    statements and maybe they are there, but in 2013, would
17    there have been over 30,000 in there?
18 A No. The amount in there was never over 10,000 at any time.
19 Q Okay.
20 A One of the investments went very south, so.
21 Q Okay. So back here on this list that I'm working on or
22    this Exhibit 12 trying to track cash, the $3,000 came from
23    your Scottrade account and the $5,000 was cash, right?
24 A Yes.
25 Q Okay. So I'll just pen that change in there and so here

Page 58

1    (indicating), the $5,900 on Exhibit 12, I'll just circle
2    that, you just don't know about that?
3 A Right.
4 Q And I just put a question mark sideways there. These other
5    two, the 10 and the 5, those are both cash deposits,
6    though?
7 A Right.
8 Q Okay. Now, Ms. Browne, we can see -- let me get these
9    exhibits out for you, it will make it easier. So I'm
10    getting Exhibit 9, Exhibit 7 and you already have
11    Exhibit 12 in front of you. These are the summaries --
12 A Okay.
13 Q -- that we went through as we looked at the statements. So
14    on Exhibit 7, that's the original -- it's right here in the
15    middle for you.
16 A Okay.
17 Q The $2,000 -- one of those $2,000 checks, it appears to be
18    a deposit just going over, right?
19 A Okay.
20 Q I'll just cross one of those out, and it could be either
21    one, we don't know?
22 A Right.
23 Q So assuming my addition of these numbers is accurate, that
24    would reduce the amount out -- I mean assuming these
25    numbers are added up correctly, that would reduce the cash

Page 59

1    out to about $180,020, correct?
2 A Yes.
3 Q So, Ms. Browne, I'm trying to figure out what happened to
4    that cash, and so we've gone through your bank accounts
5    trying -- and I'm trying to figure out the cash; and in
6    2014, this Exhibit Number 9, there are a number of question
7    marks, you just didn't know if those deposits in were cash?
8 A Right.
9 Q And the biggest one was eleven thousand some?
10 A Right.
11 Q And some of these, the five over on the other side that are
12    circled, those were all for sure cash going in?
13 A Mm-hmm.
14 Q So even if you take -- even if you assume the 11,000 on
15    Exhibit 9 is cash in and you add that to 21,000, that gets
16    you to, let's just say, $32,000, and I'm just doing rough
17    numbers here?
18 A Yep.
19 Q With the understanding that these things with question
20    marks could be cash, we just don't know?
21 A Yep.
22 Q So on this Exhibit Number 9, let's just say it's 32,000 in
23    cash, or let's just say it's 35,000, so that would cover --
24    other than the $4,000 deposit, it would cover that. Then
25    go to Exhibit Number 12.

Page 60

1 A Yep.
2 Q And we see 60,000 in cash for sure in deposits?
3 A Yep.
4 Q Sixty thousand four hundred?
5 A Yep.
6 Q And then down below that, there is for sure 15,000 --
7 A Yep.
8 Q -- and 5,900 you just don't know about?
9 A Right.
10 Q But even if it were, even if the 5,900 were a cash deposit,
11    we end up with in the range of 79,000 there?
12 A Yep.
13 Q Even if that is cash. So 79 and 35 gets you to 114,000.
14    That leaves $66,000 of cash that we don't see coming into
15    any of these accounts?
16 A Yeah.
17 Q Where is the money?
18 A It went to John Steele to pay for one of the bonds for the
19    appeal.
20 Q How much went to Mr. Steele?
21 A I think 60.
22 Q When did that go to him?
23 A I don't remember the date.
24 Q Can you give me a rough idea?
25 A It would have been in 2013 or 2014 and it would have -- I

Page 61

1  believe it was for the Lightspeed appeal, so you should be
2  able to figure out -- I mean, I don't know the dates,
3  but --
4  Q  Okay. So we've got the -- you took out the $150,000 in
5  cash?
6  A  Yeah.
7  Q  -- in December of two thousand -- I'm sorry, let me see.
8  Yeah, December of 2013?
9  A  Yeah.
10  Q  So how long after that did you --
11  A  I don't remember.
12  Q  Okay. So the very earliest it could have happened is
13  December 14th or so of 2013, right?
14  A  Yeah, it wasn't right away.
15  Q  So somehow did you get that money to Mr. Steele?
16  A  He was coming up to visit, so instead of going in,
17  depositing the money and writing him a check, we just gave
18  him the cash.
19  Q  When you say "we," it's you and Mr. Hansmeier that you're
20  referring to?
21  A  Yes.
22  Q  Who actually got the cash out and handed it to him?
23  A  I did.
24  Q  Okay. So Mr. Steele comes over to your place, the
25  condominium, right?

Page 62

1  A  Yes.
2  Q  And Mr. Hansmeier says, Go get out $60,000 in cash and give
3  it to Mr. Steele?
4  A  Well, we talked about it before he came over.
5  Q  Okay. And what was that talk?
6  A  The talk was about whether we should -- whether we should
7  contribute to the bond.
8  Q  Okay.
9  A  And the fact that he did not have the money to do it
10  himself so that if we were going to contribute to the bond,
11  it would have to come out of the trust money that was in
12  the closet.
13  Q  Okay. So there's no record?
14  A  No.
15  Q  Okay. Are there sanctions against Mr. Hansmeier in the
16  Lightspeed case?
17  A  There are -- there were -- can you be more specific?
18  Q  Was this to cover -- the $60,000 that you and Mr. Hansmeier
19  gave to Mr. Steele, was it to cover a bond for
20  Mr. Hansmeier?
21  A  Yes. So he would have been one of the people on -- that
22  was put on a judgment and, again, I'm not positive it's the
23  Lightspeed one, but I think it was.
24  Q  Okay.
25  A  Because I'm pretty sure that one had a bond. So if it was

Page 63

1  that one, they would have been -- they would have been
2  sanctioned and then there were about -- if I'm correct,
3  they were told if they didn't put up a bond, that they
4  would be fined, like, $5,000 a day until they did and
5  then -- so that was, like, well -- and then so they
6  eventually put up a bond.
7  Q  Okay.
8  A  I think that was the one, and then that one went up on
9  appeal and they lost it, so the money went to the people
10  that the money was for.
11  Q  And when did that all happen? I mean, when did --
12  A  I feel like the appeal thing came down in August of 2015,
13  like the -- whatever.
14  Q  Okay.
15  A  But I'm completely guessing on when the order came down.
16  Q  Sure, okay. How much was the sanction against
17  Mr. Hansmeier?
18  A  I don't remember at all.
19  Q  Okay.
20      MR. BURNS: We've been going a little over an
21  hour, Randy. Might this be a good time for a break?
22      MR. SEAVER: No problem.
23      (Short break taken.)
24      (Browne Deposition Exhibit 13 was marked for
25  identification by the court reporter and

Page 64

1  attached hereto.)
2  BY MR. SEAVER:
3  Q  We're back on the record now and you understand you're
4  still under oath?
5  A  Yes, I do.
6  Q  And I'm putting in front of you what's been marked as
7  Exhibit 13, and Exhibit 13 is a copy of a deposit slip that
8  Associated Bank produced pursuant to a subpoena.
9  A  Okay.
10  Q  And this is the $5,900 deposit on July 27 of 2015, correct?
11  A  Yes.
12  Q  So this indicates it is a cash deposit, right?
13  A  Yes.
14  Q  Okay. So look at Exhibit 12 again, if you would. It's --
15  okay, you have that, right?
16  A  Yep, I got it.
17  Q  So down there at the bottom, now we know the 5,900 is cash,
18  right?
19  A  Yes.
20  Q  So that's accurate. The September 2 $10,000 is cash?
21  A  Yes.
22  Q  And the December 10, $5,000 is cash, right?
23  A  Yes.
24  Q  Okay. So that's a total of $20,900, correct?
25  A  Yep -- yes.

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 65

1 Q    That was deposited by you on those dates?
2 A    Yes.
3 Q    All right.  I'm putting back in front of you Exhibit
4      Number 5.
5 A    Yep.
6 Q    And Exhibit Number 5 is the page from Mr. Hansmeier's
7      bankruptcy that we looked at earlier where it said trust
8      money of 8,554 --
9 A    Yes.
10 Q   -- on the date of his filing, correct?
11 A   Yes.
12 Q   But we know that's not true, don't we?
13 A   No.
14 Q   Okay.  Well, let's look again at how much cash you
15      deposited after -- on or after July 27.  It's $20,900,
16      correct, right here (indicating), Exhibit 12?
17 A   Yes.
18 Q   And that far exceeds $8,554 that's on Exhibit 5, doesn't
19      it?
20 A   Yes.
21 Q   So we know Exhibit 5 isn't true, don't we?
22 A   No.
23 Q   Why?
24 A   Well, because -- well, I'm not positive where the 10,000 --
25      I'm assuming it came out of this stuff, but --

Page 66

1 Q    Where else would --
2 A    Excuse me, let me finish.  I know the 5,900 I deposited
3      since you said it was cash was to pay off credit cards that
4      I had previously incurred and I believe the same thing
5      happened for September 2nd, so although the cash had not
6      been deposited yet to go out, it had already been spent.
7 Q    Where did the cash come from for those three deposits?
8      July 27th is from the 180,000, isn't it --
9 A    Yes, and I'm saying that --
10 Q   Okay, now let me finish.  September 2, 2015, 10,000 is from
11      the 180,000, correct?
12 A   Yes.
13 Q   The December 10 $5,000 deposit is from the 180,000,
14      correct?
15 A   Yes.
16 Q   Okay.  And that totals 20,900, correct?
17 A   Yes.
18 Q   So you had to have at least 20,900 in cash in your
19      possession on July 13 of 2015?
20 A   Yes, and I'm saying when we filed, I had spent that money,
21      the 15,000 already, approximately, on various things and
22      was paying -- so I said that's not there because I need to
23      pay off my credit card, and then I deposited it afterwards.
24      Just because he hadn't -- just because he listed 8,500, we
25      said, well, we've already spent that money on a credit

Page 67

1      card, we just haven't paid it off yet, so we're going to
2      say that that's not there, and then the 5,000 is part of
3      the 8,000 that we were still saying was part of the trust.
4 Q    So you and Mr. Hansmeier sat down and counted out how much
5      money was left there, correct?
6 A    Yes.
7 Q    Okay.
8 A    Pretty close.  I mean, there was probably some ones and
9      stuff lying around.
10 Q   And what did you come up with for a total?
11 A   I don't remember exactly how much it was.
12 Q   Okay.  And then you and he talked and decided rather than
13      stating how much cash was actually there, you would deduct
14      for cash that was -- for things that you were going to pay
15      in the future?
16 A   For things that had already been purchased on my credit
17      cards that needed to be paid off.  They had already -- I
18      had already, essentially, bought them, we had the things.
19 Q   You charged them on your cards?
20 A   Yes, and it needed to be paid off.
21 Q   All right.  But we know there's at least an additional $500
22      or so that you testified earlier today that still exists,
23      right?
24 A   Yes.
25 Q   So we know that there was over $21,000 in cash on the day

Page 68

1      you filed bankruptcy, correct?
2 A    Yes.
3 Q    Okay.  If there's any of that cash left, Ms. Browne, I
4      believe it's property of this estate, so don't spend it.
5      You can talk to your attorney about this, but that's the
6      way it appears to me.
7 A    I disagree with your assessment of that.
8 Q    Why do you disagree with that?
9 A    Because it's part of the trust and the trust was one where
10      he didn't -- his money was the trust money and, therefore,
11      it's not actually part of the estate until you -- well, you
12      would have to --
13 Q   Tell me why?
14 A   You would actually have to break the trust.  You would have
15      to legally break the trust before it would become part of
16      the estate.
17          MR. BURNS:  I would now just wait until
18      Mr. Seaver asked a question and then you can answer the
19      questions that he asks.
20 BY MR. SEAVER:
21 Q    So that's why you think this cash isn't bankruptcy estate
22      property?
23 A    That's correct.
24 Q    Okay.  Ms. Browne, did you use any of the cash, any of the
25      180,000 or so in cash that was taken out of those accounts

Page 69

1    to purchase any cashier's checks?
2 A    No.
3 Q    Did you use it to purchase any money orders or anything
4    like that?
5 A    No.
6 Q    Did you deposit any of those funds -- well, tell me any
7    bank account that you deposited any of those funds, the
8    cash into?
9 A    Only -- it would have only been into an Associated Bank
10    account.
11 Q    One of those two Associated Bank accounts?
12 A    Yes.
13 Q    And by that I mean the one in your name and the one in your
14    and Paul's names?
15 A    That's correct.
16 Q    Did you put any of it into a brokerage account?
17 A    No.
18 Q    So other than the cash, the 60,000 -- was it 60,000 even
19    that you folks gave to Mr. Steele?
20 A    I think so. I'm not positive on that.
21 Q    Okay. So there's the 60,000, roughly, to Mr. Steele.
22    There's the money that we saw redeposited into the account.
23    Is that the world of what happened to the cash that you
24    took out?
25 A    No, we spent cash on things.

Page 70

1 Q    Like what things?
2 A    Like babysitters, going out, paying a handyman who came to
3    fix stuff at the condo.
4 Q    Anything else?
5 A    I mean, anything we would -- that I would have spent cash
6    on, groceries possibly, coffee.
7 Q    Other than the Steele payment, the deposits into the two
8    Associated Bank accounts, was there anything that exceeded
9    $1,000 --
10 A    No.
11 Q    -- to any single person or entity?
12 A    Sorry. No, not that I -- no.
13 Q    Okay.
14        (Browne Deposition Exhibit 14 was marked for
15        identification by the court reporter and
16        attached hereto.)
17 BY MR. SEAVER:
18 Q    All right. I'm putting in front of you what has been
19    marked as Exhibit 14, and Exhibit 14 is a copy of a listing
20    agreement.
21        MR. BURNS: Can you just wait until I catch
22    up? I've been going backwards through your -- is it --
23        MR. SEAVER: It's the Lake Sotheby's --
24        MR. BURNS: Okay, got it, and that's 15?
25        MR. SEAVER: It's 14.

Page 71

1        MR. BURNS: Fourteen, okay.
2 BY MR. SEAVER:
3 Q    Do you have that in front of you?
4 A    I do.
5 Q    Can you tell me what this is, ma'am?
6 A    I believe this is the listing agreement for our condo or
7    our former condo.
8 Q    Okay. And that was for the listing for the condo in the
9    Carlyle?
10 A    That's correct.
11 Q    All right. And there's a date -- on the first page of this
12    Exhibit 14, there's a date up there of September 16, 2015.
13    Do you see that?
14 A    I do.
15 Q    Is that the date that you and Mr. Hansmeier signed the
16    listing agreement?
17 A    I'm going to assume, yes.
18 Q    Okay. And in the -- on the front of this -- well, let's
19    look at the signatures for a minute here. They appear to
20    me to be e-signatures on here?
21 A    That is correct.
22 Q    How was -- how did you go about signing it?
23 A    It was electronic, whatever that -- some document thing.
24    We got a link and you went to it and read through it and
25    typed in your name.

Page 72

1 Q    Okay. And to the best of your knowledge, it's September 16
2    that you would have put your e-signature --
3 A    I know it was in September, so that seems reasonable.
4 Q    Okay. And this is -- the only two people signing this as
5    the people selling the property are you and Mr. Hansmeier,
6    correct?
7 A    That is correct.
8 Q    The Chapter 13 trustee never agreed to pay any commission,
9    did he? He's not a signatory to this?
10 A    No, he's not a signatory.
11 Q    Nor am I, of course, right?
12 A    Right.
13 Q    In fact, there was no Chapter 7 until after this listing
14    agreement was signed?
15 A    That's correct.
16 Q    Okay. And turn to the second page of this, if you would.
17    I'm at line 59 there and it says, "Seller --" and that's
18    you and Mr. Hansmeier, correct?
19 A    Yes.
20 Q    "-- shall pay Broker, as Broker's compensation, 6 percent,"
21    correct?
22 A    Yes.
23 Q    And so you and Mr. Hansmeier agreed to pay to the broker
24    6 percent of the -- a 6 percent commission on the sale
25    price, correct?

Page 73

1  A    Yes.
2  Q    And then it says that the commission shall be reduced to 5
3       percent if the seller purchases the next home with, and
4       there are a couple of names, correct?
5  A    Yes.
6  Q    But the actual commission paid at closing was the
7       6 percent, wasn't it?
8  A    That is my understanding, yes.
9  Q    Okay.  And then down at line 63, starting at line 63, it
10      goes on to set out conditions upon which you and
11      Mr. Hansmeier would become obligated to pay the commission,
12      correct?  That's --
13 A    I'm sorry?
14 Q    Yeah, and take time to read through it.  Lines 63 through
15      70, if you will just read through those and then let me
16      know when you're done and I'll ask you the question.
17 A    And where am I supposed to read through?
18 Q    Lines 63 through 70, those lines.
19 A    Okay.
20 Q    So those lines, in summary, they set forth conditions under
21      which you and Mr. Hansmeier would become obligated to pay
22      the commission, correct?
23 A    Yes.
24 Q    Okay.  And what actually happened was the sale closed,
25      right?

Page 74

1  A    Yes.
2  Q    And the commission was paid at closing?
3  A    Yes.
4  Q    Okay.  This listing agreement contains an exclusion for
5       MLS, it doesn't go on MLS?
6  A    It did go on MLS, though.
7  Q    Oh, it did?
8  A    It did.  We ended up not doing the exclusion.
9  Q    Okay.  There is a certification to withhold property --
10 A    Right.
11 Q    -- but your testimony is that you changed your mind on
12      that?
13 A    Yes.  It took longer to get the house ready to be put up,
14      so because it was getting towards the end of the selling
15      season, we skipped the pocket listing portion and went
16      directly to MLS.
17 Q    Okay.  Do you know when it went on MLS?
18 A    I want to say right around the 1st of November, but I'm not
19      positive.
20 Q    Okay.  So the buyer came along quickly after it went on
21      MLS?
22 A    She did, in approximately ten days, I believe.
23 Q    And just so you know, we aren't mentioning her name here,
24      right?
25 A    That's fine.

Page 75

1  Q    And I say that because while I wasn't present at the
2       hearing, I understand at the hearing on the sale
3       authorization that the bankruptcy court judge, you know,
4       wanted that maintained.
5  A    Yes.
6  Q    Okay.  And I'm sorry, tell me again, you think it was
7       around November 1st that it went on MLS?
8  A    Right.  Well, I know that it wasn't listed yet when I
9       testified on October 28th in my previous examination.
10 Q    It wasn't on MLS yet?
11 A    It hadn't been listed yet on October 28th.
12 Q    But you had signed a listing agreement?
13 A    But we hadn't listed it yet.  We signed the agreement with
14      them and then we needed to finish doing what we were doing
15      to the property, so it wasn't ready for pocket listing yet,
16      it wasn't staged yet when we listed it, it was simply this
17      is the person that we're going to go forward with and they
18      hooked us up with the person that did our -- coordinated
19      getting the house ready to go.
20 Q    But just so we're clear on this, though, you knew that once
21      you signed this listing agreement, Exhibit 14, you and
22      Mr. Hansmeier were obligated to perform as required by the
23      agreement?
24 A    Yes.
25 Q    Okay.

Page 76

1          (Browne Deposition Exhibit 15 was marked for
2           identification by the court reporter and
3           attached hereto.)
4  BY MR. SEAVER:
5  Q    I'm showing you now what's been marked as Exhibit
6       Number 15, and Exhibit Number 15 is a copy of the Purchase
7       Agreement.  It's a redacted copy of the Purchase Agreement.
8       I've redacted the buyer's name, that's the extent of the
9       redaction here.
10 A    Okay.
11 Q    And just look at it, but does this appear to be the
12      Purchase Agreement that you and Mr. Hansmeier signed?
13 A    Yes.
14 Q    All right.  And you and Mr. Hansmeier are the only people
15      signing as sellers here, correct?
16 A    That is correct.
17 Q    The Chapter 13 trustee is not a signatory to this?
18 A    That is correct.
19 Q    And it's dated -- on the front page it says November 9 of
20      2015.  Does that sound like the date to you that you and
21      Mr. Hansmeier signed off on this?
22 A    It depends on what time of day.  I can't remember if we
23      signed it the same day or the next day.
24 Q    Okay.  And it was an e-signature, so you did it at home?
25 A    Yes.

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 77

1  Q    And home at that time was the rental property, right?

2  A    Yes.

3  Q    Okay. So it was either the 9th of November or the 10th of

4       November?

5  A    Yes.

6  Q    All right. And the sale price was $1.2 million, correct?

7  A    That is correct.

8              (Browne Deposition Exhibit 16 was marked for

9              identification by the court reporter and

10             attached hereto.)

11 BY MR. SEAVER:

12 Q    All right. I'm showing you what's been marked as

13      Exhibit 16, and this is a copy that I received, I think it

14      was from Mr. Hansmeier's documents in the dropbox. It's

15      the Residential Lease?

16 A    Yes.

17 Q    You recognize it as that, don't you?

18 A    I do, yes.

19 Q    All right. And this is the lease that you and

20      Mr. Hansmeier signed for the property at -- what's the

21      address there?

22 A    3749 Sunbury Alcove.

23 Q    Okay. And if you turn to the very last page of this,

24      that's where -- these are actual signatures, and it appears

25      that you and Mr. Hansmeier both signed this on

Page 78

1       September 26th, 2015, correct?

2  A    Yes.

3  Q    So it was signed several days after you folks signed the

4       listing agreement?

5  A    Yes.

6  Q    When did you actually move into this property, then?

7  A    October 5th.

8  Q    Okay. Oh, that's the start date on the lease?

9  A    Yes.

10 Q    Okay. Did you have a moving company move you?

11 A    We did.

12 Q    Who was that?

13 A    I don't remember what their name was.

14 Q    How much did the move cost?

15 A    Approximately a thousand dollars.

16 Q    That's a good deal.

17 A    Yeah.

18 Q    How did you pay them?

19 A    Credit card.

20 Q    Okay. Was it your card or --

21 A    It is.

22 Q    -- Mr. Hansmeier's?

23 A    It was mine.

24 Q    Which one was it?

25 A    I'm not sure, but I believe you have a copy of that

Page 79

1       statement, actually.

2  Q    Okay. Did it come directly out of your account?

3  A    So it was either a Bank of America or -- I'm not sure, I

4       really don't remember which one it was.

5  Q    Do you and Mr. Hansmeier have any joint credit cards?

6  A    No.

7  Q    And have you since -- let's just say since January of 2014?

8  A    We have never had a joint credit card.

9  Q    Okay, that makes it easy.

10             (Browne Deposition Exhibit 17 was marked for

11             identification by the court reporter and

12             attached hereto.)

13 BY MR. SEAVER:

14 Q    All right. I'm putting in front of you what has been

15      marked as Exhibit 17 and Exhibit 17 is -- it's a copy of

16      the closing statement from the sale of the condo and,

17      again, I redacted this to the extent of taking out the name

18      of the buyer. You have seen this before, right?

19 A    I have.

20 Q    And you actually signed off on this same HUD statement?

21 A    Yes.

22 Q    And I'm -- looking at the first page, there is the -- there

23      is the judgment payoff to Best & Flanagan and that was a

24      judgment against Mr. Hansmeier, correct?

25 A    Yes.

Page 80

1  Q    Okay. I mean, you weren't --

2  A    I was not on the judgment.

3  Q    Okay. And then down in the Commission section, there are

4       the commission numbers there. You agree that those numbers

5       were correct, right?

6  A    Yes.

7  Q    And those are the commissions that you and Mr. Hansmeier

8       agreed to pay when you signed the listing agreement,

9       correct?

10 A    Yes.

11 Q    All right. The next page of this, go to the Miscellaneous

12      section here and there is a balance of HOA dues to the

13      Carlyle for a little over 1,100. That's the homeowners

14      association, right?

15 A    Yes.

16 Q    And then there's a contractor's invoice to J. Nordstrom

17      Plumbing for $150. Was that a contract that you had with

18      Nordstrom?

19 A    Yes.

20 Q    And then there's an electrical usage to the Carlyle.

21      That's just you and Mr. Hansmeier using electricity at the

22      Carlyle; is that what it is?

23 A    That's correct.

24 Q    Okay. And then there's an escrow for Nicollet Mall and it

25      goes on. Do you know what that is?

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 81

1  A    I believe it's because they are doing some beautification
2       stuff and there was an assessment because we lived by it.
3  Q    Okay.  And then there's the HOA dues and those are just the
4       dues that were current as of the day of closing; is that
5       your understanding?
6  A    Yes.
7  Q    Okay.  And then the invoice for carpet to Midwest
8       Interiors, was that a contract you had with Midwest
9       Interiors?
10 A    Yes.
11 Q    The invoice for flooring to Duane's Floor Service, is that
12      a contract that you had with Duane's Floor Service?
13 A    Yes.
14 Q    The invoice for painting to Roell, is that a contract you
15      had with Roell?
16 A    Yes.
17 Q    Invoice to Pride Electric, is that a contract you had with
18      Pride Electric?
19 A    Yes.
20 Q    Lights and cleaning to Fix Design Haus, is that a contract
21      you had with Fix Design Haus?
22 A    Yes.
23 Q    And then the "reimburse realtor for resale disclosure,"
24      what's that?
25 A    I don't know.  I --

Page 82

1  Q    But it was only $160?
2  A    Yes.
3  Q    So these items in the Miscellaneous and -- let me just
4       delineate them.  The items on the exhibit that I've put the
5       checkmarks next to --
6  A    Yeah.
7  Q    -- and they show there on the exhibit in blue ink, those
8       are all items that you were personally obligated to pay,
9       correct?
10 A    Yes.
11 Q    And they were paid at closing, correct?
12 A    Yes.
13        (Browne Deposition Exhibits 18 through 25 were
14         marked for identification by the court
15         reporter and attached hereto.)
16 BY MR. SEAVER:
17 Q    All right.  I'm showing you what's been marked as Exhibit
18      Number 18 and this is -- it's an invoice from Fix Design
19      Haus and it says, "Bill to:  Padraigin Browne," and it was
20      for $4,519.75.  Do you see that?
21 A    I do.
22 Q    And this invoice indicates, or at least appears to
23      indicate, that it was paid, correct?
24 A    Yes.
25 Q    How was that paid?

Page 83

1  A    Credit card.
2  Q    Okay.  One of your credit cards?
3  A    That's correct.
4  Q    All right.  The next one, I'm putting Exhibit 19 in front
5       of you and this is an invoice from Duane's Floor Service
6       and this was -- this was one of the ones that got paid at
7       closing?
8  A    I believe so.
9  Q    The invoice is saying $3,740 on this one, but the Duane's
10      closing line item is $4,065, but it's close?
11 A    Well, they had to come back in and do a little bit extra.
12 Q    Oh, so there's probably a little invoice after this one?
13 A    Yeah, and I may have even approved it over the phone.  I'm
14      not sure I even got --
15 Q    But at any rate, that's the Duane's Floor Service on the
16      closing statement?
17 A    Yeah.
18 Q    Okay.  And I'm putting in front of you Exhibit 20 now.
19      This is an invoice from Midwest Interiors.  The original
20      amount was $3,700 and then there was a deposit of $1,900,
21      correct?
22 A    Yes.
23 Q    How was the $1,900 paid?
24 A    Credit card.
25 Q    Okay.  And this is one of the items that got paid, the

Page 84

1       balance, at closing, correct?
2  A    Yes.
3  Q    I'm putting Exhibit 21 in front of you now, which is a
4       Pride Electric invoice, and this is -- it's showing a
5       balance of $760 on this invoice.  The closing statement
6       shows $450.  Was there some money paid along the way?
7  A    I'm assuming I must have made a credit card payment.
8  Q    Okay.  That's where it would have come from if you did?
9  A    Yeah.  I -- yeah.  The only other thing I can think of is
10      that Fix Staging paid them also, because this one, the
11      customer is actually Fix Staging.
12 Q    Okay.  So they could have paid something on it for the
13      difference?
14 A    Yeah, from, like, my -- because we made a first payment to
15      Fix Haus, so they may have made a payment.
16 Q    Okay.
17 A    Because I don't remember making a payment on that one,
18      but --
19 Q    Okay.  The Fix Haus payment or the Fix payment, the initial
20      payment, is that one we already looked at?
21 A    Yeah, that's the one where it was -- it's Exhibit 18.
22 Q    The credit card?
23 A    Yeah, the credit card.
24 Q    Okay.  All right, I'm putting in front of you now Exhibit
25      Number 22.

Page 85

1  A    Yes.
2  Q    And that's a bill or invoice from CR Heating?
3  A    Yes.
4  Q    And that's one of -- was that one paid at closing?
5  A    No, I paid that with a check.
6  Q    Okay.  It was coming out of your Associated Bank account?
7  A    Yes.
8  Q    Okay.  And I'm putting Exhibit Number 23 in front of you
9       now, and this is -- it says -- I can't really read exactly
10      what it says over there on the right side, but do you
11      recognize this bill?
12 A    Yes, it's for the cleaners.
13 Q    Okay.  And did you pay them directly?
14 A    No.  You see lights and cleaning for the 4,861 --
15 Q    Oh, that's this one?
16 A    Yeah, that's been rolled in.
17 Q    Okay.  And I'm showing you now what's been marked as
18      Exhibit 24.  This says "Contractors Invoice" up at the top,
19      J. Nordstrom Plumbing, and that's the 150 that's on the
20      closing statement?
21 A    That's correct.
22 Q    Okay.  And I'm showing you now Exhibit Number 25.  This is
23      the Roell Painting Company invoice and this is showing a
24      $3,000 previous payment.  Was that a credit card payment?
25 A    It looks like that was that check that we didn't know,

Page 86

1       1315.  It looks like that's what that check was.
2  Q    Oh, okay, yep.  So you think this was a check coming out of
3       your personal -- your Associated Bank account?
4  A    Yes.
5  Q    Okay.  And then the balance of this invoice was paid at
6       closing, correct?
7  A    That's correct.
8            (Browne Deposition Exhibit 26 was marked for
9              identification by the court reporter and
10             attached hereto.)
11 BY MR. SEAVER:
12 Q    I'm putting in front of you Exhibit Number 28 (sic).  This
13      is a copy of a letter that was faxed over to me yesterday
14      by your attorney, Mr. Burns, talking about proceeds that
15      are being held per the court order on the sale of the
16      property, and he has a number in there of $253,763.56.  Do
17      you know how that number is calculated?
18 A    I believe it is the purchase price of the house minus TCF.
19 Q    Okay.
20 A    Minus all -- everything -- I guess maybe the better way to
21      say it would be the amount that you received, the 435 --
22 Q    Yeah.
23 A    -- plus the amount of the Chowdhury lien divided by two.
24 Q    Okay.  So when you -- did you -- I'm not asking for your
25      communications here with Mr. Burns, I'm just trying to get

Page 87

1       your understanding of this amount, but did you go through
2       and figure this out, what you thought you were owed out of
3       this?
4  A    Yes, I did a little look at what I thought was appropriate.
5  Q    And did you deduct from what you thought was owed to you
6       your share of the commission?
7  A    This number is after the commission is taken out of the
8       purchase price, after all the payments.  This number is --
9  Q    You're looking at Exhibit Number 17 now?
10 A    I am.  Let's see, where is it?  This number is the
11      435,906.21 plus 71,620.90 divided by 2, I believe.
12 Q    Okay.  Just so we're clear, though, and I think we were
13      earlier, you agree with me that you and Mr. Hansmeier are
14      responsible for payment of the commission, don't you?
15 A    I believe that that was what was listed on the -- on our
16      Purchase Agreement.
17 Q    And you agree with that, don't you?
18 A    Yes, and it was paid.
19 Q    And the only two people who agreed to pay it were you and
20      Mr. Hansmeier?
21 A    That is correct.
22            MR. SEAVER:  All right.  Let's go off the
23      record here.
24            (Short break taken.)
25            (Browne Deposition Exhibit 27 was marked for

Page 88

1            identification by the court reporter and
2              attached hereto.)
3  BY MR. SEAVER:
4  Q    We're back on the record here now and you understand you're
5       still under oath?
6  A    I do.
7  Q    When you and Mr. Hansmeier moved into the rental home --
8       October 5th, right?
9  A    Yes.
10 Q    You didn't have any intention of returning to the Carlyle,
11      did you?
12 A    Our intent was to return if we didn't sell it, but assuming
13      that it sold, we would not be returning.
14 Q    Once the Purchase Agreement was signed, you knew you
15      wouldn't be returning, assuming it closed?
16 A    Yes.
17 Q    Okay.  I'm putting in front of you what's Exhibit Number 27
18      and this is a condensed transcription of the testimony that
19      you gave during the course of the Chapter 13 on October 28,
20      2015, and just turn, if you would, Ms. Browne, to where it
21      says "Page:  13" in the upper right corner.  It's pages 51
22      and 52 of your testimony, and just take some time to read
23      through pages 51 and 52 and let me know when you're done.
24 A    Yes.
25 Q    All right.  So at page 51, you -- the question to you, I'm

In re: Paul Hansmeier

Padraigin Browne
February 18, 2016

Page 89

1    at line 9 now, "I understand you're going to list it for
2    $950,000, did I hear that correctly?"  And your response
3    is?
4  A    "We will have a final decision on that after the repair
5    work is done."
6  Q    But you had signed the listing agreement more than a month
7    before that listing it at -- agreeing to sell it for
8    1.3 million, correct?
9  A    Yes, we signed the agreement, but --
10  Q    And -- go ahead.
11  A    But when we talked to them, they said that that's where
12    they were hoping that we would be able to do it and that's
13    where the contract would kick in where we would have to pay
14    if we didn't sell it, but that we would have to make a
15    final decision on where we should actually make the listing
16    after we saw how the house looked when everything was done.
17  Q    So why didn't you tell him that you had already signed the
18    listing agreement for $1.3 million?
19  A    He didn't ask that.
20  Q    Okay.  Let's go to page 52, line 2.  "Do you know when
21    you're going to make a decision on the listing price," is
22    the question, and your answer is?
23  A    "We have not scheduled a final appointment with him yet."
24  Q    And, again, why didn't you tell him you had already signed
25    a listing agreement for $1.3 million?

Page 90

1  A    We did tell them that we were using a realtor.  It says we
2    told him we were using Ben Ganje.
3  Q    Right.
4  A    And again, the question was, when are you going to make a
5    final decision for what you're going to list at, and we had
6    not made that decision yet.  We had not met with him and we
7    had not scheduled the time when we would make the final
8    determination based on how things were looking, if we could
9    actually do the 1.3 or if we needed to go lower.
10  Q    So you didn't think that either of those questions required
11    you to disclose to him the fact that you had already signed
12    a listing agreement for 1.3 million?
13  A    No, because it doesn't say that.  He did not ask those
14    questions.
15  Q    Well, how would he know the sale price?  That's what he was
16    trying to get from you, the listing price, isn't it?
17  A    It's not my job to do his job for him.  If he wants to
18    know, he needs to ask the correct question.
19  Q    I see.  And you didn't feel any obligation to tell him, in
20    response to those questions, that a listing agreement had
21    already been signed?
22  A    That's correct.
23  Q    Okay.  I do not have anything -- well, let me ask you,
24    this: So this deposition was October 28 of 2015.  It went
25    on MLS four days later?

Page 91

1  A    I believe so, yes.
2  Q    All right.  So when did you make this final decision to
3    list it for exactly the same price that you had in the
4    listing agreement that you signed back in September?
5  A    About two hours before it went on.
6  Q    Okay.  And I'm right on that, right, it was the same
7    price -- it was listed for exactly the same price --
8  A    It did.
9  Q    -- that's in the listing agreement that's signed in
10    September?
11  A    Yes, which was actually a change from what we had discussed
12    with him.  We had discussed originally with Mr. Ganje that
13    the pocket listing would be at 1.3 and then we would put it
14    on MLS for less than that, for 1.2, but because things
15    changed, we ended up listing on MLS for 1.3, which was
16    different than what our original verbal agreement had been.
17  Q    But not different than what your written agreement that you
18    and Mr. Hansmeier had signed was?
19  A    Right, not different than the max amount that we had to
20    accept.  What it says is we are not going to definitely
21    list for 1.3, it says if we get an offer of 1.3, then we
22    have to pay him whether or not we decide to sell.
23        MR. SEAVER: Okay.  I don't have anything
24    further.
25        MR. BURNS: Okay.  We have no questions.

Page 92

1    We'll read and sign.
2        (Deposition concluded at 3:05 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1                        VERIFICATION OF DEPONENT TO TRANSCRIPT

2            I, PADRAIGIN BROWNE, do hereby verify that I

3      have read the foregoing transcript consisting of the

4      preceding 92 pages and do further verify that it is a true

5      and complete transcript of the testimony given by me on

6      February 18, 2016, (except for the following, stating page

7      and line number and the reason for the change).

8      Page        Line        Change or Addition        Reason

9      1.

10     2.

11     3.

12     4.

13     5.

14     6.

15     7.

16     8.

17     9.

18     10.

19                          _____

20                          PADRAIGIN BROWNE
                    DATED:_____

21

22     _____
             Notary

23     Signed before me this _____ day of _____, 20____.

24

25                          COLLEEN M. SICHKO, RPR

---

February  19, 2016


Dave Burns, Esq.
475 Grain Exchange North
301 Fourth Avenue South
Minneapolis, MN  55415

        In re:  Paul Hansmeier, Debtor

        Deposition of PADRAIGIN BROWNE, taken February 18, 2016

Dear Mr. Burns:

A copy of the above-referenced deposition is enclosed, along with
the reading and signing certificates.  When Ms. Browne has
completed the reading and signing, please return all but your
copy of the executed certificate to me for proper distribution.


In accordance with the Rules of Civil Procedure, if I do not
receive the executed certificate within thirty (30) days of the
date hereon, I will send the unsigned original transcript to
Mr. Seaver for proper filing.

Should you have any questions, do not hesitate to contact me.

Sincerely,

SHADDIX & ASSOCIATES


Colleen M. Sichko
Registered Professional Reporter

Enclosure

cc:  Randall L. Seaver, Esq.

---

Page 94

1      STATE OF MINNESOTA)
                         )  ss.
2      COUNTY OF DAKOTA  )

3                    Be it known that I took the deposition of
4      PADRAIGIN BROWNE on the 18th day of February, 2016, at Suite 132,
       12400 Portland Avenue South, Burnsville, Minnesota;
5
                      That I was then and there a Notary Public in
6      and for the County of Dakota, State of Minnesota, and that I was
       duly authorized to administer an oath;
7
8                     That the witness, before testifying, was first
       duly sworn to testify the truth and nothing but the truth;

9                     That the testimony was recorded by myself and
       transcribed into a computer-aided transcript and that the
10     deposition is a true record of the testimony given by the witness
       to the best of my ability;
11
                      That the cost of the original transcript has
12     been charged to the party noticing the deposition, unless
       otherwise agreed upon by Counsel; and that copies have been made
13     available to all parties at the same cost, unless otherwise
       agreed upon by Counsel;
14
                      That I am not related to any of the parties
15     hereto nor interested in the outcome of the action;

16                    That the reading and signing of the deposition
       by the witness was not waived, and that the original transcript
17     will be retained by Mr. Seaver;

18                    WITNESS MY HAND AND SEAL THIS 19th day of
       February, 2016.
19

20

21

22                          _____
                            COLLEEN M. SICHKO
23                          Registered Professional Reporter

24

25

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

PAUL HANSMEIER

Debtor.

Chapter 13

BKY 15-42460

---

ORDER

---

This case is before the court on the motion by the debtor seeking an

expedited hearing and authority to sell certain real estate located at 100 Third Ave. S., Unit 3201,

Minneapolis,  MN  55401.    For reasons stated orally and recorded in open court,

IT IS ORDERED:

1.    The debtor's request for an expedited hearing is granted.

2.    The debtor's motion to sell the property is approved.

3.    The proceeds from the sale of the property shall be used at closing only to satisfy

the underlying first mortgage on the property, judgment lien, realtor fees, and all other usual and

customary closing costs such as deed recording fees paid to the county.

4.    Insofar as this case was converted to a case under chapter 7 today by separate order,

the chapter 7 trustee to be appointed by the U.S. Trustee is authorized to close on the sale of the

property.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *12/03/2015*
Lori Vosejpka, Clerk, by LH

EXHIBIT 3

5.  The balance of the sale proceeds shall be held by the chapter 7 trustee pending further order of the court.

Dated:  December 3, 2015

/e/ Kathleen H. Sanberg
KATHLEEN H. SANBERG
United States Bankruptcy Judge

*Final*

| American Land Title Association | ALTA Settlement Statement - Seller |
|---|---|
| | Adopted 05-01-2015 |

| | | | |
|---|---|---|---|
| File No./Escrow No.: | 15-19513-KH | Burnet Title |  |
| Print Date & Time: | 12/15/2015  3:32 PM | ALTA ID : | |
| Officer/Escrow Officer: | Kristin L Harrell | 5151 Edina Industrial Boulevard, | |
| Settlement Location: | 3033 Excelsior Boulevard, #110 | Suite 500 Edina, MN 55439 | |
| | Minneapolis, MN 55416 | | |

| | | |
|---|---|---|
| Property Address: | 100 South 3rd Avenue, 3201  Minneapolis, MN 55401 | |
| | County: Hennepin | *Browne* |
| Buyer: | . | *Depo 17* |
| Seller: | Padraigin Browne and Paul Hansmeier | *12/18/16* |
| | Randall Seaver Bankruptcy Trustee- READ and Approved | *COURT REPORTER* |
| Lender: | | |
| Settlement Date: | 12/15/2015 | |
| Disbursement Date: | 12/15/2015 | |

| Description | Seller | |
|---|---|---|
| | Debit | Credit |
| **Financial** | | |
| Contract Sales Price | | $1,200,000.00 |
| Judgment payoff to Best & Flanagan LLP Trust Account ref. Chowdhury | $71,620.90 | |
| proceeds to Randall Seaver, Bankruptcy Trustee | $435,906.21 | |
| | | |
| **Prorations/Adjustments** | | |
| County Taxes 8080.6400/6 mos 12/15/15 to 01/01/16 | | $746.58 |
| HOA 890.0000/mo 12/15/15 to 01/01/16 | | $488.06 |
| | | |
| **Title Charges & Escrow / Settlement Charges** | | |
| Seller Closing Admin. Fee - Payoff Verification & Processing to Burnet Title | $55.00 | |
| Seller Closing Admin. Fee - Recording and Processing Service to Burnet Title | $25.00 | |
| Seller Closing Administrative Fee to Amber Conradi | $150.00 | |
| Seller Closing Administrative Fee to Title Nexus, LLC | $350.00 | |
| | | |
| **Commission** | | |
| Broker Commission (Listing) to Lakes Sotheby's International Realty | $495.00 | |
| Listing Commission to Lakes Sotheby's International Realty | $39,600.00 | |
| Selling Commission to Coldwell Banker Burnet | $32,400.00 | |

# EXHIBIT 4

Copyright 2015 American Land Title Association. All rights reserved.



Initials_____



File # 15-19513-KH
Printed on 12/15/2015 at  3:32 PM

| Government Recording and Transfer Charges | | |
|---|---|---|
| bkcy trustee deed to Burnet Title | $46.00 | |
| Certificate of Release to Burnet Title | $46.00 | |
| Conservation Fees to Burnet Title | $5.00 | |
| release judgment COT to Burnet Title | $46.00 | |
| Release of Judgment Recording to Burnet Title | $5.00 | |
| State Deed Tax to Burnet Title | $4,080.00 | |
| | | |
| Payoff(s) | | |
| Lender: TCF Bank 2nd Payoffs | | |
| Payoff First Mortgage to TCF Bank 2nd Payoffs | $598,402.79 | |
| | | |
| Miscellaneous | | |
| Balance of HOA dues to The Carlyle | $1,112.91 | |
| Contractors Invoice to J. Nordstrom Plumbing LLC. | $150.00 | |
| Electrical Useage to The Carlyle | $150.00 | |
| escrow for Nicollet Mall pending assessment and escrow fee to Burnet Title Master Escrow | $1,962.00 | |
| HOA dues current letter to First Service Residential | $185.00 | |
| invoice for carpet to Midwest Interiors | $1,800.00 | |
| invoice for flooring to Duanes Floor Service | $4,065.00 | |
| invoice for painting to Roell | $3,105.00 | |
| invoice to Pride Electric | $450.00 | |
| Lights and cleaning to Fix Design Haus | $4,861.83 | |
| Reimburse realtor for resale disclosure to Ben Ganje | $160.00 | |
| | | |
| | **Debit** | **Credit** |
| SubTotals | $1,201,234.64 | $1,201,234.64 |
| Balance Due/Refunds | $600.00 | |
| Due From/To Seller | | $600.00 |
| Totals | $1,201,834.64 | $1,201,834.64 |

Copyright 2015 American Land Title Association. All rights reserved.
Initials_____



File # 15-19513-KH
Printed on 12/15/2015 at 3:32 PM

**Acknowledgement**

I have carefully reviewed this Settlement Statement and to the best of my knowledge and belief, it is true and accurate statement of all receipts and disbursements. I further certify that I have received a copy of this Settlement Statement.

_____

Padraigin Browne

_____

Paul Hansmeier

_____

Randall Seaver Bankruptcy Trustee- READ and Approved

_____

Settlement Agent

Copyright 2015 American Land Title Association. All rights reserved.

Initials_____                                    Page 3 of 3

File # 15-19513-KH
Printed on 12/15/2015 at 3:32 PM

ASSOCIATED BANK N.A.
200 N ADAMS ST
PO BOX 19006
GREEN BAY, WI 54307-9006
24 Hour Telephone Banking: 1-800-236-7160
24 Hour Customer Care Center: 1-800-236-8866

*Page 1 of 2*

**FINANCIAL STATEMENT OF ACCOUNTS**
Primary Account:          853

*Statement Activity Period*
*06/22/2015 - 07/20/2015*

Bank: 001

PADRAIGIN L BROWNE
100 3RD AVE S UNIT 3201
MINNEAPOLIS MN 55401-2728

Mail Code: 0S

IMPORTANT NOTICE ABOUT YOUR DEPOSIT ACCOUNT AGREEMENT: This Important Notice and Change in Terms ("Notice") identifies changes to Section 10 of your Deposit Account Agreement.

Throughout Section 10, we have modified the language to more clearly define overdraft fees and nonsufficient funds fees (NSF).

In Section 10.3.3, we have made changes to the posting order. Starting June 23, 2015, ATM withdrawals, nonrecurring point-of-sale Debit/ATM card transactions and ATM transfers out of your Account will post chronologically by the date and time of the transactions rather than when the Bank settles them.

We encourage you to keep a copy of this Notice with your Deposit Account Agreement. For the full Deposit Account Agreement, visit us online at AssociatedBank.com/Forms or stop by your local Associated Bank branch. If you have questions, please contact our 24/7/365 Customer Care team at 800-236-8866.

IMPORTANT NOTICE ABOUT ONLINE BANKING TERMS AND CONDITIONS: The Online Banking Terms and Conditions have been updated to reflect: (1) Customers with a 12-month add-on certificate of deposit (CD) account can now transfer funds into the account through Online Banking (Section III); and (2) We have clarified which security protocol must be supported by the Internet browser being used to access Online Banking (Section IV). If you have questions, please call our 24/7/365 Customer Care team at 800-236-8866 or chat with us online by clicking the Live Chat link.

| FINANCIAL SUMMARY | ACCOUNT# | BALANCE |
|---|---|---|
| **DEPOSIT ACCOUNTS** | | |
| Associated Checking | 853 | $4,020.59 |

| DEPOSIT ACCOUNTS |
|---|

**Associated Checking**                    853

| | |
|---|---|
| Beginning Balance | 206.30 |
| Plus: Deposits and Other Additions | 36,211.15 |
| Minus: Withdrawals and Other Deductions | 16,512.86 |
| Minus: Checks Paid | 15,884.00 |
| **ENDING BALANCE ON 07/20/2015** | **$4,020.59** |

**Deposits and Other Additions**

| | | | |
|---|---|---|---|
| 06/22/2015 | CHASE       AUTOPAYBLP 000000000127942 BROWNE PADRAIGIN L | | 1,341.11 |
| 06/22/2015 | NEW HORIZON   WEBPAYMENT | | 653.00 |
| 06/23/2015 | CUSTOMER DEPOSIT | | 5,900.00 |
| 06/25/2015 | CUSTOMER DEPOSIT | | 3,000.00 |
| 06/30/2015 | SHUMAKER & SIEFF DIRECT DEF BROWNE,PADRAIGIN | | 4,862.50 |
| 07/01/2015 | BENEFIT EXTRAS  CLAIM REIM | 23 PADRAIGIN BROWNE | 454.54 |
| 07/09/2015 | CUSTOMER DEPOSIT | | 20,000.00 |
| | | **TOTAL** | **$36,211.15** |



EXHIBIT 5

PADRAIGIN L BROWNE                  Acct :⁻ ⁻       ⁻ ⁻ 53          *Page 2 of 2*

## Withdrawals and Other Deductions

| | | | |
|---|---|---|---:|
| 06/22/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 06/22/2015 | CHASE      AUTOPAYBLP | 42 BROWNE PADRAIGIN L | 1,341.11 |
| 06/22/2015 | OD FEE RETURN | | 35.00 |
| 06/22/2015 | OD FEE RETURN | | 35.00 |
| 06/23/2015 | CITI AUTOPAY   PAYMENT | )5 PADRAIGIN L BROWNE | 500.00 |
| 06/25/2015 | CHASE      EPAY    )390 PADRAIGIN L BROWNE | | 1,000.00 |
| 06/29/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 06/30/2015 | TCF CONSUMER LEN DB CR MIX | 001 HANSMEIER PAUL | 4,385.10 |
| 07/01/2015 | NEW HORIZON    WEBPAYMENT | | 683.00 |
| 07/02/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS BROWNE,PADRAIGIN | | 500.00 |
| 07/02/2015 | Gittleman-FirstS RESIDENT | 3 Padraigin Browne | 950.00 |
| 07/06/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/08/2015 | BROWNE PADRAIGI TRANSFERS | | 836.99 |
| 07/13/2015 | CITI PAYMENT   ONLINE PM` | )024 PADRAIGIN BROWNE | 138.86 |
| 07/13/2015 | TARGET CARD SRVC AUTO PYMT  |439 BROWNE PADRAIGIN L | | 459.75 |
| 07/14/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/20/2015 | SYNCHRONY BANK   PAYMENT | )56 BROWNE,PADRAIGIN | 419.00 |
| 07/20/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/20/2015 | CHASE      AUTOPAYBLP | )432 BROWNE PADRAIGIN L | 1,964.05 |
| | | **TOTAL** | **$16,512.86** |

## Checks Paid

| DATE | CHECK# | AMOUNT | DATE | CHECK# | AMOUNT |
|---|---|---:|---|---|---:|
| 07/02/2015 | 1303 | 579.00 | 07/10/2015 | 1309 * | 15,305.00 |
| | * Indicates a check number missing from sequence | | | **TOTAL** | **$15,884.00** |

## Total Overdraft Fees and Total Returned Item Fees

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| **Total Overdraft Fees*** | $0.00 | $70.00 |
| **Total Returned Item Fees**** | $70.00 | $140.00 |

Please note If you have a negative balance for more than five business days, a continued overdraft fee of $7.00 per business day will also apply.
*Total Overdraft Fees Include fees for: overdraft Items or debits paid, NSF (Unavailable Funds) Item or debit paid, and Continued overdraft fees.
** Fees for overdraft or NSF Items returned unpaid.

## Balance Summary

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---:|---|---:|---|---:|
| 06/22/2015 | 136.30 | 07/01/2015 | 7,132.24 | 07/10/2015 | 8,308.25 |
| 06/23/2015 | 5,536.30 | 07/02/2015 | 5,103.24 | 07/13/2015 | 7,709.64 |
| 06/25/2015 | 7,536.30 | 07/06/2015 | 4,450.24 | 07/14/2015 | 7,056.64 |
| 06/29/2015 | 6,883.30 | 07/08/2015 | 3,613.25 | 07/20/2015 | 4,020.59 |
| 06/30/2015 | 7,360.70 | 07/09/2015 | 23,613.25 | | |

## Current Service Fee Period Balances

| | |
|---|---:|
| Average Ledger Balance | $6,836.72 |
| Minimum Ledger Balance | $-1,787.00 |

ASSOCIATED BANK N.A.
200 N ADAMS ST
PO BOX 19006
GREEN BAY, WI 54307-9006
24 Hour Telephone Banking: 1-800-236-7160
24 Hour Customer Care Center: 1-800-236-8866

*Page 1 of 2*

**FINANCIAL STATEMENT OF ACCOUNTS**
Primary Account:    l853

*Statement Activity Period*
*09/21/2015 - 10/20/2015*

Bank: 001

Mail Code: 0S

PADRAIGIN L BROWNE
100 3RD AVE S UNIT 3201
MINNEAPOLIS MN 55401-2728

| FINANCIAL SUMMARY | ACCOUNT# | BALANCE |
|---|---|---|
| **DEPOSIT ACCOUNTS** | | |
| Associated Checking | 853 | $5,056.08 |

| DEPOSIT ACCOUNTS |
|---|

**Associated Checking          853**

| | |
|---|---|
| Beginning Balance | 6,984.98 |
| Plus: Deposits and Other Additions | 17,887.32 |
| Minus: Withdrawals and Other Deductions | 15,051.22 |
| Minus: Checks Paid | 4,765.00 |
| **ENDING BALANCE ON 10/20/2015** | **$5,056.08** |

**Deposits and Other Additions**

| | | |
|---|---|---|
| 09/23/2015 | TMASTER RESALE  TICKETS  3180109 PADRAIGIN BROWNE | 168.30 |
| 09/29/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 360.40 |
| 09/30/2015 | WEB TO DDA FR DDA           8  CONFIRMATION# 170114627491 | 5,000.00 |
| 09/30/2015 | SHUMAKER & SIEFF DIRECT DEP          iS6D  BROWNE,PADRAIGIN | 1,790.38 |
| 10/01/2015 | BENEFIT EXTRAS  CLAIM REIM            023 PADRAIGIN BROWNE | 454.54 |
| 10/09/2015 | TMASTER RESALE  TICKETS    l09 PADRAIGIN BROWNE | 314.50 |
| 10/14/2015 | WEB TO DDA FR DDA           i08  CONFIRMATION# 173718825212 | 2,000.00 |
| 10/15/2015 | WEB TO DDA FR DDA           008  CONFIRMATION# 161555842934 | 5,000.00 |
| 10/16/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 299.20 |
| 10/20/2015 | WEB TO DDA FR DDA           )08  CONFIRMATION# 103728904261 | 2,500.00 |
| | **TOTAL** | **$17,887.32** |

**Withdrawals and Other Deductions**

| | | |
|---|---|---|
| 09/23/2015 | CITI AUTOPAY    PAYMENT            004 PADRAIGIN L BROWNE | 500.00 |
| 09/23/2015 | NEW HORIZON    WEBPAYMENT | 673.00 |
| 09/28/2015 | NEW HORIZON    WEBPAYMENT | 633.00 |
| 09/29/2015 | TCF CONSUMER LEN DB CR MIX            001 HANSMEIER PAUL | 4,698.14 |
| 10/01/2015 | PAYPAL        INST XFER  JESSICAELST PADRAIGIN BROWNE | 150.00 |
| 10/02/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS  BROWNE,PADRAIGIN | 500.00 |
| 10/02/2015 | Gittleman-FirstS RESIDENT          i69 Padraigin Browne | 950.00 |
| 10/06/2015 | MAPLEWOOD TOYOTA CHECKPAYMT 1312 SERIAL NUMBER: 1312 | 1,000.00 |
| 10/07/2015 | KNOWLEDGE LEARNI WEBPAYMENT  W002 Padraigin  Browne | 680.90 |
| 10/07/2015 | BROWNE PADRAIGI  TRANSFERS | 836.99 |
| 10/13/2015 | CITI PAYMENT    ONLINE PMT            i07 PADRAIGIN BROWNE | 152.21 |
| 10/13/2015 | TARGET CARD SRVC AUTO PYMT          l39 BROWNE  PADRAIGIN L | 288.61 |
| 10/13/2015 | KNOWLEDGE LEARNI WEBPAYMENT  W003 Padraigin  Browne | 680.90 |
| 10/14/2015 | COMENITY PAY SB  WEB PYMT            75 PADRAIGIN BROWNE | 92.10 |



PADRAIGIN L BROWNE                    Acct #          3              *Page 2 of 2*

## Withdrawals and Other Deductions  (continued)

| Date | Description | | Amount |
|---|---|---|---|
| 10/16/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS BROWNE,PADRAIGIN | | 700.00 |
| 10/19/2015 | SYNCHRONY BANK   PAYMENT | 5956 BROWNE,PADRAIGIN | 419.00 |
| 10/19/2015 | KNOWLEDGE LEARNI ACHPAYMENT W004 Padraigin  Browne | | 680.90 |
| 10/20/2015 | CHASE        AUTOPAYBLP | BROWNE PADRAIGIN L | 1,415.47 |
| | | **TOTAL** | **$15,051.22** |

## Checks Paid

| DATE | CHECK# | AMOUNT | DATE | CHECK# | AMOUNT |
|---|---|---|---|---|---|
| 10/05/2015 | 1311 | 130.00 | 10/16/2015 | 1315 | 3,000.00 |
| 10/07/2015 | 1314 * | 1,635.00 | | | |
| * Indicates a check number missing from sequence | | | | **TOTAL** | **$4,765.00** |

## Total Overdraft Fees and Total Returned Item Fees

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| **Total Overdraft Fees*** | $0.00 | $70.00 |
| **Total Returned Item Fees**** | $0.00 | $140.00 |

Please note if you have a negative balance for more than five business days, a continued overdraft fee of $7.00 per business day will also apply.
*Total Overdraft Fees include fees for: overdraft items or debits paid, NSF (Unavailable Funds) item or debit paid, and Continued overdraft fees.
** Fees for overdraft or NSF items returned unpaid.

## Balance Summary

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09/23/2015 | 5,980.28 | 10/05/2015 | 6,524.46 | 10/14/2015 | 3,472.25 |
| 09/28/2015 | 5,347.28 | 10/06/2015 | 5,524.46 | 10/15/2015 | 8,472.25 |
| 09/29/2015 | 1,009.54 | 10/07/2015 | 2,371.57 | 10/16/2015 | 5,071.45 |
| 09/30/2015 | 7,799.92 | 10/09/2015 | 2,686.07 | 10/19/2015 | 3,971.55 |
| 10/01/2015 | 8,104.46 | 10/13/2015 | 1,564.35 | 10/20/2015 | 5,056.08 |
| 10/02/2015 | 6,654.46 | | | | |

## Current Service Fee Period Balances

| | |
|---|---|
| Average Ledger Balance | $5,046.10 |
| Minimum Ledger Balance | $1,009.00 |

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Paul Hansmeier,

        Debtor.

BKY No. 15-42460
ADV No. 16-4018

---

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Padraigin Browne,

        Defendant.

**SUPPLEMENTAL AFFIDAVIT**

---

STATE OF MINNESOTA   )
                       ) ss.
COUNTY OF DAKOTA    )

       Matthew D. Swanson, being first duly sworn on oath, deposes and states as follows:

       1.       That your affiant is one of the attorney retained to represent the Chapter 7 Panel Trustee in the above-captioned case and has personal knowledge of the facts contained herein.

       2.       Attached hereto as Exhibit 1 is a true and correct copy of a December 8, 2015 letter to Barbara May requesting documents.

       3.       Attached hereto as Exhibit 2 is a true and correct copy of a December 23, 2015 letter served on Padraigin Browne.

       4.       Attached hereto as Exhibit 3 is a true and correct copy of the October 20, 2015 bank statement for the Associated Bank account ending in # 1853.

       5.       Attached hereto as Exhibit 4 is a true and correct copy of the July 20, 2015 bank statement for the Associated Bank account ending in # 1853.

       6.       Attached hereto as Exhibit 5 is a true and correct copy of the August 20, 2015

bank statement for the Associated Bank account ending in # 1853.

7.     Attached hereto as Exhibit 6 is a true and correct copy of the April 7, 2016 correspondence to the Debtor's counsel.

**FURTHER YOUR AFFIANT SAYETH NOT.**

Matthew D. Swanson

Subscribed and sworn to before me
this / 3 day of May, 2016.

Notary Public

JENNIFER POHJOLA
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2017

2

# RANDALL L. SEAVER
## UNITED STATES CHAPTER 7 PANEL TRUSTEE

PORTLAND CORPORATE CENTER
12400 PORTLAND AVENUE SOUTH, SUITE 132
BURNSVILLE, MN 55337

Telephone (952) 890-0888
Facsimile (952) 890-0244

**Via email at barbara@barbaramaylawoffice.com**

December 8, 2015



Barbara J. May
Attorney at Law
2780 Snelling Ave N, Suite 102
Roseville, MN 55113

RE:    Paul Hansmeier
        BKY 15-42460

Dear Barbara:

As you know, I am the trustee in the above matter. Please have the debtor provide me with the following as soon as possible, and, at the latest, within two weeks from the date of this letter:

1. Copies of the checking account statements and registers for all bank, brokerage, and similar accounts into which any of the debtor's monies have been deposited or from which any of the debtor's bills have been paid from January 1, 2013 to date. For checking accounts, also include copies of the check register for any such account, together with microfiche or other check copies if the debtor receives them from the bank. This request includes, if applicable, the requested documents from accounts which are not held in the debtor's name but into which monies attributable to the debtor have been deposited, and from which any of his bills have been paid within the time period specified.
2. Copies of all Scottrade statements for Monyet, LLC, from the date its Scottrade account was opened to the current day.
3. Copies of all checks and wire transfer authorization for the Monyet, LLC Scottrade account from the date the account was opened to the current day. This request requires the production of documents sufficient to evidence the amount and recipient of each transfer.
4. Copies of all documents evidencing or relating to the source of all funds which were deposited into the Monyet, LLC Scottrade account from the date it was opened to the current day. The response to this request requires the production of documents sufficient to determine the source and amount of all funds deposited into the Monyet, LLC Scottrade account.
5. Provide a copy of the lease for the property at 3749 Sunbury Alcove, Woodbury, MN.

# EXHIBIT 1

December 8, 2015
Page Two

6. For all improvements, repairs, remodeling, or any other work done on the property located at 100 3rd Avenue South, Unit 3201, Minneapolis, MN 55401 ("Property"), provide the following: 1) copies of all contracts and agreements for the performance of any such work; 2) copies of all checks or other documentation evidencing the source of funds used to make payment for those services; 3) all communications between the entities providing services to either the debtor and/or his spouse; and 4) copies of all instruments evidencing or relating to payments for those services or goods. If payments were made by wire transfer, provide a copy of the account statement for any account from which such transfers were made.

7. Provide a list of the accounts receivable listed in the schedules, including the name, address and amount of each receivable.

8. For all utilities, mortgage payments and other payments associated with or relating to ownership of the Property and the rental of 3749 Sunbury Alcove, Woodbury, MN, provide copies of all bills for those items from September 1, 2013 to date.

9. Provide a copy of the HUD settlement statement for the Property purchased by Mr. Hansmeier in 2013, together with copies of all checks and wire transfers used in the purchase of the Property.

Thank you.

Very truly yours,

Randall L. Seaver
Trustee
*rseaver@fssklaw.com*

RLS:tlj

2

LAW OFFICE

# FULLER, SEAVER, SWANSON & KELSCH, P.A.

A PROFESSIONAL ASSOCIATION

Timothy D. Fuller
Randall L. Seaver
Matthew D. Swanson
Chad A. Kelsch

PORTLAND CORPORATE CENTER
12400 PORTLAND AVENUE SOUTH, SUITE 132
BURNSVILLE, MN 55337

Telephone: (952) 890-0888
Facsimile: (952) 890-0244

December 23, 2015


Padraigin Browne
3749 Sunbury Cove
Woodbury, MN 55125

RE:   Paul Hansmeier
      BKY 15-42460

Dear Ms. Browne:

Enclosed please find a copy of a Rule 2004 subpoena in the above matter. We had a process server attempt personal service at the above address on December 23, 2015. I want to make sure you get a copy of this subpoena as soon as possible because some of the information sought by the subpoena relates to the recent sale of the property at 100 3rd Avenue South #3201, Minneapolis, MN. We need all of the information relating to that sale as soon as possible in order analyze rights and claims. If you are represented by counsel, please provide me with the contact information for the attorney.

Also, if you will accept service of the subpoena by this letter, please let me know by email to the address below.

Very truly yours,

Matthew D. Swanson
mswanson@fssklaw.com

Enclosure

EXHIBIT 2

ASSOCIATED BANK N.A.                                        *Page 1 of 2*
200 N ADAMS ST
PO BOX 19006                                     FINANCIAL STATEMENT OF ACCOUNTS
GREEN BAY, WI 54307-9006                              Primary Account:      1853
24 Hour Telephone Banking: 1-800-236-7160
24 Hour Customer Care Center: 1-800-236-8866           *Statement Activity Period*
                                                       *09/21/2015 - 10/20/2015*

                                                          Bank: 001
                                                          Mail Code: 0S

PADRAIGIN L BROWNE
100 3RD AVE S UNIT 3201
MINNEAPOLIS MN 55401-2728

| FINANCIAL SUMMARY | ACCOUNT# | BALANCE |
|---|---|---|
| **DEPOSIT ACCOUNTS** | | |
| Associated Checking | 1853 | $5,056.08 |

| DEPOSIT ACCOUNTS |
|---|

**Associated Checking**            853

| | |
|---|---|
| Beginning Balance | 6,984.98 |
| Plus: Deposits and Other Additions | 17,887.32 |
| Minus: Withdrawals and Other Deductions | 15,051.22 |
| Minus: Checks Paid | 4,765.00 |
| ENDING BALANCE ON 10/20/2015 | $5,056.08 |

**Deposits and Other Additions**

| | | |
|---|---|---|
| 09/23/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 168.30 |
| 09/29/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 360.40 |
| 09/30/2015 | WEB TO DDA FR DDA         )08  CONFIRMATION# 170114627491 | 5,000.00 |
| 09/30/2015 | SHUMAKER & SIEFF DIRECT DEP 355056020756S6D BROWNE,PADRAIGIN | 1,790.38 |
| 10/01/2015 | BENEFIT EXTRAS  CLAIM REIM 1548000 1883023 PADRAIGIN BROWNE | 454.54 |
| 10/09/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 314.50 |
| 10/14/2015 | WEB TO DDA FR DDA         )08  CONFIRMATION# 173718825212 | 2,000.00 |
| 10/15/2015 | WEB TO DDA FR DDA        I4008  CONFIRMATION# 161555842934 | 5,000.00 |
| 10/16/2015 | TMASTER RESALE  TICKETS 3180109 PADRAIGIN BROWNE | 299.20 |
| 10/20/2015 | WEB TO DDA FR DDA        I008  CONFIRMATION# 103728904261 | 2,500.00 |
| | TOTAL | $17,887.32 |

**Withdrawals and Other Deductions**

| | | |
|---|---|---|
| 09/23/2015 | CITI AUTOPAY    PAYMENT  0R        36004 PADRAIGIN L BROWNE | 500.00 |
| 09/23/2015 | NEW HORIZON    WEBPAYMENT  · | 673.00 |
| 09/28/2015 | NEW HORIZON    WEBPAYMENT  ·· | 633.00 |
| 09/29/2015 | TCF CONSUMER LEN DB CR MIX  :        8001 HANSMEIER PAUL | 4,698.14 |
| 10/01/2015 | PAYPAL       INST XFER  JESSICAELST PADRAIGIN BROWNE | 150.00 |
| 10/02/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS BROWNE,PADRAIGIN | 500.00 |
| 10/02/2015 | Glittleman-FirsIS RESIDENT  41768369 Padraigin Browne | 950.00 |
| 10/06/2015 | MAPLEWOOD TOYOTA CHECKPAYMT 1312 SERIAL NUMBER: 1312 | 1,000.00 |
| 10/07/2015 | KNOWLEDGE LEARNI WEBPAYMENT  W002 Padraigin  Browne | 680.90 |
| 10/07/2015 | BROWNE PADRAIGI TRANSFERS | 836.99 |
| 10/13/2015 | CITI PAYMENT    ONLINE PMT  :        J007 PADRAIGIN BROWNE | 152.21 |
| 10/13/2015 | TARGET CARD SRVC AUTO PYMT 7       .15439 BROWNE PADRAIGIN L | 288.61 |
| 10/13/2015 | KNOWLEDGE LEARNI WEBPAYMENT  W003 Padraigin  Browne | 680.90 |
| 10/14/2015 | COMENITY PAY SB  WEB PYMT         ···375 PADRAIGIN BROWNE | 92.10 |



EXHIBIT 3

PADRAIGIN L BROWNE                    Acct #      ..853                *Page 2 of 2*

## Withdrawals and Other Deductions  (continued)

| Date | Description | Amount |
|---|---|---|
| 10/16/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS BROWNE,PADRAIGIN | 700.00 |
| 10/19/2015 | SYNCHRONY BANK  PAYMENT ·  ............  /NNE,PADRAIGIN | 419.00 |
| 10/19/2015 | KNOWLEDGE LEARNI ACHPAYMENT  W004 Padraigin  Browne | 680.90 |
| 10/20/2015 | CHASE         AUTOPAYBLP ·        .462 BROWNE PADRAIGIN L | 1,415.47 |
| | TOTAL | $15,051.22 |

## Checks Paid

| DATE | CHECK# | AMOUNT | DATE | CHECK# | AMOUNT |
|---|---|---|---|---|---|
| 10/05/2015 | 1311 | 130.00 | 10/16/2015 | 1315 | 3,000.00 |
| 10/07/2015 | 1314 * | 1,635.00 | | | |
| | * Indicates a check number missing from sequence | | | TOTAL | $4,765.00 |

## Total Overdraft Fees and Total Returned Item Fees

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees* | $0.00 | $70.00 |
| Total Returned Item Fees** | $0.00 | $140.00 |

Please note if you have a negative balance for more than five business days, a continued overdraft fee of $7.00 per business day will also apply.
*Total Overdraft Fees include fees for: overdraft items or debits paid, NSF (Unavailable Funds) item or debit paid, and Continued overdraft fees.
** Fees for overdraft or NSF items returned unpaid.

## Balance Summary

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09/23/2015 | 5,980.28 | 10/05/2015 | 6,524.46 | 10/14/2015 | 3,472.25 |
| 09/28/2015 | 5,347.28 | 10/06/2015 | 5,524.46 | 10/15/2015 | 8,472.25 |
| 09/29/2015 | 1,009.54 | 10/07/2015 | 2,371.57 | 10/16/2015 | 5,071.45 |
| 09/30/2015 | 7,799.92 | 10/09/2015 | 2,686.07 | 10/19/2015 | 3,971.55 |
| 10/01/2015 | 8,104.46 | 10/13/2015 | 1,564.35 | 10/20/2015 | 5,056.08 |
| 10/02/2015 | 6,654.46 | | | | |

## Current Service Fee Period Balances

| | |
|---|---|
| Average Ledger Balance | $5,046.10 |
| Minimum Ledger Balance | $1,009.00 |

*20*

ASSOCIATED BANK N.A.
200 N ADAMS ST
PO BOX 19006
GREEN BAY, WI 54307-9006
24 Hour Telephone Banking: 1-800-236-7160
24 Hour Customer Care Center: 1-800-236-8866

*Page 1 of 2*

**FINANCIAL STATEMENT OF ACCOUNTS**

Primary Account:        1853

*Statement Activity Period*
*06/22/2015 - 07/20/2015*

Bank: 001

Mail Code: 0S

PADRAIGIN L BROWNE
100 3RD AVE S UNIT 3201
MINNEAPOLIS MN 55401-2728

IMPORTANT NOTICE ABOUT YOUR DEPOSIT ACCOUNT AGREEMENT: This Important Notice and Change in Terms ("Notice") identifies changes to Section 10 of your Deposit Account Agreement.

Throughout Section 10, we have modified the language to more clearly define overdraft fees and nonsufficient funds fees (NSF).

In Section 10.3.3, we have made changes to the posting order. Starting June 23, 2015, ATM withdrawals, nonrecurring point-of-sale Debit/ATM card transactions and ATM transfers out of your Account will post chronologically by the date and time of the transactions rather than when the Bank settles them.

We encourage you to keep a copy of this Notice with your Deposit Account Agreement. For the full Deposit Account Agreement, visit us online at AssociatedBank.com/Forms or stop by your local Associated Bank branch. If you have questions, please contact our 24/7/365 Customer Care team at 800-236-8866.

IMPORTANT NOTICE ABOUT ONLINE BANKING TERMS AND CONDITIONS: The Online Banking Terms and Conditions have been updated to reflect: (1) Customers with a 12-month add-on certificate of deposit (CD) account can now transfer funds into the account through Online Banking (Section III); and (2) We have clarified which security protocol must be supported by the Internet browser being used to access Online Banking (Section IV). If you have questions, please call our 24/7/365 Customer Care team at 800-236-8866 or chat with us online by clicking the Live Chat link.

| FINANCIAL SUMMARY | ACCOUNT# | BALANCE |
|---|---|---|
| **DEPOSIT ACCOUNTS** | | |
| Associated Checking | 3 | $4,020.59 |

| DEPOSIT ACCOUNTS |
|---|

**Associated Checking**                1853

| | |
|---|---|
| Beginning Balance | 206.30 |
| Plus: Deposits and Other Additions | 36,211.15 |
| Minus: Withdrawals and Other Deductions | 16,512.86 |
| Minus: Checks Paid | 15,884.00 |
| **ENDING BALANCE ON 07/20/2015** | **$4,020.59** |

**Deposits and Other Additions**

| Date | Description | Amount |
|---|---|---|
| 06/22/2015 | CHASE        AUTOPAYBLP 000000000127942 BROWNE PADRAIGIN L | 1,341.11 |
| 06/22/2015 | NEW HORIZON   WEBPAYMENT | 653.00 |
| 06/23/2015 | CUSTOMER DEPOSIT | 5,900.00 |
| 06/25/2015 | CUSTOMER DEPOSIT | 3,000.00 |
| 06/30/2015 | SHUMAKER & SIEFF DIRECT DEP 526058016790S6D BROWNE,PADRAIGIN | 4,862.50 |
| 07/01/2015 | BENEFIT EXTRAS  CLAIM REIM 15480001883023 PADRAIGIN BROWNE | 454.54 |
| 07/09/2015 | CUSTOMER DEPOSIT | 20,000.00 |
| | **TOTAL** | **$36,211.15** |



EXHIBIT 4

PADRAIGIN L BROWNE                    Acc          853              *Page 2 of 2*

### Withdrawals and Other Deductions

| Date | Description | | Amount |
|------|-------------|--|-------:|
| 06/22/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 06/22/2015 | CHASE       AUTOPAYBLP  000000000127942 BROWNE PADRAIGIN L | | 1,341.11 |
| 06/22/2015 | OD FEE RETURN | | 35.00 |
| 06/22/2015 | OD FEE RETURN | | 35.00 |
| 06/23/2015 | CITI AUTOPAY    PAYMENT  081730610267405 PADRAIGIN L BROWNE | | 500.00 |
| 06/25/2015 | CHASE        EPAY  2265390390 PADRAIGIN L BROWNE | | 1,000.00 |
| 06/29/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 06/30/2015 | TCF CONSUMER LEN DB CR MIX  992100083678001 HANSMEIER PAUL | | 4,385.10 |
| 07/01/2015 | NEW HORIZON    WEBPAYMENT | | 683.00 |
| 07/02/2015 | BK OF AMER VI/MC ONLINE PMT  CKFXXXXX7982POS BROWNE,PADRAIGIN | | 500.00 |
| 07/02/2015 | Gittleman-FirstS RESIDENT  37721183 Padraigin Browne | | 950.00 |
| 07/06/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/08/2015 | BROWNE PADRAIGI TRANSFERS | | 836.99 |
| 07/13/2015 | CITI PAYMENT    ONLINE PMT            0024 PADRAIGIN BROWNE | | 138.86 |
| 07/13/2015 | TARGET CARD SRVC AUTO PYM          I5439 BROWNE PADRAIGIN L | | 459.75 |
| 07/14/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/20/2015 | SYNCHRONY BANK   PAYMENT          '55956 BROWNE,PADRAIGIN | | 419.00 |
| 07/20/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/20/2015 | CHASE       AUTOPAYBLP            32 BROWNE PADRAIGIN L | | 1,964.05 |
| | | **TOTAL** | **$16,512.86** |

### Checks Paid

| DATE | CHECK# | AMOUNT | DATE | CHECK# | AMOUNT |
|------|--------|-------:|------|--------|-------:|
| 07/02/2015 | 1303 | 579.00 | 07/10/2015 | 1309 * | 15,305.00 |
| | * Indicates a check number missing from sequence | | | **TOTAL** | **$15,884.00** |

### Total Overdraft Fees and Total Returned Item Fees

| | Total For This Period | Total Year-to-Date |
|--|--|--|
| **Total Overdraft Fees*** | $0.00 | $70.00 |
| **Total Returned Item Fees**** | $70.00 | $140.00 |

Please note if you have a negative balance for more than five business days, a continued overdraft fee of $7.00 per business day will also apply.
*Total Overdraft Fees include fees for: overdraft items or debits paid, NSF (Unavailable Funds) item or debit paid, and Continued overdraft fees.
** Fees for overdraft or NSF items returned unpaid.

### Balance Summary

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|--------:|------|--------:|------|--------:|
| 06/22/2015 | 136.30 | 07/01/2015 | 7,132.24 | 07/10/2015 | 8,308.25 |
| 06/23/2015 | 5,536.30 | 07/02/2015 | 5,103.24 | 07/13/2015 | 7,709.64 |
| 06/25/2015 | 7,536.30 | 07/06/2015 | 4,450.24 | 07/14/2015 | 7,056.64 |
| 06/29/2015 | 6,883.30 | 07/08/2015 | 3,613.25 | 07/20/2015 | 4,020.59 |
| 06/30/2015 | 7,360.70 | 07/09/2015 | 23,613.25 | | |

### Current Service Fee Period Balances

| | |
|--|--:|
| Average Ledger Balance | $6,836.72 |
| Minimum Ledger Balance | $-1,787.00 |

ASSOCIATED BANK N.A.
200 N ADAMS ST
PO BOX 19006
GREEN BAY, WI 54307-9006
24 Hour Telephone Banking: 1-800-236-7160
24 Hour Customer Care Center: 1-800-236-8866

*Page 1 of 2*

**FINANCIAL STATEMENT OF ACCOUNTS**
Primary Account:        53

*Statement Activity Period*
*07/21/2015 - 08/20/2015*

Bank: 001

Mail Code: 0S

PADRAIGIN L BROWNE
100 3RD AVE S UNIT 3201
MINNEAPOLIS MN 55401-2728

INFORMATION ABOUT COMBINED BALANCES: Having combined deposit and/or investment balances with Associated Bank is one way to avoid a monthly maintenance fee on your Associated Checking or Associated Elite Checking account.

Combined balances include the aggregate average balance of any deposit and/or investment accounts using an identical customer taxpayer ID number on record.

Investment accounts exclude personal trusts, Individual Retirement Accounts (IRAs) or retirement plans serviced by Associated Trust Company (ATC) and individual retirement balances managed through Retirement Plan Services including 401(k) and Health Savings Investment accounts.

For specific details, please visit any Associated Bank location or call our 24/7/365 Customer Care team at 800-236-8866.

Securities and insurance products are NOT deposits or obligations of, insured or guaranteed by Associated Bank or any bank or affiliate, are NOT insured by the FDIC or any agency of the United States, and involve INVESTMENT RISK, including POSSIBLE LOSS OF VALUE.

IMPORTANT NOTICE ABOUT YOUR DEPOSIT ACCOUNT AGREEMENT: This Important Notice and Change in Terms ("Notice") identifies changes to Section 10 of your Deposit Account Agreement.

Throughout Section 10, we have modified the language to more clearly define overdraft fees and nonsufficient funds fees (NSF).

In Section 10.3.3, we have made changes to the posting order. Starting June 23, 2015, ATM withdrawals, nonrecurring point-of-sale Debit/ATM card transactions and ATM transfers out of your Account will post chronologically by the date and time of the transactions rather than when the Bank settles them.

We encourage you to keep a copy of this Notice with your Deposit Account Agreement. For the full Deposit Account Agreement, visit us online at AssociatedBank.com/Forms or stop by your local Associated Bank branch. If you have questions, please contact our 24/7/365 Customer Care team at 800-236-8866.

| FINANCIAL SUMMARY | ACCOUNT# | BALANCE |
|---|---|---|
| **DEPOSIT ACCOUNTS** | | |
| Associated Checking | 353 | $7,204.04 |

| DEPOSIT ACCOUNTS | | |
|---|---|---|
| **Associated Checking** | 353 | |
| Beginning Balance | | 4,020.59 |
| Plus: Deposits and Other Additions | | 16,435.58 |
| Minus: Withdrawals and Other Deductions | | 13,252.13 |
| **ENDING BALANCE ON 08/20/2015** | | **$7,204.04** |

**Deposits and Other Additions**

| | | |
|---|---|---|
| 07/27/2015 | CUSTOMER DEPOSIT | 5,900.00 |
| 07/31/2015 | SHUMAKER & SIEFF DIRECT DEP 372536357993S6D BROWNE,PADRAIGIN | 3,311.04 |
| 08/03/2015 | BENEFIT EXTRAS CLAIM REIM 1548000188023 PADRAIGIN BROWNE | 454.54 |



EXHIBIT 5

PADRAIGIN L BROWNE                    Acct #    1853              *Page 2 of 2*

### Deposits and Other Additions (continued)

| | | | |
|---|---|---|---|
| 08/03/2015 | CITICARDS CASH REWARD | 1485 BROWNE,PADRAIGIN L | 50.00 |
| 08/18/2015 | WEB TO DDA FR DDA | 08 CONFIRMATION# 143215035116 | 4,600.00 |
| 08/20/2015 | MN DEPT OF REVEN MN Rev Pay 000000388635392 PADRAIGIN L BROWNE | | 2,120.00 |
| | | **TOTAL** | **$16,435.58** |

### Withdrawals and Other Deductions

| | | | |
|---|---|---|---|
| 07/21/2015 | COMENITY PAY SB WEB PYM1 | ?975 PADRAIGIN BROWNE | 198.80 |
| 07/23/2015 | CITI AUTOPAY    PAYMENT | 361 PADRAIGIN L BROWNE | 500.00 |
| 07/27/2015 | CITI CARD ONLINE PAYMENT | 44566 PADRAIGIN L BROWNE | 200.00 |
| 07/27/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 07/29/2015 | TCF CONSUMER LEN DB CR MIX | ?001 HANSMEIER PAUL | 4,385.10 |
| 07/31/2015 | CHASE        EPAY        ? PADRAIGIN L BROWNE | | 1,000.00 |
| 08/03/2015 | BK OF AMER VI/MC ONLINE PMT CKFXXXXX7982POS BROWNE,PADRAIGIN | | 500.00 |
| 08/03/2015 | BK OF AMER VI/MC ONLINE PMT CKFXXXXX7982POS BROWNE,PADRAIGIN | | 500.00 |
| 08/03/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 08/04/2015 | Gittleman-FirstS RESIDENT 39263159 Padraigin Browne | | 100.00 |
| 08/04/2015 | Gittleman-FirstS RESIDENT 39194577 Padraigin Browne | | 950.00 |
| 08/06/2015 | BROWNE PADRAIGI TRANSFERS | | 836.99 |
| 08/12/2015 | TARGET CARD SRVC AUTO PYMT | 645439 BROWNE PADRAIGIN L | 162.90 |
| 08/13/2015 | CITI PAYMENT    ONLINE PMT | ?37 PADRAIGIN BROWNE | 140.34 |
| 08/17/2015 | NEW HORIZON    WEBPAYMENT | | 653.00 |
| 08/18/2015 | SYNCHRONY BANK PAYMENT | 956 BROWNE,PADRAIGIN | 419.00 |
| 08/19/2015 | CHASE        EPAY        ?4 PADRAIGIN L BROWNE | | 1,400.00 |
| | | **TOTAL** | **$13,252.13** |

### Total Overdraft Fees and Total Returned Item Fees

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| **Total Overdraft Fees\*** | $0.00 | $70.00 |
| **Total Returned Item Fees\*\*** | $0.00 | $140.00 |

Please note if you have a negative balance for more than five business days, a continued overdraft fee of $7.00 per business day will also apply.
\*Total Overdraft Fees include fees for: overdraft items or debits paid, NSF (Unavailable Funds) item or debit paid, and Continued overdraft fees.
\*\* Fees for overdraft or NSF items returned unpaid.

### Balance Summary

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07/21/2015 | 3,821.79 | 08/03/2015 | 5,146.27 | 08/17/2015 | 2,303.04 |
| 07/23/2015 | 3,321.79 | 08/04/2015 | 4,096.27 | 08/18/2015 | 6,484.04 |
| 07/27/2015 | 8,368.79 | 08/06/2015 | 3,259.28 | 08/19/2015 | 5,084.04 |
| 07/29/2015 | 3,983.69 | 08/12/2015 | 3,096.38 | 08/20/2015 | 7,204.04 |
| 07/31/2015 | 6,294.73 | 08/13/2015 | 2,956.04 | | |

### Current Service Fee Period Balances

| | |
|---|---|
| Average Ledger Balance | $4,303.55 |
| Minimum Ledger Balance | $2,303.00 |

LAW OFFICE

# FULLER, SEAVER, SWANSON & KELSCH, P.A.
A PROFESSIONAL ASSOCIATION

Timothy D. Fuller
Randall L. Seaver
Matthew D. Swanson
Chad A. Kelsch

PORTLAND CORPORATE CENTER
12400 PORTLAND AVENUE SOUTH, SUITE 132
BURNSVILLE, MN 55337

Telephone: (952) 890-0888
Facsimile: (952) 890-0244

**Via email at barbara@barbaramaylawoffice.com**

April 7, 2016

Barbara J. May
Attorney at Law
2780 Snelling Ave N. Suite 102
Roseville, MN 55113

RE:    Paul Hansmeier/BKY 15-42460

Dear Barbara:

As you know, I have received another communication from Mr. Hansmeier regarding the funds held in the trustee's account for this case at Associated Bank. Mr. Hansmeier is again threatening litigation against the trustee relating to a lack of interest on funds held in that account. I am writing to again advise you and the debtor that any such litigation would be without actual legal basis and would result in an immediate motion against Mr. Hansmeier and/or his attorney for sanctions.

The trustee's Hansmeier account at Associated Bank is in full compliance with applicable trustee guidelines. I strongly suggest that you or your client contact Assistant U.S. Trustee, Robert Raschke, to confirm that fact. The language to which Mr. Hansmeier refers was from the guidelines in effect many years ago when there was an availability of interest bearing accounts for funds held by Chapter 7 trustees. That is no longer the case.

Coincidentally, Mr. Hansmeier's law firm, Class Justice, LLC, maintains its business account at Associated Bank. The interest rate paid on that account is zero. His personal account at Associated Bank pays zero percent interest. When Mr. Hansmeier was holding hundreds of thousands of dollars in a TCF Bank account under the name of Monyet, LLC, the interest rate that Mr. Hansmeier received on that account was zero percent. Enclosed with this correspondence, is a copy of a March 30, 2012 statement from the Monyet, LLC account confirming that fact. Finally, when the $180,000 was concealed in a box in the debtor's home, those funds were also generating zero percent interest.

Once again, if your client proceeds with litigation based upon his frivolous "interest issue," sanctions will be sought against him.

Very truly yours,

Matthew D. Swanson
Enclosure

cc:    Robert Raschke via email

EXHIBIT 6

TCF NATIONAL BANK
801 MARQUETTE AVE
MINNEAPOLIS MN  55402

STATEMENT DATE
03-30-12

L212
0

ATDFTFFTDTTFFFDFTODADTDADAADTFFFAFDTAFFDTTFATAATAFTAAAFDFDFDTFTFT

0      93 99
MONYET LLC
UNIT 455
225 PORTLAND AVE
MINNEAPOLIS MN  55401-2649

REFER YOUR FRIENDS TO TCF AND GET
REWARDED! GET $25 FOR EVERY FRIEND
YOU REFER. PICK UP YOUR REFERRAL FORMS
AT ANY TCF BANK OR PRINT THEM ONLINE
AT TCFBANK.COM. OFFER SUBJECT TO
LIMITATIONS AND REQUIREMENTS. SEE A
TCF REPRESENTATIVE FOR DETAILS.

REDUCE THE CLUTTER IN YOUR MAILBOX BY SWITCHING OFF PAPER STATEMENTS.  DECREASE THE LIKELIHOOD OF
FRAUD BY REMOVING A PAPER TRAIL AND OPTING FOR ONLINE STATEMENTS ONLY.  NEVER AGAIN WILL YOU HAVE
TO WORRY ABOUT YOUR STATEMENTS IN THE MAIL!  VISIT WWW.TCFBANK.COM.  MEMBER FDIC.

TCF SMALL BUSINESS CHECKING                    STATEMENT PERIOD 03-01-12 THROUGH 03-30-12
ACCOUNT NUMBER                    212
ACCOUNT SUMMARY

| BALANCE 02-29-12 | CHECKS/WITHDRAWALS | DEPOSITS/ADDITIONS | BALANCE 03-30-12 |
|---|---|---|---|
| 320,982.50 | .00 | .00 | 320,982.50 |

INTEREST EARNED IN STATEMENT PERIOD      .00
ANNUAL PERCENTAGE YIELD EARNED     .00%

FOR BALANCE AND CHECKS PAID INFORMATION, DEPOSIT VERIFICATION, FUNDS TRANSFERS, AND OTHER CUSTOMER SERVICE,
VISIT US ONLINE AT TCFBANK.COM OR CALL 1-800-823-2265 OR TDD 1-800-343-6145.  YOU CAN ALSO DIRECT INQUIRIES TO
THE ADDRESS SHOWN AT THE TOP OF THIS PAGE. FOR ALL ACCOUNTS OTHER THAN TCF CHOICE CHECKING, TCF CHARGES UP TO
$37 FOR OVERDRAFTS AND RETURNED ITEMS. FOR TCF CHOICE CHECKING, TCF CHARGES UP TO $28 FOR EACH DAY YOUR ACCOUNT
IS OVERDRAWN BY MORE THAN $5, AND $27 FOR ANY DAY THAT WE RETURN ITEMS WITHOUT PAYING THEM. SEE REVERSE SIDE
FOR MORE INFORMATION ABOUT OVERDRAFTS.